UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
A&E PARTNERS HOLDING, LLC and A&E
PARTNERS HOLDING I, LLC,

        Plaintiffs,

  -against-

IAC/INTERACTIVE CORP. f/k/a USA
INTERACTIVE,

        Defendant

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

08 Civ. 4734 (JGK)

**DECLARATION OF JANET M. WEISS IN SUPPORT OF DEFENDANT IAC/INTERACTIVECORP'S MOTION TO REFER ACTION TO BANKRUPTCY COURT**

Pursuant to 28 U.S.C. § 1746, I, Janet M. Weiss, under penalty of perjury, declare as follows:

1.  I am a member of the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), attorneys for defendant IAC/InterActiveCorp ("IAC") in above-captioned action. I submit this Declaration in Support of IAC's Motion to Refer the above-captioned action to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

2.  Gibson Dunn was retained by IAC to represent it in this action shortly after its receipt of the summons and complaint filed in this action. IAC received such summons and complaint on April 21, 2008.

3.  PRC's disclosure statement (the "Disclosure Statement") as approved by the Bankruptcy Court on May 8, 2008 (the "May 8, 2008 Bankruptcy Order") provides that the leases that PRC will assume pursuant to its Joint Plan of Reorganization (the "Plan") will be set forth on Schedule 8.01(B), which will be contained in a Plan Supplement. The Plan Supplement

will be filed on or before June 2, 2008. *See* Disclosure Statement at 55; May 8, 2008 Bankruptcy Order.

4.    I understand that in conversations with Stephen R. Dubé, the chief restructuring officer of PRC, LLC f/k/a Precision Response Corp. ("PRC"), Mr. Dubé informed IAC, that PRC intends to assume the lease agreement, dated March 14, 2003, between PRC, on the one hand, and A&E Partners Holding, LLC and A&E Partners Holding I, LLC (collectively, "A&E"), on the other hand (the "Lease"), and that the Lease will be identified on Schedule 8.01(B) of the Plan Supplement.

5.    Pursuant to the requirements of sections 365(a) and 1123(b)(2) of Title 11 of the United State Code (the "Bankruptcy Code"), PRC is required to cure all defaults under the Lease, other than certain nonmonetary defaults not applicable here. The cure obligation includes any obligation PRC has under the Lease, including any unpaid rent, real property taxes and related costs, expenses, interest and attorneys fees, all of which are treated as additional rent pursuant to the terms of the Lease.

6.    A&E has filed a proof of claim dated April 21, 2008 in PRC's bankruptcy case, which claimed the taxes sought in this action, along with any unpaid rent and obligations under the Lease.

7.    Annexed hereto as the following designated exhibits are true and correct copies of the following documents:

| EXHIBIT | DOCUMENT |
| --- | --- |
| A | Complaint dated April 2, 2008 |
| B | Voluntary Petition of PRC dated January 23, 2008 |
| C | Notice of Appearance and Request for Service of Documents filed by Ilana Volkov on behalf of A&E Partners Holding I LLC and A&E Partners Holding |

|   | LLC dated February 6, 2008 |
|---|---|
| D | A&E Proof of Claim, dated April 24, 2008 |
| E | Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated May 2, 2008 |
| F | Disclosure Statement for PRC's Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated May 2, 2008 |
| G | Bankruptcy Court Order dated May 8, 2008 |
| H | July 10, 1984 Standing Order of Reference to Bankruptcy Judges of then-Acting Chief Judge Robert J. Ward |

I declare under penalty of perjury that foregoing is true and correct.

Executed at New York, New York this 20th day of May, 2008.

By: _Janet Weiss_____
Janet M. Weiss

100449613_3.DOC

3

# Exhibit A

Served 4-21-08

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A&E PARTNERS HOLDING, LLC and A&E
PARTNERS HOLDING I, LLC,

                    Plaintiffs,

          v.

IAC/INTERACTIVE CORP. f/k/a USA
INTERACTIVE,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Index No. **105288/2008**

**SUMMONS**

Plaintiffs' designates New York
County as the place of trial. The
basis of the venue is New York
County is Plaintiffs' place of
business pursuant to C.P.L.R.
§503(c).

TO THE ABOVE-NAMED DEFENDANT:

        **YOU ARE HEREBY SUMMONED** to answer the Complaint in this

action and to serve a copy of your Answer, or, if the Complaint is not served with this

Summons, to serve a Notice of Appearance, on the Plaintiff's attorneys within twenty

(20) days after the service of this summons, exclusive of the day of service (or within

thirty (30) days after service is complete if this summons is not personally delivered to

you within the State of New York).

        In case of your failure to appear or answer, judgment will be taken against

you by default for the relief demanded in the complaint.

        New York, New York
        DATED:  April 2, 2008

45519/0001-1516542v1

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Plaintiffs

By:_____
    Leo V. Leyva
    900 Third Avenue
    16th Floor
    New York, NY  10022
    (212) 752-8000

TO:    IAC/Interactive Corp.
       555 West 18th Street
       New York, New York 10011

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-------------------- -----------------------------------

A&E PARTNERS HOLDING, LLC and A&E
PARTNERS HOLDING I, LLC,

                    Plaintiffs,

    -against-

IAC/INTERACTIVE CORP. f/k/a/ USA
INTERACTIVE,

                    Defendants

-------------------- -----------------------------------

Index No.

**COMPLAINT**

Plaintiffs, A&E Partners Holding, LLC ("A&E Partners") and A&E Partners Holding I,

LLC ("A&E Partners I" and together with A&E Partners, collectively referred to herein as

"A&E"), by their attorneys, Cole, Schotz, Meisel, Forman & Leonard, P.A., complaining against

Defendant, IAC/Interactive Corp. f/k/a/ USA INTERACTIVE ("IAC"), alleges and states as

follows:

<u>**PARTIES**</u>

    1.    A&E Partners and A&E Partners I are limited liability companies organized under

the laws of the State of Delaware.  A&E has its principal place of business at 450 Seventh

Avenue, 45th Floor, New York, NY 10123.

    2.    Upon information and belief, IAC is and at all relevant times was a corporation

incorporated and organized under the laws of the State of Delaware, and maintains its principal

place of business at 555 West 18th Street, New York, NY 10011.

## FACTS COMMON TO ALL CLAIMS

3.    Pursuant to a written lease agreement dated March 14, 2003 (the "Lease"),

between Parker Real Estate Partners III, LLLP ("Parker"), as landlord, and PRC LLC, formerly

known as Precision Response Corp ("PRC"), as tenant, Parker leased to PRC a certain parcel of

land with buildings and improvements thereon located at 19500 South Dixie Highway, Cutler

Ridge, Miami Dade County, Florida 33157 (the "Premises").

4.    On May 11, 2007 Parker assigned the Lease to A&E.

5.    IAC guaranteed PRC's performance and obligations under the Lease pursuant to a

Guaranty (the "Guaranty").

6.    Article 3, Section 3.01 of the Lease, titled "Payment of Taxes and Assessments,"

requires PRC to pay, among other things, real estate taxes with respect to the Premises:

> 3.01 During the Term Tenant shall, as additional rent, pay
> to the taxing authority directly. . .before any fine, penalty, interest
> or cost may be added thereto, or become due or be imposed by
> operation of law for the non payment thereof, all taxes (including
> ad valorem real property taxes, personal property and sales taxes, if
> any), assessments, water and sewer rents, rates and charges, transit
> taxes, charges for public utilities, excises, levies, license and
> permit fees and other governmental charges, general and special,
> ordinary and extraordinary, foreseen and unforeseen, of any kind
> and nature whatsoever which at any time may be assessed, levied,
> confirmed, imposed upon, or grow or become due and payable out
> of or in respect of, or become a lien on the Demised Premises. . . .

7.    Pursuant to Article 31, Section 31.01 of the Lease, titled "Guaranty, Financial

Statements and Audits," IAC agreed to absolutely, irrevocably and unconditionally the Lease:

> 31.01 This Lease shall be absolutely, irrevocably and
> unconditionally guaranteed by USA Interactive, a Delaware
> Corporation (jointly and severally and collectively the
> "Guarantor") to secure Tenant's payment and faithful performance
> of each of Tenant's obligations under this Lease.  Guarantor shall
> execute and deliver to Landlord prior to the Lease Effective Date
> the form of Guaranty attached hereto as Schedule C, which

2

Guaranty shall be executed and delivered to Landlord on the Lease Effective Date.

8.    In turn, Section 2 of the "Guaranty" provides:

> 2.    The Guarantor hereby absolutely, irrevocably and unconditionally guarantees (as a primary obligor and not merely as a surety) to Landlord, its successors, assigns and participants the full and prompt payment of all sums due and payable to the Landlord under the Lease on the dates same shall become due and payable, whether by lapse of time, acceleration of maturity or otherwise. The Guarantor hereby agrees that if Tenant shall fail to pay the sums due under the Lease in accordance with its terms, then the Guarantor shall fully and punctually make such payments and, if there shall be a default under any provision of any of the Lease, then the Guarantor shall satisfy such obligation and cure any such default.

9.    Section 3 of the "Guaranty" states, in pertinent part:

> 3.    The obligations, covenants, agreements and duties of the Guarantor under this Guaranty shall in no way be affected or impaired by: (i) the modification or amendment (whether material or otherwise) of any of the obligations of Tenant; (ii) the voluntary or involuntary bankruptcy or rejection of the Lease by a trustee or debtor in bankruptcy, assignment for the benefit of creditors, reorganization, or other similar proceedings affecting Tenant; (iii) the release of Tenant from performance or observance of any of the agreements, covenants, terms or conditions contained in this Guaranty or under the Lease by the operation of law including, but not limited to, the release of Tenant's obligation to pay interest of attorney's fees. . . .

10.    The combined ad valorem taxes and non-ad valorem assessments for the Premises for the 2007 calendar year were $244,755.57 (the "Assessment"). The Assessment had to be paid by March 31, 2008.

11.    On January 23, 2008, PRC filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York.

12.    PRC did not pay the Assessment on March 31, 2008, despite due demand by A&E.

3

43519/0001-3109808v1

13.    Sections 6.01 and 6.02 of the Lease, titled "Landlord's Rights to Perform Tenant's Covenants," state, in pertinent part:

6.01    If Tenant shall at any time fail to pay any Imposition in accordance with the provision of Article 3 hereof, or to take out, pay for, maintain or deliver any of the insurance policies provided for in Article 5 hereof, or shall fail to make any other payment or perform any other material act on its part to be made or performed, then Landlord, after ten (10) days' written notice to Tenant describing the alleged failure and the actions required by Tenant to cure such failure (or without notice in case of an emergency or failure to provide any insurance) and without waiving or releasing Tenant from any obligations of Tenant contained in this Lease, may (but shall be under no obligation to): (a) pay any Imposition payable by Tenant pursuant to the provisions of Article 3 hereof or (b) take out, pay for and maintain any of the insurance policies provided for in Article 5 hereof, or (c) make any other payment or perform any other act on Tenant's part to be made or performed as in this Lease provided. . . .

6.02    All reasonable sums so paid by Landlord and all costs and expenses incurred by Landlord in connection with the performance of any such act, together with interest thereon at the Default Rate from the respective dates of Landlord's making of each such payment or incurring of each such cost and expense (but in no event earlier that ten (10) days after Landlord's written notice to Tenant), shall constitute additional rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand, and Landlord shall not be limited in the proof of any damages. . . .

14.    Exercising its rights and remedies under Article 6 of the Lease, A&E paid the Assessment.

15.    Under the terms of the Lease and the Guaranty, IAC is liable to A&E for the Assessment and all costs and expenses incurred by A&E in connection with the payment thereof, together with any interest thereon at the default rate and attorneys fees.

4

45319/0001-3109808v1

## FIRST CAUSE OF ACTION
### (Breach of Guaranty)

16.    A&E repeats and realleges the allegations set forth in paragraphs 1 through 15 above, as if the same were fully set forth herein.

17.    In light of PRC's anticipatory repudiation and despite due demand, IAC has failed to pay or agree to pay the taxing authority or in the alternative A&E on PRC's behalf.

18.    Based upon the foregoing, IAC is directly liable to A&E in the amount of $244,755.57, all costs and expenses incurred by Plaintiffs in connection with their payment of the Assessment, together with interest thereon at the default rate, plus A&E's attorneys' fees and costs as provided in Article 26, Sections 26.01-26.02 of the Lease, titled "Attorneys' Fees and Costs, Notice of Litigation."

WHEREFORE, Plaintiffs demand that judgment be entered against the Defendant as follows:

A.    On all Causes of Action, awarding Plaintiffs a money judgment against Defendant, in the amount of $244,755.57, all costs and expenses incurred by Plaintiffs in connection with their payment of the Assessment,  together with interest thereon at the default rate, attorneys' fees and costs;

B.    Awarding such other and further relief as this Court deems just and proper.

5

DATED:   New York, New York       COLE, SCHOTZ, MEISEL,
           April 2, 2008              FORMAN & LEONARD, P.A.
                                 A Professional Corporation
                                 Attorneys for Plaintiffs, A&E Partners Holding,
                                 LLC and A&E Partners Holding I, LLC

                           By:_____
                              Leo V. Leyva
                              900 Third Avenue, 16th floor
                              New York, NY 10022-4728
                              (212) 752-8000

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____

A&E PARTNERS HOLDING, LLC and A&E
PARTNERS HOLDING I, LLC,

                    Plaintiffs,

  -against-                          INDEX NO.

IAC/INTERACTIVE CORP. f/k/a USA
INTERACTIVE,

                    Defendant.
_____

## SUMMONS AND COMPLAINT

LEO V. LEYVA, ESQ.
Cole Schotz Meisel Forman & Leonard, P.A.
A Professional Corporation
900 Third Avenue, 16th Floor
NEW YORK, NEW YORK 10022-1906
(212) 752-8000
Attorneys for A&E Partners Holding, LLC and A&E Partners Holdings I, LLC

Service of a copy of the within SUMMONS AND COMPLAINT is hereby admitted.

Dated:  April 2, 2008

                                 Attorneys for A&E Partners Holding, LLC and
                                 A&E Partners Holdings I, LLC

# Exhibit B

(Official Form 1) (1/08)

| United States Bankruptcy Court<br>Southern District of New York | Voluntary Petition |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**PRC, LLC** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**N/A** |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**Precision Response Corp.; Panther/DCP Acquisition, LLC** | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names):<br>**N/A** |
| Last four digits of Social-Security No./Complete EIN or other Tax-I.D. No. (if more than one, state all):<br>**EIN # 592194806** | Last four digits of Social-Security No./Complete EIN or other Tax-I.D. No. (if more than one, state all):<br>**N/A** |
| Street Address of Debtor (No. and Street, City, and State):<br>**8151 Peters Road, Suite 4000**<br>**Plantation, Florida**<br><br>ZIP CODE **33324** | Street Address of Joint Debtor (No. and Street, City, and State):<br>**N/A**<br><br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>**Broward County** | County of Residence or of the Principal Place of Business:<br>**N/A** |
| Mailing Address of Debtor (if different from street address):<br><br>**N/A**    ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br><br>**N/A**    ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br><br>**N/A**    ZIP CODE | |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.)<br>_____ | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other **Business Process Outsourcing** | ☐ Chapter 7    ☐ Chapter 15 Petition for Recognition of a Foreign<br>☐ Chapter 9         Main Proceeding<br>☒ Chapter 11  ☐ Chapter 15 Petition for Recognition of a Foreign<br>☐ Chapter 12         Nonmain Proceeding<br>☐ Chapter 13 |

Tax-Exempt Entity
(Check box, if applicable.)
☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code).

**Nature of Debts (Check one box)**

☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."      ☒ Debts are primarily business debts.

**Chapter 11 Debtors**

Check one box:
☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).
☒ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).

Check if:
☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,190,000.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Check all applicable boxes:
☐ A plan is being filed with this petition.
☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(B).

**Filing Fee (Check one box)**

☒ Full Filing Fee attached
☐ Filing Fee to be paid in installments (applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.
☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B.

| Statistical/Administrative Information- UNDETERMINED | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | |

Estimated Number of Creditors

| ☐<br>1-49 | ☐<br>50-99 | ☐<br>100-199 | ☒<br>200-999 | ☐<br>1,000-5,000 | ☐<br>5,001-10,000 | ☐<br>10,001-25,000 | ☐<br>25,001-50,000 | ☐<br>50,001-100,000 | ☐<br>Over 100,000 |
|---|---|---|---|---|---|---|---|---|---|

Estimated Assets (Consolidated with affiliates)

| ☐<br>$0 to $50,000 | ☐<br>$50,001 to $100,000 | ☐<br>$100,001 to $500,000 | ☐<br>$500,001 to $1 million | ☐<br>$1,000,001 to $10 million | ☐<br>$10,000,001 to $50 million | ☐<br>$50,000,001 to $100 million | ☒<br>$100,000,001 to $500 million | ☐<br>$500,000,001 to $1 billion | ☐<br>More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|

Estimated Liabilities (Consolidated with affiliates)

| ☐<br>$0 to $50,000 | ☐<br>$50,001 to $100,000 | ☐<br>$100,001 to $500,000 | ☐<br>$500,001 to $1 million | ☐<br>$1,000,001 to $10 million | ☐<br>$10,000,001 to $50 million | ☐<br>$50,000,001 to $100 million | ☒<br>$100,000,001 to $500 million | ☐<br>$500,000,001 to $1 billion | ☐<br>More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|

HO1:\355220\13\7M3813!.DOC\68397.0001

(Official Form 1) (1/08)

<div align="right">FORM B1, Page 2</div>

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | **Name of Debtor(s):**<br>**PRC, LLC** |
|---|---|

| **All Prior Bankruptcy Case Filed Within Last 8 Years (If more than two, attach additional sheet.)** ||||
|---|---|---|
| Location<br>Where Filed: **N/A** | Case Number: **N/A** | Date Filed: **N/A** |
| Location<br>Where Filed: **N/A** | Case Number: **N/A** | Date Filed: **N/A** |

| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet.)** ||||
|---|---|---|
| Name of Debtor:<br>**See Attached Schedule 1** | Case Number: **Pending** | Date Filed: **1/23/08** |
| District: **Southern District of New York** | Relationship: **Affiliates** | Judge: **Pending** |

| **Exhibit A** | **Exhibit B** |
|---|---|
| (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>**NOT APPLICABLE**<br><br>☐   Exhibit A is attached and made a part of this petition. | (To be completed if debtor is an individual<br>whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.  I further certify that I have delivered to the debtor the notice required by § 342(b).<br><br>X _____<br>Signature of Attorney for Debtor(s)           Date |

| **Exhibit C** |
|---|
| Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?<br>☐   Yes, and Exhibit C is attached and made a part of this petition.<br>☒   No. (See Exhibit C attached hereto) |

| **Exhibit D** |
|---|
| **NOT APPLICABLE**<br>(To be completed by every individual debtor.  If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)<br><br>☐   Exhibit D completed and signed by the debtor is attached and made a part of this petition.<br><br>If this is a joint petition:<br><br>☐   Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition. |

| **Information Regarding the Debtor – Venue** |
|---|
| (Check any applicable box.)<br><br>☐   Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.<br><br>☒   There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.<br><br>☐   Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District. |

| **Certification by a Debtor Who Resides as a Tenant of Residential Property** |
|---|
| **NOT APPLICABLE**<br><br>☐   Landlord has a judgment against the debtor for possession of debtor's residence.  (If box checked, complete the following.)<br><br>                    _____<br>                    (Name of landlord that obtained judgment)<br><br>                    _____<br>                    (Address of landlord)<br><br>☐   Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and<br><br>☐   Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.<br><br>☐   Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(1)). |

(Official Form 1) (1/08)

FORM B1, Page 3

| Voluntary Petition | Name of Debtor(s): |
|---|---|
| *(This page must be completed and filed in every case)* | **PRC, LLC** |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
 Signature of Debtor

X _____
 Signature of Joint Debtor

_____
 Telephone Number (if not represented by attorney)

_____
 Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only **one** box.)

☐  I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐  Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition.  A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
 (Signature of Foreign Representative)

_____
 (Printed Name of Foreign Representative)

_____
 Date

### Signature of Attorney*

x  /s/ Alfredo R. Pérez
 _____
 Signature of Attorney for Debtor(s)

Alfredo R. Pérez, Esq. (AP3629)
 Printed Name of Attorney for Debtor(s)

Weil, Gotshal & Manges LLP
 Firm Name

700 Louisiana St., Suite 1600
 Address

Houston, Texas  77002

(713) 546-5000
 Telephone Number

1/23/08
 Date

* In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19B is attached.

_____
 Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
 Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
 Address

x _____

_____
 Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

x  /s/ H. Philip Goodeve
 _____
 Signature of Authorized Individual

H. Philip Goodeve
 Printed Name of Authorized Individual

Chief Financial Officer
 Title of Authorized Individual

1/23/08
 Date

## Schedule 1 to Chapter 11 Petition for PRC, LLC

| Name of Debtor:<br>Panther/DCP Intermediate Holdings, LLC | Case No.<br><br>08-_____ ( ) | Date Filed:<br>1/23/08 |
|---|---|---|
| District:<br>Southern District of New York | Relationship:<br><br>Parent | Judge:<br><br>Pending |

| Name of Debtor:<br><br>PRC B2B, LLC | Case No.<br><br>08-_____ ( ) | Date Filed:<br>1/23/08 |
|---|---|---|
| District:<br>Southern District of New York | Relationship:<br><br>Affiliate | Judge:<br><br>Pending |

| Name of Debtor:<br><br>Access Direct Telemarketing, Inc. | Case No.<br><br>08-_____ ( ) | Date Filed:<br>1/23/08 |
|---|---|---|
| District:<br>Southern District of New York | Relationship:<br><br>Affiliate | Judge:<br><br>Pending |

| Name of Debtor:<br>Precision Response of Pennsylvania LLC | Case No.<br><br>08-_____ ( ) | Date Filed:<br>1/23/08 |
|---|---|---|
| District:<br>Southern District of New York | Relationship:<br><br>Affiliate | Judge:<br><br>Pending |

On the date hereof, each of the affiliated entities listed above (including the debtor in this chapter 11 case) filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court For the Southern District of New York (the "Court"). A motion has been filed or shortly will be filed with the Court requesting that the chapter 11 cases of these entities be consolidated for procedural purposes only and jointly administered.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------x
In re                                           :
                                                :
PRC, LLC                                        :      Chapter 11
              Debtor                            :
                                                :      Case No. 08-_____  (___)
8151 Peters Road, Suite 4000                    :
Plantation, FL  33324                           :      Jointly Administered
EIN No. 592194806                               :
------------------------------------------------x
```

## EXHIBIT 'C' TO VOLUNTARY PETITION

1.       Identify and briefly describe all real or personal property owned by or in possession of the debtor that, to the best of the debtor's knowledge, poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety (attach additional sheets if necessary):

The Debtor does not believe it owns or possesses any real or personal property that poses

or is alleged to pose a threat of imminent and identifiable harm to the public health or safety.  To

the extent the Debtor has an interest in such property, to the best of the Debtor's knowledge, the

Debtor is in compliance with all applicable laws, including, without limitation, all environmental

laws and regulations.


2.       With respect to each parcel of real property or item of personal property identified in question 1, describe the nature and location of the dangerous condition, whether environmental or otherwise, that poses or is alleged to pose a threat of imminent and identifiable harm to the public health or safety (attach additional sheets if necessary):

The Debtor is not aware of any real or alleged dangerous conditions existing on or related

to any real or personal property owned or possessed by the Debtor.

## CERTIFICATE OF RESOLUTIONS

I, H. Philip Goodeve, a duly authorized officer of PRC, LLC, a Florida limited

liability company (the "Company"), hereby certify that at a special meeting of the Board of

Managers for the Company, duly called and held on January 23, 2008, the following resolutions

were adopted in accordance with the requirements of the Delaware Limited Liability Company

Law and that these resolutions have not been modified or rescinded and are still in full force and

effect on the date hereof:

RESOLVED, that, in the judgment of the Board, it is desirable and in the best interests of the Company, its creditors, employees, and other interested parties that a petition be filed by the Company, seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

RESOLVED, that each of the Chairman of the Board, the Chief Executive Officer, the Chief Financial Officer, and the Chief Restructuring Officer (each such officer or designee being an "Authorized Person" and all being the "Authorized Persons") are hereby authorized, empowered and directed, in the name and on behalf of the Company, to execute and verify petitions and amendments thereto under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of New York at such time or in such other jurisdiction as such Authorized Person executing the same shall determine.

RESOLVED, that the law firm of Weil, Gotshal & Manges LLP is hereby engaged as attorneys for the Company under a general retainer in the Chapter 11 Case, subject to any requisite bankruptcy court approval.

RESOLVED, that the firm of Evercore Partners is hereby engaged as financial advisors for the Company in the Chapter 11 Case, subject to any requisite bankruptcy court approval.

RESOLVED, that Stephen R. Dubé and the firm of CXO, LLC are hereby engaged as Chief Restructuring Officer and restructuring advisors, respectively, for the Company in the Chapter 11 Case, subject to any requisite bankruptcy court approval.

RESOLVED, that each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, and any employees or agents (including counsel) designated by or directed by any such officers, be, and each hereby is, authorized, empowered and directed, in the name

and on behalf of the Company, to execute and file all petitions, schedules, motions, lists, applications, pleadings and other papers, and to take and perform any and all further acts and deeds which he or she deems necessary, proper or desirable in connection with the Chapter 11 Case, with a view to the successful prosecution of such case.

RESOLVED, that each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to engage and retain all assistance by legal counsel, accountants, financial advisors, and other professionals in connection with the Chapter 11 Case, with a view to the successful prosecution of such case.

RESOLVED, that in connection with the Chapter 11 Case, the terms, conditions and other provisions reflected in the Terms of Senior Secured Superpriority Debtor-in-Possession Financing Facility (the "Financing Term Sheet") attached hereto as Exhibit A are hereby approved.

RESOLVED, that  in connection with the Chapter 11 Case, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized and empowered on behalf of and in the name of the Company, to cause the Company to make interim borrowings pursuant to arrangements on substantially the same terms contemplated by the Financing Term Sheet (the "Interim Arrangements") with such changes therein and additions thereto as such officer or officers causing the same may consider necessary, appropriate, desirable or advisable, such determination to be conclusively evidenced by such making of such changes.

RESOLVED, that in connection with the Chapter 11 Case, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized and empowered on behalf of and in the name of the Company, to negotiate, execute, deliver and perform or cause the performance of any notes, guarantees, security agreements, other agreements, certificates or instruments as such person considers necessary, appropriate, desirable or advisable to effectuate borrowings pursuant to the Interim Arrangements, such determination to be evidenced by such execution or taking of such action.

RESOLVED, that in connection with the commencement of the Chapter 11 Case, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to negotiate, execute, deliver and perform or cause the performance of a debtor-in-possession loan facility (including, in connection therewith, such guarantees, notes, security agreements and other agreements, certificates, or instruments as such officer or officers executing the same considers appropriate) on substantially the same terms and conditions reflected in the Financing Term Sheet with such

changes therein and additions thereto as such officer or officers executing the same may consider necessary, proper, desirable, or advisable, such determination to be conclusively evidenced by such execution or the taking of such action, and to consummate the transactions contemplated by such agreements or instruments on behalf of the Company and any affiliates thereof.

RESOLVED, that in connection with the commencement of the Chapter 11 Case by the Company, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to adopt a plan of reorganization on terms and conditions substantially similar to those included in the proposed plan term sheet attached hereto as Exhibit B, as such officer or officers executing the same may consider necessary, proper or desirable, such determination to be conclusively evidenced by such execution or the taking of such action, and to consummate the transactions contemplated by such agreements or instruments on behalf of the Company and any affiliates; and

RESOLVED, that each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, and any employees or agents (including counsel) designated by or directed by any such officers, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, to cause the Company to enter into, execute, deliver, certify, file and/or record, and perform, such agreements, instruments, motions, affidavits, applications for approvals or ruling of governmental or regulatory authorities, certificates or other documents, and to take such other action, as in the judgment of such persons shall be or become necessary, proper and desirable to effectuate a successful reorganization of the business of the Company.

RESOLVED, that each Authorized Person be, and each hereby is, authorized and empowered on behalf of and in the name of the Company, to execute such consents of the Company, as such Authorized Person considers necessary, proper or desirable to effectuate these resolutions, such determination to be evidenced by such execution or taking of such action.

RESOLVED, each Authorized Person, and such other officers of the Company as the Authorized Persons shall from time to time designate, be, and each hereby is, authorized, empowered and directed, in the name and on behalf of the Company, as the case may be, and any such actions heretofore taken by any of them are hereby ratified, confirmed and approved in all respects: (i) negotiate, execute, deliver and/or file any and all of the agreements, documents and instruments referenced herein, and such other agreements, documents and instruments and assignments thereof as may be required or as such officers deem appropriate or advisable, or to cause the negotiation, execution and delivery thereof, in the name and on behalf of the Company, as the case may be, in such form and substance as such officers may approve, together with such changes and

amendments to any of the terms and conditions thereof as such officers may approve, with the execution and delivery thereof on behalf of the Company by or at the direction of such officers to constitute evidence of such approval, (ii) negotiate, execute, deliver and/or file, in the name and on behalf of the Company any and all agreements, documents, certificates, consents, filings and applications relating to the resolutions adopted and matters ratified or approved herein and the transactions contemplated thereby, and amendments and supplements to any of the foregoing, and to take such other actions as may be required or as such officers deem appropriate or advisable in connection therewith, and (iii) doing such other things as may be required, or as may in their judgment be appropriate or advisable, in order to effectuate fully the resolutions adopted and matters ratified or approved herein and the consummation of the transactions contemplated thereby.

RESOLVED, that, any and all past actions heretofore taken by members of the Company in the name and on behalf of the Company in furtherance of any or all of the preceding resolutions be, and the same hereby are, ratified, confirmed, and approved.

IN WITNESS WHEREOF, I have set my hand this 23rd day of January, 2008.

/s/ H. Philip Goodeve
By:  H. Philip Goodeve
Title:  Chief Financial Officer

**EXHIBIT A**
**(DIP Term Sheet)**


**EXHIBIT A IS A VOLUMINOUS DOCUMENT**
**AND ACCORDINGLY HAS NOT BEEN ATTACHED.**
**IT IS AVAILABLE, HOWEVER, UPON REQUEST TO THE**
**DEBTORS.**

**EXHIBIT B**
**(Plan Term Sheet)**

## PRC, LLC

*The following is a summary (the "Preliminary Term Sheet") of certain material terms of a proposed restructuring plan (the "Plan") of PRC, LLC and its wholly-owned affiliates (collectively, "PRC"). This Preliminary Term Sheet is for discussion purposes only and remains subject to further review and comment. This Preliminary Term Sheet does not contain all the terms, conditions and other provisions of the Plan and does not constitute a commitment on behalf of the Postpetition Lenders, the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders or any of their respective affiliates to arrange or provide financing for or to PRC, compromise any existing debt or other obligations of PRC or agree to any restructuring plan of reorganization of PRC, except upon mutually satisfactory documentation and court orders, as applicable. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Debtor-In-Possession Financing Term Sheet. This is not a solicitation to vote for a Plan under Chapter 11 of the U.S. Bankruptcy Code, which can only be accomplished pursuant to a Disclosure Statement and voting process approved by the Bankruptcy Court.*

| | | |
|---|---|---|
| 1. | ***Corporate Structure Upon Emergence from Bankruptcy:*** | As of the Effective Date, Panther/DCP Intermediate Holdings, LLC ("Intermediate HoldCo") would be the sole owner of the equity interests of reorganized PRC, LLC ("New PRC") and a newly formed top tier holding company ("HoldCo") would be the sole owner of the equity interests of Intermediate HoldCo. The equity interests of HoldCo would be held as set forth below. |
| 2. | ***Treatment of Secured Claims of Postpetition Lenders:*** | As of the effective date of the Plan (the "Effective Date"), the secured claims of the Postpetition Lenders would be repaid in full by an exit facility (the "Exit Facility") having the following principal financial terms: |

Type of Facility:  Revolver or a combination revolver and term loan.

Borrower:  New PRC.

Guarantors:  All subsidiaries of New PRC, Intermediate HoldCo and HoldCo.

Facility Amount:  Not to exceed $40-$45 million (consisting of amounts drawn under the debtor-in-possession revolving facility (the "DIP Facility") at exit, plus go forward revolver needs per exit business plan).

Interest:  Market pricing.

Maturity Date:  3 years following the Effective Date.

Purpose:  Repayment of the Postpetition Lenders and working capital and general corporate purposes.

Security:  First priority liens upon all existing and after acquired assets of the Borrower and the Guarantors that constitute Collateral under the DIP Facility.

3.  *Treatment of Secured Claims of Prepetition First Lien Lenders:*

(A) As of the Effective Date, $40 million of the secured claims of the Prepetition First Lien Lenders would be rolled over at par as part of a second lien term loan facility (the "Second Lien Facility") having the following principal financial terms:

Type of Facility:  Term loan.

Borrower:  New PRC.

Guarantors:  Same as under the Exit Facility.

Facility Amount:  $40 million; provided that as of the Effective Date, the Second Lien Facility shall be deemed fully drawn.

Interest:  Market pricing.

Maturity Date:  4 years following the Effective Date.

Principal Amortization:  None.

Security:  Second priority liens upon all existing and after acquired assets of the Borrower and the Guarantors that constitute Collateral under the Exit Facility, which liens shall be subject and subordinate to the liens granted under the Exit Facility.

(B) As of the Effective Date, $40 million of the secured claims of the Prepetition First Lien Lenders would be exchanged for an unsecured note issued by Intermediate HoldCo having the following principal financial terms:

Borrower:  Intermediate HoldCo.

Guarantors:  None.

2

Principal Amount: $40 million.

Interest: 12% per annum, all of which is payable in kind no less frequently than quarterly.

Maturity Date: 5 years following the Effective Date.

Principal Amortization: None.

Security: None.

(C) As of the Effective Date, the balance of the secured claims of the Prepetition First Lien Lenders would be converted into 80% of the equity interests of HoldCo (the "Equity Interests"), subject to dilution as described below.

| | | |
|---|---|---|
| 4. | ***Treatment of Secured Claims of Prepetition Second Lien Lenders:*** | As of the Effective Date, all claims of the Prepetition Second Lien Lenders would be converted into 20% of the Equity Interests, subject to dilution as described below. |

The Prepetition Second Lien Lenders shall also receive warrants to purchase up to 4% of the fully diluted Equity Interests of HoldCo with an exercise price based upon an enterprise value of $170 million, and warrants to purchase up to an additional 2% of the fully diluted Equity Interests of HoldCo with an exercise price based upon an enterprise value of $200 million. The exercise period shall be from the Effective Date to a date that is 5 years from the Effective Date.

| | | |
|---|---|---|
| 5. | ***Treatment of Holders of Unsecured Claims:*** | On or as soon as practicable after the Effective Date, each holder of an allowed unsecured claim shall receive, on a pro rata basis, a cash distribution (in amounts yet to be determined) on terms and conditions mutually satisfactory to the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders under the Plan. |

| | | |
|---|---|---|
| 6. | ***Treatment of Equity Holders:*** | As of the Effective Date, all pre-existing equity interests in Panther/DCP Holdings, LLC shall be extinguished without releases from the estate, the Prepetition First Lien Lenders or the Prepetition Second Lien Lenders unless pursuant to separate consideration paid and satisfactory to |

3

individual Prepetition First Lien Lenders and Prepetition Second Lien Lenders.

| | | |
|---|---|---|
| 7. | **Litigation Rights Reserved:** | All other rights of the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders and the estate against third parties relating to the purchase and financing of PRC from IAC/InterActive Corp., if any, are expressly reserved and not contemplated by or otherwise affected by the Plan. The parties reserve their rights to separately discuss mutually agreeable litigation trust structures, but such discussion is not a term or condition of this Preliminary Term Sheet. |
| 8. | **Treatment of Management:** | A yet to be determined amount of the Equity Interests will be issued to management of New PRC. |
| | | The amounts and conditions upon which such Equity Interests will be issued, and the respective dilution between the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders will need to be determined by and be mutually satisfactory to the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders. |
| 9. | **Corporate Governance:** | Class of Equity Interests issued to the Prepetition First Lien Lenders shall be entitled to nominate 3 members of the board of directors or other relevant governing authority of HoldCo. |
| | | Class of Equity Interests issued to the Prepetition Second Lien Lenders shall be entitled to nominate 1 member of the board of directors or other relevant governing authority of HoldCo. |
| | | Management of New PRC shall be entitled to nominate 1 member of the board of directors or other relevant governing authority of HoldCo. |
| 10. | **Other Terms and Conditions:** | The Plan and all related documentation shall reflect the terms and conditions of this Preliminary Term Sheet to the parties' mutual satisfaction and shall contain such other terms and conditions as the parties mutually agree. |
| | | The debtor-in-possession financing facility, adequate protection in connection therewith and related pleadings shall be consistent with the provisions of the DIP Term Sheet which will be subject to and attached to the Lock- |

4

Up Agreement (as defined below).

Customary corporate provisions including corporate governance, tag along, drag along, preemptive, information access rights and sale or merger of New PRC to be discussed.

This Preliminary Term Sheet will become part of a pre-petition plan support agreement (the "Lock-Up Agreement") containing customary terms and conditions to be executed by PRC, Prepetition First Lien Lenders and Prepetition Second Lien Lenders in support of the Plan.

The distributions on and treatment of claims of Prepetition First Lien Lenders and Prepetition Second Lien Lenders contemplated herein shall become effective and binding only upon the confirmation and effective date of a Plan under Chapter 11 of the U.S. Bankruptcy Code which has been voted upon and approved by the Prepetition First Lien Lenders and Prepetition Second Lien Lenders, voting as separate classes, and approved by the Bankruptcy Court.

5

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------x
In re                                            :
                                                 :
PRC, LLC                                         :    Chapter 11
                Debtor                           :
                                                 :    Case No. 08-_____ (___)
8151 Peters Road, Suite 4000                     :
Plantation, FL  33324                            :    Jointly Administered
EIN No. 592194806                                :
-------------------------------------------------x
```

### LIST OF CREDITORS
### HOLDING 20 LARGEST UNSECURED CLAIMS

The following is a list of creditors holding the 20 largest unsecured claims against the Debtor.  This list has been prepared based upon the unaudited books and records of the Debtor.  The list reflects amounts from the Debtor's books and records as of January 18, 2008.  Except as set forth above, this list has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure.  The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is less than the total amount of such creditor's claim.  The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  Moreover, nothing herein shall affect the Debtors' right to challenge the amount or characterization of any claim at a later date.

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| Advanced Contact Solutions, Inc. | 17315 W. Sunset Blvd. Unit B Pacific Palisades, CA  90272<br><br>9th Floor, Citibank Center 8471 Paseo de Roxas 1200 Makati City, Philippines Attn: Victor M. Endaya | Trade Debt | Disputed | $14,800,065.52 |
| Verizon Network Integration Corp. | One Verizon Way Basking Ridge, NJ  07920 Attn: Procurement Legal Counsel<br><br>255 Parkshore Drive Folsom, CA  95630 Attn: Procurement Manager<br><br>52 E. Swedesford Rd. Malvern, PA  19355-1488<br><br>P.O. Box 650457 Dallas, TX  75265-0457 | Trade Debt | Subject to Set-off Disputed | $4,860,066.17 |

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| IAC/InterActiveCorp | 152 West 57th Street, 42 Floor New York, NY 10019 <br><br> c/o Gibson, Dunn & Crutcher LLP 333 South Grand Avenue Los Angeles, CA 90071 Attn: Karen E. Bertero, Esq. | Employee benefits | Contingent | $2,625,000.00 |
| AT&T | One AT&T Way Bedminster, NJ 07921-0752 Attn: General Counsel <br><br> P.O. Box 78214 Phoenix, AZ 85062-8214 | Trade Debt | Subject to Set-off | $1,742,008.60 |
| Verizon Business f/k/a MCI, Inc. | 22001 Loudon County Pkwy. Ashburn, VA 20147 Attn: General Counsel <br><br> PO Box 905236 Charlotte, NC 28290 | Trade Debt | Subject to Set-off Disputed | $881,299.36 |
| Nice Systems, Inc. | Attn: A/R Dept. 301 Route 17 North, 10th Floor Rutherford, NJ 07070 <br><br> 200 Plaza Drive, 4th Floor Secaucus, NJ 07094 Attn: Legal Department | Trade Debt | | $860,751.49 |
| iEnergizer (USA), Inc. | A-37 Sector – 60 Noida, India 201301 <br><br> 1120 Avenue of the Americas New York, NY 10036 Attn: Adarsh Agarwal | Trade Debt | Disputed | $856,000.00 |
| Oracle Corporation | 500 Oracle Parkway Redwood City, CA 94065 Attn: General Counsel <br><br> P.O. Box 71028 Chicago, IL 60694-1025 | Trade Debt | | $756,154.89 |
| Miami Dade County Tax Collector | 140 W. Flagler St., Ste. 1407 Miami, FL 33130-1575 | Taxing Authority | | $693,112.59 |
| Amov International Teleservices, S.A. | 249, 27 de Febrero Avenue Santo Domingo Dominican Republic Attn: Rosanna Ureña | Trade Debt | Subject to Set-off | $512,587.95 |
| U.S. Security Associates, Inc. | 200 Mansell Ct. E., Ste. 500 Roswell, GA 30076-4852 Attn: General Counsel <br><br> P.O. Box 931703 Atlanta, GA 31193 | Trade Debt | | $355,391.55 |

| Name of Creditor | Complete Mailing Address of Creditor Including Zip Code | Nature of Claim (trade debt, bank loan, government contract, etc.) | Indicate if Claim is contingent, unliquidated, disputed or subject to set-off | Amount of Claim (If secured also state value of security) |
|---|---|---|---|---|
| Sencommunications, Inc. | 1611 Allison Woods Lane<br>Tampa, FL  33619-7873 | Trade Debt | | $275,730.83 |
| Broward County Revenue Collector | Governmental Center Annex<br>115 South Andrews Avenue<br>Fort Lauderdale, FL  33301<br><br>Governmental Center Annex<br>815 N.E. 13th Street<br>Fort Lauderdale, FL  33301 | Taxing Authority | | $253,653.31 |
| C. Davis Electric Co., Inc. | 1701 S.W. 100th Terrace<br>Miramar, FL  33025-1841 | Trade Debt | | $208,419.64 |
| Dell Marketing, L.P. | One Dell Way, RR8<br>Round Rock, TX  78682<br>Attn:  General Counsel<br><br>P.O. Box 534118<br>Atlanta, GA  30353-4118 | Trade Debt | | $203,543.38 |
| TMP Worldwide, Inc. | 622 third Avenue, 39th Floor<br>New York, NY  10017<br>Attn:  General Counsel<br><br>P.O. Box 538361<br>Atlanta, GA  30353-0001 | Trade Debt | | $200,636.72 |
| Kroll Background America, Inc. | 1900 Church Street, Suite 400<br>Nashville, TN  37203<br>Attn:  General Counsel<br><br>900 Third Avenue, 8th Floor<br>New York, NY 10022<br>Attn:  General Counsel<br><br>P.O. Box 1418<br>Columbus, GA 31902-1418 | Trade Debt | | $189,762.00 |
| Customized Support Serv. Inc. | 319 Yard Drive<br>Verona, WI 53953 | Trade Debt | | $172,471.67 |
| PRC Plaza Associates, LLP | c/o Julianna Bork<br>4751 New Broad Street<br>Mail Code – Orlando – 0018<br>Orlando, FL  32814-6643 | Trade Debt | | $172,461.67 |
| American Express | World Financial Center<br>200 Vesey St.<br>New York, NY  10285<br>Attn:  General Counsel<br><br>P.O. Box 360001<br>Ft. Lauderdale, FL  33336-0001 | Trade Debt | Subject to Set-off | $124,706.84 |

## DECLARATION UNDER PENALTY OF PERJURY

I, the undersigned authorized officer of PRC, LLC, named as the debtor in this case (the "Debtor"), declare under penalty of perjury that I have read the foregoing list of creditors holding the twenty (20) largest unsecured claims against the Debtor and that it is true and correct to the best of my information and belief.

Dated:  January 23, 2008

<div style="margin-left:50%;">

H. Philip Goodeve _____

By:    H. Philip Goodeve

Title:   Chief Financial Officer

</div>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
In re                                                :
                                                     :
PRC, LLC                                             :        Chapter 11
                        Debtor                       :
                                                     :        Case No. 08-_____ (___)
8151 Peters Road, Suite 4000                         :
Plantation, FL  33324                                :        (Jointly Administered
EIN No. 592194806                                    :
----------------------------------------------------x

## LIST OF CREDITORS[1]

      Contemporaneously herewith, the Debtor and its affiliated debtors (the "Debtors") have filed a motion requesting a waiver of the requirement for filing a list of creditors pursuant to sections 105(a), 342(a), and 521(a)(1) of title 11 of the United States Code, Rules 1007(a)(1) and 2002(a), (f), and (l) of the Federal Rules of Bankruptcy Procedure, and Rule 1007-1 of the Local Bankruptcy Rules for the Southern District of New York, and General Orders M-133, M-137, M-138 and M-192 of the United States Bankruptcy Court for the Southern District of New York.  The Debtors propose to furnish their list of creditors to the proposed claims and noticing agent.  The Debtors have consulted with and received the approval of the Clerk of this Court to implement the foregoing procedures.

      The list of creditors will contain only those creditors whose names and addresses were maintained in the Debtors' consolidated database or were otherwise ascertainable by the Debtors prior to the commencement of these cases.  The schedules of liabilities to be subsequently filed should be consulted for a list of the Debtors' creditors that is comprehensive and current as of the date of the commencement of these cases.

---

[1]    The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------x
In re                                      :
                                           :
PRC, LLC                                   :      Chapter 11
                    Debtor                 :
                                           :      Case No. 08-_____  (___)
8151 Peters Road, Suite 4000               :
Plantation, FL  33324                      :      Jointly Administered
EIN No. 592194806                          :
------------------------------------------------------x
```

**STATEMENT OF SOCIAL-SECURITY NUMBER(S)**
*(or other Individual Taxpayer-Identification Number(s) ("ITIN(s)"))*

1.  Name of Debtor (Last, First, Middle):  <u>PRC, LLC</u>
*(Check the appropriate box and, if applicable, provide the required information.)*
    ☐ Debtor has a Social-Security Number and it is: _ _ _-_-_ _ _ _
        *(If more than one, state all.)*
    ☒ Debtor does not have a Social-Security Number but has an Individual
        Taxpayer-Identification Number (ITIN), and it is:
        <u>EIN No. 592194806.</u>
                *(If more than one, state all.)*
    ☐ Debtor does not have either a Social-Security Number or an Individual
        Taxpayer-Identification Number (ITIN).

2.  Name of Joint Debtor (Last, First, Middle):_____
*(Check the appropriate box and, if applicable, provide the required information.)*
    ☐ Joint Debtor has a Social-Security Number and it is: _ _ _-_-_ _ _ _
        *(If more than one, state all.)*
    ☐ Joint Debtor does not have a Social-Security Number but has an
        Individual Taxpayer-Identification Number (ITIN) and it is:
        _____.
                *(If more than one, state all.)*
    ☐ Joint Debtor does not have either a Social-Security Number or an
        Individual Taxpayer-Identification Number (ITIN).

I declare under penalty of perjury that the foregoing is true and correct.

        X    <u>/s/ H. Philip Goodeve</u>
             H. Philip Goodeve, Chief Financial Officer
             Date:  January 23, 2008

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------x
In re                                          :
                                               :
PRC, LLC                                       :        Chapter 11
                Debtor                         :
                                               :        Case No. 08-_____ (___)
8151 Peters Road, Suite 4000                   :
Plantation, FL 33324                           :        Jointly Administered
EIN No. 592194806                              :
--------------------------------------------------x
```

### LIST OF EQUITY SECURITY HOLDERS PURSUANT TO
### RULE 1007(a)(3) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

| Name and Last Known Address of Equity Interest Holder | Kind of Interest | Number of Interests Held |
|---|---|---|
| Panther/DCP Intermediate Holdings, LLC<br>208 Park Avenue<br>New York, NY   10017 | Limited Liability Company Membership Interests | 100% |

### DECLARATION UNDER PENALTY OF PERJURY

      I, the undersigned authorized officer of PRC, LLC, named as the debtor in this case, declare under penalty of perjury that I have reviewed the "List of Equity Security Holders" and that it is true and correct to the best of my knowledge, information and belief, with reliance on appropriate corporate officers.

      Dated:  January 23, 2008

                             By:    /s/ H. Philip Goodeve      
                                       H. Philip Goodeve
                                     Chief Financial Officer

# Exhibit C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 08-10239 (MG) |
| PRC, LLC, *et al.,* | Chapter 11 |
| | Jointly Administered |
| Debtors. | **NOTICE OF APPEARANCE AND REQUEST FOR SERVICE OF DOCUMENTS** |

TO:    Clerk, United States Bankruptcy Court
        Southern District of New York

    PLEASE TAKE NOTICE that the undersigned counsel hereby enters her appearance as

counsel for A&E Partners Holding, LLC and A&E Partners Holding I, LLC, pursuant to Federal

Rules of Bankruptcy Procedure 2002 and 9010(b), and demands that all notices given or required

to be given in this case and all papers served or required to be served in this case be given to and

served upon the undersigned at the following office and address:

> **COLE, SCHOTZ, MEISEL,**
> **FORMAN & LEONARD, P.A.**
> Court Plaza North
> 25 Main Street
> P.O. Box 800
> Hackensack, NJ 07602-0800
> Attn:   Ilana Volkov, Esq.
> Phone:    (201) 489-3000
> Facsimile: (201) 489-1536
> E-mail: ivolkov@coleschotz.com

    PLEASE TAKE FURTHER NOTICE that the foregoing demand includes not only the

notices and pleadings referred to in the Federal Rules of Bankruptcy Procedure specified above,

but also includes, without limitation, notices of any application, motion, petition, pleading,

request, complaint, or demand, whether formal or informal, whether written or oral, and whether

transferred or conveyed by mail, delivery, telephone, telegraph, telex, electronically or

otherwise, which affect or seek to affect in any way the Debtors or their respective property

and/or property of the estate.

<div align="center"></div>

                                        COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation
Counsel for A&E Partners Holding, LLC and
A&E Partners Holding I, LLC


By: ___/s/ Ilana Volkov_____
      Ilana Volkov
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Telecopier

DATED:  Hackensack, New Jersey
          February 6, 2008

45519/0001-1509715v1

**CERTIFICATION OF SERVICE**

I certify that on February 6, 2008, the foregoing Notice of Appearance was served by electronic transmission (CM/ECF System) to the parties on the clerk's list who receive electronic notification of filings.

_____ */s/ Ilana Volkov*_____
ILANA VOLKOV

DATED:  February 6, 2008

45519/0001-1509715v1

# Exhibit D

United States Bankruptcy Court for the Southern District of New York
PRC, LLC Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5082
New York, NY 10150-5082

# PROOF OF CLAIM

| In Re: PRC, LLC, Inc., et al. Debtors. | Chapter 11 Case No. 08-10239 (MG) Jointly Administered |
|---|---|

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|

**PRC, LLC**

Filed: USBC - Southern District of New York
PRC LLC, Et Al.
08-10239 (MG)    0000000291

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

A&E Partners Holding, LLC and A&E Partners
Holding I, LLC
c/o Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North, 25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
(Attn: Ilana Volkov, Esq)
Telephone number: (201) 489-3000    Email Address: ivolkov@coleschotz.com

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
   (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____    Email Address: _____

1. Amount of Claim as of Date Case Filed: $244,755.57 plus all applicable interest and fees under the Lease
   If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges.

2. Basis for Claim: Real estate taxes pursuant to Lease Agreement
   (See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

   Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
   Describe: _____

   Value of Property: $_____    Annual Interest Rate _____%

   Amount of arrearage and other charges as of time case filed included in secured claim, if any:

   $_____    Basis for perfection: _____

   Amount of Secured Claim: $_____    Amount Unsecured: $_____

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

   **Amount entitled to priority:**

   $_____

* Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment

6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

APR 2 4 2008

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 7/21/08 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

2601732

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
Fill in the name of the debtor in the bankruptcy case, and the bankruptcy case number.

| | |
|---|---|
| PRC, LLC | 08-10239 |
| Panther/DCP Intermediate Holdings, LLC | 08-10238 |
| PRC B2B, LLC | 08-10240 |
| Precision Response of Pennsylvania LLC | 08-10241 |
| Access Direct Telemarketing, Inc. | 08-10242 |

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

**_ DEFINITIONS _**

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car.

A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**_ INFORMATION _**

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the Claims Agent's system (http://chapter11.epiqsystems.com/prcllc) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

2601732

**PRC, LLC _et al._**
**Case No. 08-10239**

## ATTACHMENT TO PROOF OF CLAIM FOR A&E PARTNERS HOLDING, LLC AND A&E PARTNERS HOLDING I, LLC

On January 23, 2008 (the "Filing Date"), PRC, LLC (the "Debtor") filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code").

A&E Partners Holding, LLC and A&E Partners Holding I, LLC, successor-in-interest to Parker Real Estate Partners II, LLP (collectively, the "Landlord"), is the landlord of that certain parcel of land with the buildings and improvements thereon located at 19500 South Dixie Highway, Cutler Ridge, Miami-Date County, Florida (the "Premises") pursuant to a Lease Agreement dated April 1, 2008 (the "Lease"). A copy of the Lease is attached hereto as Exhibit A.

Article 3 of the Lease, captioned Payment of Taxes, Assessments, etc., provides, in relevant part, as follows:

> During the Term Tenant shall, as additional rent, pay to the taxing authority directly . . . all taxes (including ad valorem real property taxes, personal property and sales taxes, if any), assessments . . . of any kind and nature whatsoever which at any time may be assessed, levied, confirmed, imposed upon, or grow or become due and payable out of or in respect of, or become a lien on, the Demised Premises or any party thereto or any appurtenances thereto . . .

See Lease, § 3.01.

Article 6 of the Lease, captioned Landlord's Right to Perform Tenant's Covenants, provides, in relevant part:

> If Tenant shall at any time fail to pay any Imposition in accordance with the provisions of Article 3 hereof . . . the Landlord, after ten (10) days' written notice to Tenant . . . may (a) pay any Imposition payable by Tenant pursuant to the provisions of Article 3 hereof . . .[1]

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

See Lease, § 6.01.

Additionally, Section 6.02 of the Lease states, in pertinent part:

> All reasonable sums so paid by Landlord and all costs and
> expenses incurred by Landlord in connection with the
> performance of any such act, together with interest thereon at
> the Default Rate from the respective dates of Landlord's
> making of each such payment or incurring of each such cost
> and expense . . . shall constitute additional rent payable by
> Tenant under the Lease . . .

Real estate taxes and assessments for the Premises for 2007 in the total amount of $244,755.57 were due and payable by the Debtor to the Miami-Dade Tax Collector on March 31, 2008. The Debtor failed to make the payment and the Landlord exercised its right under Article 6 of the Lease to satisfy the obligation. Thus, the total amount of the Landlord's claim is $244,755.57, plus all applicable interest, fees and costs in accordance with the Lease.

*NOTHING CONTAINED HEREIN SHALL BE DEEMED OR CONSTRUED TO PRECLUDE THE LANDLORD FROM ASSERTING THAT THIS CLAIM CONSTITUTES AN ADMINISTRATIVE EXPENSE OBLIGATION PURSUANT TO SECTION 503(b) OF THE BANKRUPTCY CODE.*

*THE LANDLORD EXPRESSLY RESERVES THE RIGHT TO AMEND AND SUPPLEMENT THIS PROOF OF CLAIM.*



Express

The World

3

ORIGIN ID: TEBA (201) 489-3000
MALGORZATA
COLE SCHOTZ MEISEL FORMAN & LE
25 MAIN ST.

Ship Date: 23APR08
ActWgt: 0.2 LB
System#: 0032579/CAFE2355
Account: S 156500500

HACKENSACK, NJ 07601
UNITED STATES US

TO ATTN: PRC, LLC CLAIMS PROCESSING
EPIQ BANKRUPTCY SOLUTIONS
757 3RD AVENUE 3RD FLOOR

(201) 489-3000
FedEx
Express

NEW YORK, NY 10017

Ref: 45519-0001-FY-0462

Delivery Address
Barcode

BILL SENDER

[E] CLS058107/22/23

PRIORITY OVERNIGHT

TRK# 6365 9630 7695

Form
0201

THU
Deliver By:
24APR08
A1

10017    -NY-US
DSR

ZB 0GSA

EWR

Part# 156148-434 NRN V3 11-07

For FedEx Express® Shipments Only

# Exhibit E

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re                                    :
                                         :        **Chapter 11 Case No.**
**PRC, LLC, et al.,**                    :        **Case No. 08-10239 (MG)**
                                         :
                                         :
                            **Debtors**  :        **(Jointly Administered)**
                                         :
**8151 Peters Road**                     :
**Suite 4000**                           :
**Plantation, FL 33324**                 :
**EIN No. 592194806**                    :

-------------------------------------------------------------x

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**
**DATED AS OF MAY 2, 2008**

PRC, LLC, Panther/DCP Intermediate Holdings, LLC, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

**A.    Definitions.**

        The following terms used herein shall have the respective meanings set forth below:

        1.1    ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of the Reorganization Cases Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases and (d) any compensation for professional services rendered and reimbursement of expenses incurred.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense Claim and shall be paid in accordance with section 13.7 of the Plan.

1.2    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3    ***Allowed*** means, with reference to any Claim against the Debtors, (a) any Claim against any Debtor that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim as to which no objection has been or is interposed in accordance with section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under section 7.4 of the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims." Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.4    ***Allowed Postpetition Financing Obligation Claim*** means an Allowed Claim of the DIP Lenders under the Postpetition Financing Agreement.

1.5    ***Allowed Prepetition First Lien Claim*** means the Allowed Claim of the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement in the amount of $119,350,000.

1.6    ***Allowed Prepetition Second Lien Claim*** means the Allowed Claim of the Prepetition Second Lien Lenders under the Prepetition Second Lien Credit Agreement in the amount of $67,000,000.

1.7    ***Ballot*** means the form distributed to each holder of an impaired Claim or Preconfirmation Equity Interest that is entitled to vote to accept or reject the Plan on which is to be indicated an acceptance or rejection of the Plan.

1.8    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.9    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the Reorganization Cases.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.11    ***Benefit Plans*** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including, without limitation, all incentive and bonus arrangements, medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement pension plans and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).

1.12    ***Business Day*** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    ***Cash*** means legal tender of the United States of America.

1.14    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.15    ***Class*** means a category of holders of Claims or Preconfirmation Equity Interests set forth in Article IV of the Plan.

1.16    ***Collateral*** means any property or interest in property of the estates of the Debtors subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.17    ***Commencement Date*** means January 23, 2008, the date on which the Debtors commenced their Reorganization Cases.

1.18    ***Creditors' Committee*** means the committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.19    ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.20    ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.21    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan.

1.22   *Contingent Claim* means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.23   *Debtors* means each of PRC, LLC, Intermediate HoldCo, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC.

1.24   *Debtors in Possession* means the Debtors in their capacity as debtors in possession in the Reorganization Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.25   *DIP Agent* means The Royal Bank of Scotland plc, as administrative agent and collateral agent under the Postpetition Financing Agreement.

1.26   *DIP Lenders* means the lenders party to the Postpetition Financing Agreement.

1.27   *Disbursing Agent* means Postconfirmation PRC or any entity in its capacity as a disbursing agent under sections 6.5 and 6.6 of the Plan.

1.28   *Disclosure Statement* means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.29   *Disclosure Statement Order* means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.30   *Disputed* means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order. Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the

Bankruptcy Court, a Claim shall be considered a Disputed Claim to the extent that the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated.

1.31 **Distribution Date** means (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March, June, September and December, commencing with the first such date to occur more than forty-five (45) days after the Effective Date and until the second anniversary of the Effective Date, (c) after the second anniversary of the Effective Date, the first Business Day after the end of the month of December and (d) the Final Distribution Date; *provided, however,* that any General Unsecured Claim that becomes Allowed less than ten (10) Business Days prior to a Distribution Date shall be treated as a Disputed Claim for the purposes of the distribution occurring on such Distribution Date and shall not receive a distribution until the Distribution Date immediately succeeding such Distribution Date.

1.32 **Distribution Pro Rata Share** means, as of any Distribution Date, the ratio (expressed as a percentage) of the amount of an Allowed General Unsecured Claim to the aggregate amount of all Allowed General Unsecured Claims at such date plus the Disputed Claim amount of all remaining Disputed General Unsecured Claims.

1.33 **Distribution Record Date** means the date that is three (3) Business Days from and after the Confirmation Date.

1.34 **Effective Date** means a Business Day selected by the Debtors on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in section 10.1 of the Plan shall have been satisfied or waived as provided in section 10.2.

1.35 **Estate Representative** means a Person appointed as a representative of the estates of the Debtors under section 1123(b) of the Bankruptcy Code for the purpose of enforcing claims or causes of action relating to the purchase and financing of PRC from IAC/Interactive Corp.  The terms of such an appointment shall be subject to approval by (a) the Prepetition Lenders, and (b) the Bankruptcy Court, after notice of a motion and a hearing.

1.36 **Exit Facility** means financing obtained by the Debtors in connection with the occurrence of the Effective Date and emergence from chapter 11, (a) which shall not exceed $45 million in principal amount, shall have a maturity of no earlier than three years, shall have a market rate of interest, and the proceeds of which shall be used, in part, to repay the Postpetition Financing Obligations and (b) a form of which shall be included in the Plan Supplement.

1.37    ***Final Distribution Date*** means a date on or after the Initial
Distribution Date and after (a) the deadline for the Debtors or the Reorganized Debtors
to interpose objections to Claims has passed, (b) all such objections have been
resolved by signed agreement with the Debtors or Reorganized Debtors and/or Final
Order, as may be applicable, and (c) all Claims that are Contingent Claims or
Unliquidated Claims have been liquidated but, in any event, the Final Distribution
Date shall be no later than thirty (30) days thereafter, or such later date as the
Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause
shown.

1.38    ***Final Order*** means an order or judgment of a court of
competent jurisdiction that has been entered on the docket maintained by the clerk of
such court and has not been reversed, vacated or stayed and as to which (a) the time to
appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has
expired and as to which no appeal, petition for *certiorari* or other proceedings for a
new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of
*certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or
judgment shall have been affirmed by the highest court to which such order was
appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing
shall have been denied or resulted in no modification of such order and (ii) the time to
take any further appeal, petition for *certiorari*, or move for a new trial, reargument or
rehearing shall have expired; *provided, however*, that the possibility that a motion
under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the
Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order
shall not prevent such order from being a Final Order.

1.39    ***General Unsecured Claim*** means any Claim against the
Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other
Priority Claim, Secured Tax Claim, Other Secured Claims, Prepetition First Lien
Claim, Prepetition Second Lien Claim, or Preconfirmation Equity Interest Claim.

1.40    ***Initial Distribution Date*** means a date after the Effective Date
that is selected by the Reorganized Debtors in their sole discretion but, in any event, is
within forty-five (45) days after the date of service of notice of the Confirmation Date,
or such later date as the Bankruptcy Court may establish upon request by Reorganized
Debtors, for cause shown; *provided, however*, that in no event shall the Initial
Distribution Date be more than seventy-five (75) days after the date of service of
notice of the Confirmation Date.

1.41    ***Intercompany Claim*** means any Claim against any Debtor or
Non-Debtor Subsidiary held by another Debtor or Non-Debtor Subsidiary.

1.42    ***Intermediate HoldCo*** means Panther/DCP Intermediate
Holdings, LLC.

1.43 ***Lender Released Parties*** means, collectively, (a) the Prepetition First Lien Agent; (b) the Prepetition Second Lien Agent; (c) the Prepetition Lenders; (d) the DIP Agent; and (e) the DIP Lenders.

1.44 ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.45 ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the Southern District of New York, as amended from time to time.

1.46 ***Material General Unsecured Claim*** means any General Unsecured Claim if its reduction or disallowance following a good faith objection pursuant to Bankruptcy Rule 3007 would reduce the aggregate amount of Allowed General Unsecured Claims by at least $200,000.

1.47 ***Non-Debtor Subsidiary*** means any direct or indirect subsidiary of PRC that is not a Debtor.

1.48 ***Other Priority Claim*** means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.49 ***Other Secured Claim*** means a Secured Claim other than a Secured Tax Claim, Prepetition First Lien Claim, or Prepetition Second Lien Claim.

1.50 ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.51 ***Plan*** means this Joint Plan of Reorganization, including, without limitation, the exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.52 ***Plan Supplement*** means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan specified in section 13.6 of the Plan.

1.53 ***Postconfirmation Board*** means the board of directors or managers of Postconfirmation HoldCo which will be disclosed in the Plan Supplement.

1.54 ***Postconfirmation HoldCo*** means, as of the Effective Date, as of the Effective Date, a newly formed limited liability company that will be the holder of the sole equity interests of Postconfirmation Intermediate HoldCo, as more fully described in section 5.2(a) of the Plan.

1.55    ***Postconfirmation Intermediate HoldCo*** means, as of the Effective Date, the obligor on the Postconfirmation Unsecured Note.

1.56    ***Postconfirmation Management Incentive Plan*** means the management bonus providing for, *inter alia*, possible equity incentives for management, which shall be substantially in the form set forth in the Plan Supplement and shall contain terms and conditions that shall be subsequently reviewed and approved by the Postconfirmation Board.

1.57    ***Postconfirmation Organizational Documents*** means each certificate of incorporation, certificate of formation, limited liability company agreement, bylaws, and other organizational document for each of the Reorganized Debtors and Postconfirmation HoldCo, in each case, forms of which shall be included in the Plan Supplement.

1.58    ***Postconfirmation PRC*** means PRC, on and after the Effective Date.

1.59    ***Postconfirmation Second Lien Facility*** means that certain second lien term loan facility, with Postconfirmation PRC as borrower, referenced in Article IV of the Plan, (a) which shall not exceed $40 million in principal amount, shall have a bullet maturity of no earlier than four years, shall have a market rate of interest and a pay-in-kind toggle feature, and (b) a form of which shall be included in the Plan Supplement.

1.60    ***Postconfirmation Unsecured Note*** means that certain unsecured note issued by Postconfirmation Intermediate HoldCo and referenced in Article IV of the Plan, (a) which shall not exceed $40 million in principal amount, shall have a bullet maturity of no earlier than five years, shall have a rate of interest of 12% per annum, all of which is payable in kind no less frequently than quarterly, and shall have no security or guaranty and (b) a form of which shall be included in the Plan Supplement.

1.61    ***Postpetition Financing Agreement*** means that certain senior secured superpriority debtor-in-possession credit and guaranty agreement dated as of March 4, 2008, among PRC, as borrower, Intermediate HoldCo, and certain subsidiaries of the borrower as guarantors, various lenders and The Royal Bank of Scotland plc as administrative agent and collateral agent, as entered into pursuant to the Postpetition Financing Order as modified or amended from time to time during the Reorganization Cases.

1.62    ***Postpetition Financing Obligation*** means any obligation of the Debtors arising under the Postpetition Financing Agreement and the Postpetition Financing Order.

1.63    ***Postpetition Financing Order*** means the Final Order Approving Debtors' Motion For Authorization to (i) Obtain Postpetition Financing

Pursuant to 11 U.S.C. § 364; (ii) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (iii) Grant Priming Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. § 364(c) and (d); (iv) Provide Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, dated February 28, 2008.

1.64    ***Preconfirmation Equity Interests*** means all instruments evidencing an ownership interest in Intermediate HoldCo, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

1.65    ***Preconfirmation Equity Interest Claim*** means a Claim of a holder of a Preconfirmation Equity Interest.

1.66    ***Prepetition First Lien Agent*** means the administrative agent and collateral agent under the Prepetition First Lien Credit Agreement.

1.67    ***Prepetition First Lien Claim*** means a Claim of a Prepetition First Lien Lender under the Prepetition First Lien Credit Agreement.

1.68    ***Prepetition First Lien Credit Agreement*** means that certain Amended & Restated First Lien Credit and Guaranty Agreement, dated as of November 29, 2006, as amended and restated on December 20, 2006.

1.69    ***Prepetition First Lien Lender*** means the holder of a Prepetition First Lien Claim.

1.70    ***Prepetition Lenders*** means the Prepetition First Lien Lender and the Prepetition Second Lien Lender.

1.71    ***Prepetition Period*** means the time-period prior to the Commencement Date.

1.72    ***Prepetition Second Lien Agent*** means, collectively, the administrative agent and collateral agent, and any predecessors thereto, under the Prepetition Second Lien Credit Agreement.

1.73    ***Prepetition Second Lien Claim*** means a Claim of a Prepetition Second Lien Lender under the Prepetition Second Lien Credit Agreement.

1.74    ***Prepetition Second Lien Credit Agreement*** means that certain Amended & Restated Second Lien Credit and Guaranty Agreement, dated as of November 29, 2006, as amended and restated on December 20, 2006.

1.75    ***Prepetition Second Lien Lender*** means the holder of a Claim arising under the Prepetition Second Lien Credit Agreement.

1.76    ***PRC*** means PRC, LLC.

1.77  **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.78  **Ratable Proportion** means, with reference to any distribution on account of any Allowed Claim in any class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such class.

1.79  **Reorganization Cases** means the jointly administered cases commenced by the Debtors under chapter 11 of the Bankruptcy Code.

1.80  **Reorganized Debtors** means Postconfirmation PRC, Postconfirmation Intermediate HoldCo, Postconfirmation HoldCo, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC on and after the Effective Date.

1.81  **Restructuring Transactions** means the transactions described in section 5.2(a) of the Plan.

1.82  **Schedules** means, collectively, the schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.83  **Secured Claim** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.84  **Secured Tax Claim** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.85  **Tax Code** means the Internal Revenue Code of 1986, as amended.

1.86  **Trade Creditor** means a holder of a General Unsecured Claim against a Debtor if the holder of such General Unsecured Claim provided goods or services to the Debtors in the ordinary course of the Debtors' business; *provided, however,* that IAC/Interactive Corp., former employees of the Debtors, and former officers of the Debtors shall not be considered Trade Creditors for purposes of the Plan. For purposes of this definition, an employee or officer of the Debtors shall be

considered a former employee or former officer if that person is not an employee or officer on the date of the Confirmation Hearing.

  1.87 ***Transition Services Agreement*** means that certain agreement, between Panther/DCP Acquisition, LLC, PRC, and IAC/Interactive Corp., dated as of November 29, 2006.

  1.88 ***U.S. Trustee*** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

  1.89 ***Unliquidated Claim*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**B.**  **Interpretation; Application of Definitions and Rules of Construction**.

  Unless otherwise specified, all section, article, schedule or exhibit references in the Plan are to the respective section in, article of or schedule or exhibit, to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**PROVISIONS FOR PAYMENT OF ADMINISTRATIVE**
**EXPENSES AND PRIORITY TAX CLAIMS**

  2.1 ***Administrative Expense Claims***.

  Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such

transactions; *provided, further*, that if any such ordinary course expense is not billed or a request for payment is not made within ninety (90) days after the Effective Date, claims for payment of such an ordinary course expense shall be barred.

### 2.2   *Postpetition Financing Agreement*.

On the Effective Date, all Allowed Postpetition Financing Obligation Claims shall be paid in full in Cash.  Upon payment and satisfaction in full of all Allowed Postpetition Financing Obligation Claims, all liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

### 2.3   *Professional Compensation and Reimbursement Claims*.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim; *provided, however*, that from and after May 1, 2008, all fees and expenses incurred by the Creditors' Committee and their professionals that are chargeable to the Debtors' estates shall be capped (barring an increase granted by the Bankruptcy Court in the event of any unforeseen circumstances) at $75,000 per month for a period of two months, and shall be capped at $50,000 for all time thereafter; *provided further*, that the sum of the amounts payable to the Creditors' Committee and their professionals under this section 2.3 shall be a cumulative amount which, if exceeded during one period, shall go against the total cap and, similarly, any amount which is not used during a given period shall be carried forward, subject to a total cap of $200,000.  The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4   *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim or, (b) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for

the period after the Effective Date at the rate determined under applicable non-bankruptcy law, *provided* that the first payment shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims, and subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

## ARTICLE III
### CLASSIFICATION OF CLAIMS AND
### PRECONFIRMATION EQUITY INTERESTS, IMPAIRMENT AND VOTING

The following table designates the classes of Claims against and Preconfirmation Equity Interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Allowed Prepetition First Lien Claims | Impaired | Yes |
| Class 5 | Allowed Prepetition Second Lien Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | Preconfirmation Equity Interests | Impaired | No (deemed to reject) |

## ARTICLE IV
### PROVISIONS FOR TREATMENT OF CLAIMS AND
### PRECONFIRMATION EQUITY INTERESTS

4.1    ***Other Priority Claims (Class 1)***.

(a)    <u>Impairment and Voting.</u>  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

4.2    ***Secured Tax Claims (Class 2)***.

(a)    <u>Impairment and Voting.</u>  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law, *provided* that the first payment shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims, and subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

4.3    ***Other Secured Claims (Class 3)***.

(a)    <u>Impairment and Voting.</u>  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

4.4     ***Allowed Prepetition First Lien Claims (Class 4).***

(a)     <u>Impairment and Voting.</u> Class 4 is impaired by the Plan. Each holder of a Prepetition First Lien Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u> The Allowed Prepetition First Lien Claims shall be allowed in the aggregate amount of $119,350,000. On the Effective Date, and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition First Lien Claim shall receive its Ratable Proportion of each of: (i) $40 million of the Postconfirmation Second Lien Facility; (ii) $40 million of the Postconfirmation Unsecured Note; and (iii) 80% of the equity interests of Postconfirmation HoldCo, which equity interests shall be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections 4.5(b)(ii) and (iii) of the Plan.

4.5     ***Allowed Prepetition Second Lien Claims (Class 5).***

(a)     <u>Impairment and Voting.</u> Class 5 is impaired by the Plan. Each holder of a Prepetition Second Lien Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u> The Allowed Prepetition Second Lien Claims shall be allowed in the aggregate amount of $67,000,000. On the Effective Date, and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition Second Lien Claim shall receive its Ratable Proportion of each of: (i) 20% of the equity interests of Postconfirmation HoldCo, which equity interests shall be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections (ii) and (iii) of this section 4.5(b) of the Plan; (ii) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to 4% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based upon an enterprise value of $170 million; and (iii) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to an additional 2% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based on an enterprise value of $200 million.

4.6     ***General Unsecured Claims (Class 6).***

(a)     <u>Impairment and Voting.</u> Class 6 is impaired by the Plan. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)     <u>Distributions.</u> Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive its Distribution Pro Rata Share of $1,350,000 in Cash (which shall be calculated as if no prior distributions had been

made) on each Distribution Date or as soon thereafter as is practicable, *provided, however,* that in any distribution made to the holder of an Allowed General Unsecured Claim, there shall be deducted from such distribution the amount of any distribution previously distributed to such holder on account of such Allowed General Unsecured Claim in any distribution made prior thereto.

4.7    *Preconfirmation Equity Interests (Class 7).*

(a)    Impairment and Voting. Class 7 is impaired by the Plan. Each holder of a Preconfirmation Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)    Distributions. On the Effective Date, the Preconfirmation Equity Interests shall be cancelled and the holders of Preconfirmation Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Preconfirmation Equity Interests under the Plan.

## ARTICLE V
## MEANS OF IMPLEMENTATION

5.1    *Intercompany Claims.*

Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Debtors, the Debtors in Possession, or the Reorganized Debtors.

5.2    *Restructuring and Other Transactions.*

(a)    **Restructuring Transactions**.

On the Effective Date, the following transactions (the "Restructuring Transactions") shall be effectuated in the order set forth:

(i)    Simultaneously, (A) in accordance with section 4.7 of the Plan, all of the Preconfirmation Equity Interests shall be cancelled, and (B) all of the new membership interests in Postconfirmation Intermediate HoldCo shall be issued to the Prepetition First Lien Agent and the Prepetition Second Lien Agent on behalf of the holders of Allowed Prepetition First Lien Claims and the Allowed Prepetition Second Lien Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative values of their Claims); and

(ii)    Immediately thereafter, the Prepetition First Lien Agent and the Prepetition Second Lien Agent shall, on behalf of the holders of Allowed Prepetition First Lien Claims and the Allowed Prepetition Second Lien Claims,

respectively, contribute all of the membership interests in Postconfirmation Intermediate HoldCo to Postconfirmation HoldCo in exchange for the consideration described in sections 4.4 and 4.5 of the Plan.

(b)    **Consistent Tax Reporting.**

(i)    All parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of Postconfirmation HoldCo membership interests and warrants) shall report for all federal income tax purposes consistent with the form of the Restructuring Transactions.

(ii)    As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Postconfirmation Board shall determine the value of the membership interests of Postconfirmation Intermediate HoldCo as of the Effective Date (as appropriate for federal income tax purposes) and the portions of such value which are allocable, respectively, to the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants to purchase fully diluted interests of Postconfirmation HoldCo. Such allocation shall take into account the relative fair market values of the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants. The Postconfirmation Board shall apprise, in writing, all parties of such valuation and allocation. The valuation and allocation shall be used consistently by all parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of membership interests and warrants) for all federal income tax purposes.

(iii)    Consistent with the intent that Postconfirmation HoldCo shall initially be treated as a partnership for federal income tax purposes, no election shall be made by Postconfirmation HoldCo or by Intermediate HoldCo (or any of their direct or indirect subsidiaries) to be taxed as a corporation for federal income tax purposes that is effective on or prior to the Effective Date. All parties (including the Reorganized Debtors and the holders of Postconfirmation HoldCo membership interests and warrants) shall not treat the holders of warrants as owning partnership interests in Postconfirmation HoldCo for federal income tax purposes by reason of their ownership of warrants, unless the Postconfirmation Board determines otherwise.

(c)    **Other Transactions.**

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors or to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan.

5.3    *Cancellation of Existing Agreements and Preconfirmation Equity Interests.*

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Postpetition Financing Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement and any notes issued thereunder, all Preconfirmation Equity Interests and other instruments evidencing any Claims against the Debtors or Preconfirmation Equity Interests in the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

5.4    *Incurrence of New Indebtedness.*

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests.

## ARTICLE VI
## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

6.1    *Voting of Claims.*

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

6.2    *Nonconsensual Confirmation.*

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 13.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired classes of claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

6.3    *Distributions on Allowed General Unsecured Claims.*

Distributions with respect to holders of Allowed General Unsecured Claims shall only be made on each Distribution Date; *provided, however,* that, if any Disputed General Unsecured Claim becomes Allowed subsequent to the Initial Distribution Date, the Reorganized Debtors may, in their sole discretion, make a distribution with respect to such Claim prior to a Distribution Date. All Allowed General Unsecured Claims held by a creditor shall be aggregated and treated as a single Claim. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed General Unsecured Claims shall provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions shall be sent.

6.4    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.5    *Disbursing Agent.*

All distributions under the Plan shall be made by Postconfirmation PRC as Disbursing Agent or such other entity designated by Postconfirmation PRC as a Disbursing Agent.

6.6    *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.7    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in this Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

6.8     *Unclaimed Distributions.*

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and reinvested in the Reorganized Debtors and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.

6.9     *Distribution Record Date.*

With respect to holders of all General Unsecured Claims against the Debtors, on the Distribution Record Date, the claims register shall be closed and any transfer of any Claim therein shall be prohibited.   The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

6.10     *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.  All distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

6.11     *Cash Distributions.*

No payment of Cash less than fifty dollars ($50) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

6.12     *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

6.13     *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**ARTICLE VII**
**PROCEDURES FOR TREATING DISPUTED**
**CLAIMS UNDER PLAN OF REORGANIZATION**

7.1     *Objections*.

(A)     Except as otherwise provided in section 7.1(B), as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of: (i) sixty (60) days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court (the "Objection Deadline"); *provided, however*, that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter, or adversary proceeding (an "Initial Objection") wherein the Reorganized Debtors' objection to such claim is ultimately denied, the objection deadline shall be extended to the latter of: (a) sixty (60) days from the date on which the Bankruptcy Court enters an order denying such Initial Objection or (b) sixty (60) days from the date on which any appellate court enters a final order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; *provided, further*, that with respect to Claims that are filed (whether as an amended Claim, new Claim, or otherwise) after the Effective Date, the objection deadline shall be sixty (60) days after the date on which such Claim was filed.  Nothing herein shall affect the Debtors' or the Reorganized Debtors' ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(B)     The Reorganized Debtors will make a good faith effort to file objections to Material General Unsecured Claims as appropriate under the circumstances, in consultation with the Creditors' Committee, and will cooperate with the Creditors' Committee in the identification of Claims to which such objections will be filed.  The Reorganized Debtors will use their best efforts to file and serve such objections to Material General Unsecured Claims on or before the later of thirty (30) days after the Effective Date of the Plan or thirty (30) days after a proof of claim for rejection damages is filed.  Until any objections to Material General Unsecured Claims are resolved, the Creditors' Committee will have standing (i) to appear and be heard in connection with the administration of General Unsecured Claims and any pending objections to such Claims, (ii) to file objections to any Material General Unsecured Claim as to which, despite the Committee's urging, the Reorganized Debtors elect not to object, and (iii) to oppose any proposed settlement or compromise of a Material General Unsecured Claim that is advocated by the Reorganized Debtors.

7.2     *No Distributions Pending Allowance*.

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Administrative Expense Claim

unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

### 7.3    *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

### 7.4    *Resolution of Administrative Expense Claims and Claims.*

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

### 7.5    *Estimation of Claims.*

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 7.6    *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

## ARTICLE VIII
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1    *Assumption or Rejection of Executory Contracts and Unexpired Leases.*

(A)    Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (1) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (2) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date,  or (3) that is specifically designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedule shall be contained in the Plan Supplement; *provided, however,* that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date; *provided further, however,* that any agreement by a party to (i) refrain from offering employment to persons employed by the Debtors, (ii) refrain from competition with the Debtors' business, (iii) refrain from soliciting business transactions from the Debtors' customers (iv) protect the Debtors' confidential information from disclosure, or (v) recognize the Debtors' ownership of any intellectual property or inventions, shall remain in full force and effect and shall be enforceable by the Debtors or the Reorganized Debtors, as the case may be.  The Debtors shall provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(B)    Notwithstanding section 8.1(A) above, to the extent (1) the Debtors are party to any contract, service agreement, statement of work, letter of authorization or similar agreement providing for the sale of the Debtors' services to third parties, (2) any such agreement constitutes an executory contract and (3) such agreement (a) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (b) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such executory contract, or (c) is not subject to a motion to reject such executory contract filed on or prior to the Effective Date, such agreement will be assumed as of the Effective Date by the Debtor that performs the obligations to the client under such agreement, in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code.  The cure required to be paid in connection with the assumption of such a client-related agreement shall be $0.00.

8.2    *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the executory contracts and unexpired leases specified in section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to section 8.1 of the Plan.

8.3    *Inclusiveness*.

Unless otherwise specified on Schedules 8.01(A) or 8.01(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) or 8.01(B).

8.4    *Cure of Defaults*.

Except to the extent that different treatment has been agreed to by the parties, within thirty (30) days after the Effective Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. Notwithstanding section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are the subject of a dispute concerning amounts necessary to cure any defaults, in which event the Reorganized Debtors shall make their election to reject such executory contracts and unexpired leases within thirty (30) days of the entry of a Final Order determining the amount required to be cured.

8.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan*.

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and

served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.01(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the Debtors' election to reject under section 8.4 of the Plan. All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

8.6    *Indemnification Obligations*.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

8.7    *Insurance Policies*.

Unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies which are executory, if any, and any agreements, documents or instruments relating thereto, shall be assumed under the Plan. Nothing contained in this section shall constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

8.8    *Benefit Plans*.

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors shall continue to honor, in the ordinary course of business, all employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, *provided*, *however*, that, to the extent the Transition Services Agreement is determined to be an executory contract by the Bankruptcy Court, this section 8.8 of the Plan shall not apply to the Transition Services Agreement.

8.9    *Retiree Benefits*.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of

the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

## ARTICLE IX
### CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

9.1    *General*.

On the Effective Date, the management, control and operation of Postconfirmation PRC and the other Reorganized Debtors shall become the general responsibility of the Postconfirmation Board of Postconfirmation HoldCo.

9.2    *Postconfirmation Board of Postconfirmation HoldCo*.

The initial Postconfirmation Board of Postconfirmation HoldCo shall consist of five members, who shall be selected as follows:  three members by the class of equity interests issued to the holders of Allowed Prepetition First Lien Claims, one member by the class of equity interests issued to the holders of Allowed Prepetition Second Lien Claims, and one member from the management of Postconfirmation PRC.  The initial members of the Postconfirmation Board of Postconfirmation HoldCo, together with biographical information, shall be set forth in the Plan Supplement.

9.3    *Filing of Postconfirmation Organizational Documents*.

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors shall file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment to reflect that: (i) Postconfirmation Intermediate HoldCo is the sole owner of the equity interests of Postconfirmation PRC and (ii) Postconfirmation HoldCo is the sole owner of the equity interests of Postconfirmation Intermediate HoldCo.

9.4    *Officers of the Reorganized Debtors*.

The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date.  Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors and the Postconfirmation Organizational Documents.

9.5    ***Adoption of Postconfirmation Management Incentive Plan.***

On the Effective Date, Postconfirmation HoldCo shall be deemed to have adopted the Postconfirmation Management Incentive Plan.  Entry of the Confirmation Order shall constitute an approval of the Postconfirmation Management Incentive Plan.


# ARTICLE X
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

10.1    ***Conditions Precedent to Effectiveness.***

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with section 10.2 of the Plan:

(a)    The Confirmation Order, in form and substance acceptable to the Debtors, the Prepetition Lenders, and the DIP Lenders, shall have been entered and is a Final Order;

(b)    The conditions precedent to the effectiveness of the Exit Facility are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility;

(c)    All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

(d)    All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

10.2    ***Waiver of Conditions.***

Each of the conditions precedent in section 10.1 hereof may be waived, in whole or in part, upon written notice, signed by both the Debtors and the DIP Lenders (and, in the case of section 10.1(a), the Prepetition Lenders).  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

10.3    ***Satisfaction of Conditions.***

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have

occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in section 10.1 of the Plan have not occurred or otherwise been waived pursuant to section 10.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Preconfirmation Equity Interests, shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Preconfirmation Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## ARTICLE XI
### EFFECT OF CONFIRMATION

### 11.1    *Continued Vesting of Assets*.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall continue to vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

### 11.2    *Binding Effect*.

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Preconfirmation Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Preconfirmation Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

### 11.3    *Discharge of Claims and Termination of Preconfirmation Equity Interests*.

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Preconfirmation Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the

Plan, upon the Effective Date, all existing Claims against the Debtors and Preconfirmation Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Preconfirmation Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Preconfirmation Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Preconfirmation Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 11.4    *Discharge of Debtors*.

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Preconfirmation Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Preconfirmation Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Preconfirmation Equity Interest in the Debtors.

### 11.5    *Injunction or Stay*.

**Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Preconfirmation Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Preconfirmation Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest and (e) pursuing any claim released pursuant to this Article XI of the Plan.**

11.6   *Terms of Injunction or Stay*.

**Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date, *provided, however*, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.**

11.7   *Reservation of Causes of Action/Reservation of Rights*.

Nothing contained in the Plan, except as set forth in section 11.9(b) of the Plan, a Final Order approving the appointment of an Estate Representative, or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors, or the Prepetition Lenders may have or may choose to assert against any parties relating to the purchase and financing of PRC from IAC/Interactive Corp.

11.8   *Exculpation*.

None of the Debtors, the Prepetition First Lien Agent, the Prepetition Second Lien Agent, the Prepetition Lenders, the DIP Agent, the DIP Lenders, the Creditors' Committee and its members solely in their capacity as such, and members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors (collectively, the "Exculpated Parties"), and the Exculpated Parties' respective officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but, in each case, solely in connection with their official capacities in the Reorganization Cases), shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however,* that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

11.9   *Limited Releases*.

(a)    Except as expressly provided in the Plan, including but not limited to section 11.7 of the Plan, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of the present and former members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors, directors, officers, employees, agents,

financial advisors, restructuring advisors, attorneys and representatives of the Debtors who acted in such capacities after the Commencement Date; (x) the Debtors; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and, (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim that does not vote to accept the Plan (the parties set forth in subsections (x), (y), and (z) being the "Releasors"), shall release, waive and discharge, unconditionally and forever each present or former members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors, director, officer, employee, agent, financial advisor, restructuring advisor, attorney and representative of the Debtors who acted in such capacity after the Commencement Date, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the performance of their duties on behalf of the Debtors in the Prepetition Period, these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or gross negligence of any such person or entity, *provided further*, that the equity interests of Panther/DCP Holdings LLC in the Debtors shall be extinguished without releases from the Debtors and the Prepetition Lenders unless pursuant to separate consideration paid and satisfactory to the individual Prepetition Lenders.

(b)     Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and without regard to section 11.7 of the Plan, in consideration of the services, agreements and accommodations of the Lender Released Parties; the Releasors and any Estate Representative, shall release, waive and discharge unconditionally and forever each of the Lender Released Parties and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Commencement Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder.

(c)     Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and the provisions of a Final Order approving the appointment of an Estate Representative, and without regard to section 11.7 of the Plan, in consideration of the services and other benefits provided by an Estate

Representative; the Releasors, shall release, waive and discharge unconditionally and forever any Estate Representative and each of its respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Commencement Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder.

11.10  *Avoidance Actions/Objections.*

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession; *provided, however,* that the Reorganized Debtors shall be deemed to have waived all causes of action under section 547 of the Bankruptcy Code against Trade Creditors of the Debtors.

## ARTICLE XII
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)    To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(j)    To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(k)    To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(l)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(o)    To enter a final decree closing the Reorganization Cases; and

(p)    To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    ***Effectuating Documents and Further Transactions***.

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.2    ***Withholding and Reporting Requirements***.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

13.3    ***Corporate Action***.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

### 13.4    *Modification of Plan.*

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Preconfirmation Equity Interests.

### 13.5    *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 13.6    *Plan Supplement.*

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, the DIP Lenders, and the Prepetition Lenders, except that the Exit Facility shall only be required to be in form, scope and substance satisfactory to the Debtors and the DIP Lenders, shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

13.7  *Payment of Statutory Fees.*

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

13.8  *Dissolution of the Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate, except as follows: (a) the Creditors' Committee and its professionals may continue to perform their duties solely with respect to the evaluation and prosecution of objections to Material General Unsecured Claims as provided in section 7.1 for a period after the Effective Date of the Plan until any objections to Material General Unsecured Claims are resolved; and (b) for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.  All fees and expenses incurred by the Creditors' Committee and their professionals after the Effective Date for the services set forth in the preceding sentence shall be subject to the limitations on such fees and expenses set forth in section 2.3.

13.9  *Exemption from Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Exit Facility and the Postconfirmation Unsecured Note, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

13.10  *Expedited Tax Determination.*

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

13.11  ***Exhibits/Schedules***.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.12  ***Substantial Consummation***.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.13  ***Severability of Plan Provisions***.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

13.14  ***Governing Law***.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

13.15  ***Notices***.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

PRC, LLC
8151 Peters Road, Suite 4000
Plantation, Florida 33324
Attn:  Stephen R. Dubé
Title:  Chief Restructuring Officer
Telephone:  (214) 577-3619
Telecopier:  (253) 498-4915

- and -

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77021
Attn:   Alfredo R. Pérez
        James T. Grogan III
Telephone:  (713) 546-5000
Telecopier:  (713) 224-9511

Dated: May 2, 2008

Respectfully submitted,

PRC, LLC
PANTHER/DCP INTERMEDIATE HOLDINGS, LLC
PRC B2B, LLC
ACCESS DIRECT TELEMARKETING, INC.
PRECISION RESPONSE OF PENNSYLVANIA, LLC

By:    /s/ Stephen R. Dubé
       Name:  Stephen R. Dubé
       Title:   Chief Restructuring Officer

# Exhibit F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x
In re                                         :
                                              :    Chapter 11
PRC, LLC, et al.,                             :
                                              :    Case No. 08-10239 (MG)
                                              :
                    Debtors                   :    Jointly Administered
                                              :
8151 Peters Road                              :
Suite 4000                                    :
Plantation, FL  33324                         :
EIN No. 592194806                             :
----------------------------------------------------------x

DISCLOSURE STATEMENT FOR DEBTORS'
JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE BANKRUPTCY CODE DATED AS OF MAY 2, 2008

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors and
    Debtors in Possession
700 Louisiana, Suite 1600
Houston, TX  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Dated:  May 2, 2008

# TABLE OF CONTENTS

**Page**

SUMMARY OF PLAN ............................................................................ 1

I. INTRODUCTION ................................................................................ 3

    A. HOLDERS OF CLAIMS ENTITLED TO VOTE................................. 4

    B. VOTING PROCEDURES ................................................................. 5

    C. CONFIRMATION HEARING .......................................................... 6

II. OVERVIEW OF THE PLAN .............................................................. 8

III. GENERAL INFORMATION .............................................................. 13

    A. Overview of Chapter 11 .................................................................. 13

    B. Corporate Structure ......................................................................... 14

    C. Business Background ........................................................................ 15

        1. Formation and Acquisition by IAC/InterActive Corp ................ 15

        2. Sale of PRC by IAC ................................................................. 15

        3. Business Operations ................................................................. 16

            (a) B2C Division ............................................................... 17

            (b) B2B Division ............................................................... 17

        4. Employees and Labor Matters .................................................. 18

        5. Properties and Assets ............................................................... 18

        6. Legal Proceedings and Claims.................................................. 18

            (a) Pending Matters ........................................................... 18

            (b) Potential Claims Relating to Purchase Agreement .......... 19

    D. Significant Prepetition Indebtedness................................................ 21

        1. Prepetition First Lien Credit Agreement.................................... 21

        2. Prepetition Second Lien Credit Agreement ................................ 22

        3. Intercreditor Agreement............................................................ 22

        4. Recent Financial Information .................................................... 23

IV. KEY EVENTS LEADING TO THE COMMENCEMENT OF THE REORGANIZATION CASES........................................................... 23

    A. Decline in Financial Performance .................................................... 23

        1. Competition and Market Conditions........................................... 23

        2. Operational Issues .................................................................... 23

**TABLE OF CONTENTS**
**(continued)**

Page

3. Turnaround Efforts ........................................................................ 24
B. The Restructuring Negotiations .................................................. 26
1. Lock-up Agreement .............................................................. 26
2. Postpetition Financing Agreement ....................................... 26
V. THE REORGANIZATION CASES ....................................................... 26
A. First Day Orders .......................................................................... 26
1. Case Administration Orders ................................................. 26
2. Critical Obligations ............................................................. 26
3. Business Operations ............................................................. 26
4. Financial Operations ........................................................... 27
B. Chapter 11 Financing .................................................................. 27
C. Creditors' Committee and Plan Support Agreement ................... 28
D. Assumption of ACS Contract ..................................................... 30
E. Sale of Certain Non-Material assets ........................................... 31
F. Rejection of Certain Agreements ................................................ 31
G. Schedules and Bar Date .............................................................. 32
VI. THE PLAN OF REORGANIZATION .................................................. 32
A. Introduction ................................................................................ 32
B. Classification and Treatment of Claims and Equity Interests Under the Plan of Reorganization ......................................................... 32
1. Unclassified .......................................................................... 34
Administrative Expense Claims ............................................ 34
Postpetition Financing Obligation Claims ............................ 34
Professional Compensation and Reimbursement Claims ........... 35
Priority Tax Claims ............................................................... 35
2. Classified ............................................................................. 36
Class 1 – Other Priority Claims ............................................ 36
Class 2 – Secured Tax Claims ............................................... 36
Class 3 – Other Secured Claims ............................................ 36
Class 4 – Allowed Prepetition First Lien Claims .................. 37

**TABLE OF CONTENTS**
(continued)

Page

       Class 5 – Allowed Prepetition Second Lien Claims .................. 38

       Class 6 – General Unsecured Claims ................................ 38

       Class 7 – Preconfirmation Equity Interests ................................ 38

C.    Means of Implementing the Plan ................................................ 39

    1.    Intercompany Claims ................................................ 39

    2.    Restructuring and Other Transactions ........................ 39

        (a)    Restructuring Transactions ................................ 39

        (b)    Consistent Tax Reporting ................................ 39

        (c)    Other Transactions ........................................... 40

    3.    Cancellation of Existing Agreements and Preconfirmation Equity Interests ................................................ 40

    4.    Incurrence of New Indebtedness ................................ 40

D.    Plan Provisions Governing Distribution ................................ 41

    1.    Distributions on Account of Allowed General Unsecured Claims ................................................ 41

    2.    Date of Distributions ................................................ 41

    3.    Disbursing Agent ................................................ 41

    4.    Rights and Powers of Disbursing Agent ........................ 41

    5.    Expenses of the Disbursing Agent ................................ 42

    6.    Delivery of Distributions ................................ 42

        (a)    Last Known Address ................................ 42

        (b)    Unclaimed Distributions ................................ 42

        (c)    Distribution Record Date ................................ 42

    7.    Manner of Payment ................................................ 42

    8.    Cash Distributions ................................................ 42

    9.    Setoffs and Recoupment ................................ 42

    10.    Allocation of Plan Distributions Between Principal and Interest ................................................ 43

E.    Procedures for Treating Disputed Claims ................................ 43

    1.    Objections ................................................ 43

iii

**TABLE OF CONTENTS**
**(continued)**

Page

2.   No Distributions Pending Allowance ........................................... 44

3.   Distributions After Allowance ................................................... 44

4.   Resolution of Administrative Expense Claims and Claims ......... 44

5.   Estimation of Claims ............................................................... 44

6.   Interest ................................................................................... 44

F.   Provisions Governing Executory Contracts and Unexpired Leases ........ 45

1.   Assumption or Rejection of Executory Contracts and
     Unexpired Leases ................................................................. 45

2.   Approval of Assumption or Rejection of Executory
     Contracts and Unexpired Leases ........................................... 45

3.   Inclusiveness ........................................................................ 46

4.   Cure of Defaults ................................................................... 46

5.   Bar Date for Filing Proofs of Claim Relating to Executory
     Contracts and Unexpired Leases Rejected Pursuant to the
     Plan ...................................................................................... 46

6.   Indemnification Obligations ................................................... 46

7.   Insurance Policies ................................................................. 47

8.   Benefit Plans ........................................................................ 47

9.   Retiree Benefits .................................................................... 47

G.   Corporate Governance and  Management of the Reorganized
     Debtors .......................................................................................... 47

1.   General ................................................................................. 47

2.   Postconfirmation Board of Postconfirmation HoldCo ............... 47

3.   Postconfirmation Organizational Documents ........................... 48

4.   Officers of the Reorganized Debtors ...................................... 48

5.   Postconfirmation Management Incentive Plan .......................... 48

H.   Conditions Precedent to Effective Date .............................................. 48

1.   Conditions Precedent to Effectiveness .................................... 48

2.   Waiver of Conditions ............................................................. 49

3.   Satisfaction of Conditions ...................................................... 49

I.   Effect of Confirmation .................................................................... 49

**TABLE OF CONTENTS**
(continued)

Page

|  | 1. | Continued Vesting of Assets | 49 |
|  | 2. | Binding Effect | 49 |
|  | 3. | Discharge of Claims and Termination of Preconfirmation Equity Interests | 49 |
|  | 4. | Discharge of Debtors | 50 |
|  | 5. | Injunction or Stay | 50 |
|  | 6. | Terms of Injunction or Stay | 50 |
|  | 7. | Reservation of Causes of Action/Reservation of Rights | 51 |
|  | 8. | Exculpation | 51 |
|  | 9. | Limited Releases | 51 |
|  | 10. | Avoidance Actions/Objections | 52 |
| J. |  | Retention of Jurisdiction | 53 |
| K. |  | Miscellaneous Provisions | 54 |
|  | 1. | Effectuating Documents and Further Transactions | 54 |
|  | 2. | Withholding and Reporting Requirements | 54 |
|  | 3. | Corporate Action | 55 |
|  | 4. | Modification of Plan | 55 |
|  | 5. | Revocation or Withdrawal of the Plan | 55 |
|  | 6. | Plan Supplement | 55 |
|  | 7. | Payment of Statutory Fees | 56 |
|  | 8. | Dissolution of the Creditors' Committee | 56 |
|  | 9. | Exemption from Transfer Taxes | 56 |
|  | 10. | Expedited Tax Determination | 56 |
|  | 11. | Exhibits/Schedules | 57 |
|  | 12. | Substantial Consummation | 57 |
|  | 13. | Severability of Plan Provisions | 57 |
|  | 14. | Governing Law | 57 |
|  | 15. | Notices | 57 |
|  | 16. | Exemption from Securities Laws | 58 |
| VII. |  | PROJECTIONS AND VALUATION ANALYSIS | 61 |

**TABLE OF CONTENTS**
**(continued)**

<div align="right">Page</div>

A.  Consolidated Condensed Projected Financial Statements ...................... 61

    1.  Responsibility for and Purpose of the Projections...................... 61

    2.  Pro Forma Financial Projections.................................................. 61

B.  Valuation.......................................................................................... 64

    1.  Overview....................................................................................... 64

    2.  Valuation Methodology ............................................................... 66

        (a)  Comparable Company Analysis ....................................... 66

        (b)  Precedent Transactions Analysis ..................................... 67

        (c)  Discounted Cash Flow Analysis ...................................... 68

VIII.  CERTAIN FACTORS AFFECTING THE DEBTORS ...................... 69

A.  Certain Bankruptcy Law Considerations ................................................ 69

    1.  Risk of Non-Confirmation of the Plan of Reorganization ........... 69

    2.  Non-Consensual Confirmation ..................................................... 70

    3.  Risk of Delay in Confirmation of the Plan ................................. 70

B.  Additional Factors To Be Considered........................................................ 70

    1.  The Debtors Have No Duty to Update.......................................... 70

    2.  No Representations Outside This Disclosure Statement Are
        Authorized.................................................................................... 70

    3.  Projections and Other Forward-Looking Statements Are
        Not Assured, and Actual Results May Vary................................ 71

    4.  General Unsecured Claims Could Be More Than Projected ........ 71

    5.  Debtors Could Withdraw the Plan ............................................... 71

    6.  No Legal or Tax Advice Is Provided to You by This
        Disclosure Statement ................................................................... 71

    7.  No Admission Made ..................................................................... 71

    8.  Business Factors and Competitive Conditions ............................ 71

        (a)  General Economic Conditions .......................................... 71

        (b)  Business Factors................................................................ 72

        (c)  Competitive Conditions .................................................... 72

        (d)  Reliance on Key Clients.................................................... 72

**TABLE OF CONTENTS**
(continued)

Page

|     |     | (e) | Reliance on Employees | 72 |
|     |     | (f) | Clients | 73 |
|     |     | (g) | Risks of International Operations | 73 |
|     |     | (h) | Other Factors | 73 |
|     | 9. | | Access to Financing and Trade Terms | 73 |
|     | 10. | | Impact of Interest Rates and Foreign Exchange Valuations | 74 |
|     | 11. | | Variances from Projections | 74 |
| C. | | | Certain Tax Matters | 74 |

IX.  CONFIRMATION OF THE PLAN OF REORGANIZATION ........................ 75

    A.    Confirmation Hearing ........................................................ 75

    B.    Requirements for Confirmation of the Plan of Reorganization ............ 75

        1.    Requirements of Section 1129(a) of the Bankruptcy Code ......... 75

            (a)    General Requirements .................................... 75

            (b)    Best Interests Test .......................................... 77

            (c)    Liquidation Analysis ...................................... 78

            (d)    Feasibility ...................................................... 78

        2.    Requirements of Section 1129(b) of the Bankruptcy Code ......... 78

X.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION ................................................... 79

    A.    Liquidation Under Chapter 7 ................................................ 79

    B.    Alternative Plan of Reorganization ........................................ 80

XI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................................................................................... 80

    A.    Consequences to the Debtors .............................................. 81

    B.    Consequences to Holders of Certain Claims ........................... 82

        1.    Consequences to Holders of Prepetition First Lien Claims and Prepetition Second Lien Claims .............................. 82

        2.    Consequences to Holders of General Unsecured Claims ............ 84

        3.    Distributions in Discharge of Accrued but Unpaid Interest ......... 84

vii

**TABLE OF CONTENTS**
**(continued)**

Page

4. Ownership and Disposition of Postconfirmation Second
Lien Facility and Postconfirmation Unsecured Note.................. 85

(a) Interest and OID on the Postconfirmation Second
Lien Facility .................................................................. 86

(b) Interest and OID on the Postconfirmation
Unsecured Note............................................................ 86

(c) Application of AHYDO Provisions of the Tax Code ...... 87

(d) Sale, Exchange or Redemption of Postconfirmation
Second Lien Facility and Postconfirmation
Unsecured Note............................................................ 87

5. Ownership and Disposition of Postconfirmation HoldCo
Membership Interests.................................................... 88

6. Ownership and Disposition of Warrants...................................... 90

C. Information Reporting and Withholding ................................. 91

XII. CONCLUSION................................................................................ 92

## SUMMARY OF PLAN

The following is a summary of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of May 2, 2008 (as the same may be amended or modified, the "Plan"), of PRC, LLC ("PRC"), Panther/DCP Intermediate Holdings, LLC, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC (collectively, the "Debtors"), the debtors and debtors in possession in these chapter 11 cases. This Disclosure Statement describes the Plan and the distributions contemplated thereunder for each of the Debtors and their creditors. Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement have the meanings ascribed to them in the Plan.

The Debtors commenced their Reorganization Cases following several months of declining financial performance, which can be traced to, among other things, (i) a substantially unprofitable relationship with a key client, (ii) decreased operational and financial flexibility due to long-term facility leases and a highly leveraged capital structure, (iii) high fixed costs, and (iv) a lower percentage of business serviced at offshore sites compared to competitors. This declining financial performance, coupled with the Debtors' inability to obtain additional financing, the recent downgrade of PRC by major financial ratings agencies, and the resultant fallout among the Debtors' clients and prospective clients, left the Debtors with the need for financial reorganization.

Beginning in the fourth quarter of 2007, the Debtors and their advisors explored various restructuring alternatives including M&A transactions, refinancing options, recapitalizations and a potential chapter 11 filing. During this time, the Debtors initiated a number of internal cost reduction and liquidity improvement initiatives, made changes in senior leadership, and implemented workforce reductions. Such efforts were insufficient to ease the financial strain on the businesses, however. With the assistance of their financial advisors, the Debtors determined that the most efficient way to de-lever their balance sheet and return the company to profitability was through a pre-negotiated chapter 11 restructuring. In January 2008, the Debtors, their Prepetition Lenders, and holders of membership interests in HoldCo reached an agreement on the principal terms of a chapter 11 plan of reorganization. Thereafter, the Debtors commenced the Reorganization Cases on January 23, 2008.

Upon commencement of the Reorganization Cases, the Debtors filed a term sheet outlining the terms of the reorganization plan reached with the Prepetition Lenders. Under the term sheet, the Debtors agreed to sponsor a chapter 11 plan that provided for the reorganization of the Debtors as a going concern (the "Reorganized Debtors"). Integral components of the agreement with the Prepetition Lenders were (i) the Debtors' $30 million debtor in possession financing facility, which would provide sufficient liquidity to fund the Debtors during the course of the Reorganization Cases, and (ii) the conversion of a portion of the prepetition secured debt into equity in the Reorganized Debtors. Certain of the Prepetition Lenders also stated their willingness to provide exit financing for the Debtors' operations following their emergence from the chapter 11 cases.

Moreover, during the first few months of the Reorganization Cases, the Debtors and certain of the Prepetition Lenders engaged the Creditors' Committee in extensive negotiations regarding the treatment of General Unsecured Claims under a chapter 11 plan that will allow the Debtors to restructure their businesses and successfully emerge from these chapter 11 cases. Following these significant, arms'-length negotiations, the Debtors and the Creditors' Committee entered into an agreement that resolves the outstanding issues raised by the Creditors'

Committee in connection with the Plan. Accordingly, the Creditors' Committee has expressed its support for the terms of the Plan.

Under the Plan, the Prepetition First Lien Claims (Class 4) will be satisfied in full, as follows: (i) $40 million of Allowed Prepetition First Lien Claims will be rolled over as part of the Postconfirmation Second Lien Facility, (ii) an additional $40 million of the Allowed Prepetition First Lien Claims will be exchanged for the Postconfirmation Unsecured Note to be issued by Postconfirmation Intermediate HoldCo, the principal and interest of which shall be payable in kind no less frequently than quarterly, and (iii) the remaining balance of the Allowed Prepetition First Lien Claims will be converted to 80% of the equity interests of Postconfirmation Holdco (subject to dilution), as more fully described in Section VI.B.2 of this Disclosure Statement. The Prepetition Second Lien Claims (Class 5) will be satisfied in full under the Plan, as follows: (i) all of the outstanding Allowed Prepetition Second Lien Claims will be converted to 20% of the equity interests of Postconfirmation Holdco (subject to dilution), and (ii) each holder of an Allowed Prepetition Second Lien Claim will receive certain warrants, as more fully described in Section VI.B.2 of this Disclosure Statement. Each holder of an Allowed General Unsecured Claim (Class 6) will receive its Distribution Pro Rata Share of $1,350,000 in Cash on each Distribution Date or as soon thereafter as practicable. The proposed distributions to other creditors are discussed in Section VI.B.2 of this Disclosure Statement.

Based upon the Debtors' estimate of the Allowed Claims in these Reorganization Cases, the Plan provides for a 67%-74% recovery to holders of Allowed Prepetition First Lien Claims, a 0%-3% recovery to holders of Allowed Prepetition Second Lien Claims, a 4%-8% recovery to holders of Allowed General Unsecured Claims, and no recovery for holders of Preconfirmation Equity Interests. These projections are based on assumptions described herein and are not guaranteed. The Plan is supported by the Prepetition Lenders and the Creditors' Committee.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN. THE CREDITORS' COMMITTEE ALSO STRONGLY ENCOURAGES ALL GENERAL UNSECURED CREDITORS TO VOTE IN FAVOR OF THE PLAN. THE CREDITORS' COMMITTEE WAS ACTIVELY INVOLVED IN THE FORMULATION OF THE PLAN AND BELIEVES THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR ALL OF THE DEBTORS' GENERAL UNSECURED CREDITORS.**

# I.

## INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of equity interests ("Preconfirmation Equity Interests") in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for June 19, 2008 at 10:00 a.m. (prevailing Eastern Time).

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A);

- Order of the Bankruptcy Court, dated May 8, 2008 (the "Disclosure Statement Order"), approving, among other things, this Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (attached hereto without exhibits) (Exhibit B);

- The Debtors' most recent financial statements for the year ended December 31, 2007, as well as the Debtors' Projected Financial Information (Exhibit C); and

- The Debtors' Liquidation Analysis (Exhibit D).

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement mailed to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On May 8, 2008, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Preconfirmation Equity

Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Preconfirmation Equity Interests under the Plan, see Section VI of this Disclosure Statement.

Claims in Class 4 (Prepetition First Lien Claims), Class 5 (Prepetition Second Lien Claims), and Class 6 (General Unsecured Claims) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

Claims in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) of the Plan are unimpaired. As a result, holders of Claims in those Classes are conclusively presumed to have accepted the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section IX of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section IX.B.2 of this Disclosure Statement.

Holders of Preconfirmation Equity Interests (Class 7) will not receive any distribution under the Plan and are therefore deemed to have rejected the Plan. With respect to the Class of Preconfirmation Equity Interests that is deemed to have rejected the Plan, i.e., Class 7, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

The Debtors are commencing this solicitation after extensive negotiations with the DIP Lenders, the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders and the Creditors' Committee. The Prepetition First Lien Lenders have been represented by Chadbourne & Parke LLP as legal advisor and FTI Consulting as financial advisor. The Prepetition Second Lien Lenders have been represented by Bingham McCutchen LLP as legal advisor and Capstone

Advisory Group LLC as financial advisor.  The Creditors' Committee has been represented by
Blank Rome LLP as legal advisor and J.H. Cohn LLP as financial advisor.

**THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN
CLASSES 4, 5, AND 6 VOTE TO ACCEPT THE PLAN.  THE CREDITORS'
COMMITTEE ALSO RECOMMENDS THAT HOLDERS OF CLAIMS IN CLASS 6
VOTE TO ACCEPT THE PLAN.**

The Debtors' legal advisor is Weil, Gotshal & Manges LLP, and their
restructuring and financial advisors are CXO, L.L.C. ("CXO") and Evercore Group LLC
("Evercore"), respectively.  They can be contacted at:

Evercore Group LLC                          CXO, L.L.C.
55 East 52nd Street                         5956 Sherry Lane, Suite 1000
New York, NY  10055                         Dallas, TX 75225
Phone (212) 857-3100                        Phone: (214) 577-3619
Attn:   Stephen Sieh                        Attn:   Stephen Dubé
        Matthew Theodorakis                 Email:  stephen@cxollc.com

                                                    and

                                            Weil, Gotshal & Manges LLP
                                            700 Louisiana, Suite 1600
                                            Houston, TX 77002
                                            Phone: (713) 546-5000
                                            Attn:   Alfredo R. Pérez
                                                    James T. Grogan III


**B.      VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the
purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to
vote Claims in more than one Class, you will receive separate Ballots, which must be used for
each separate Class of Claims.  Ballots should be returned to:

In re PRC, LLC, et al. Ballot Processing
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, New York 10017

**Do not return any other documents with your Ballot.**

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR
REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M.
(PREVAILING EASTERN TIME) ON JUNE 9, 2008.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set May 8, 2008 as the record date for holders of Claims entitled to vote on the Plan. Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Epiq Bankruptcy Solutions, LLC at (866) 897-6433.

## C.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on June 19, 2008 at 10:00 a.m. (prevailing Eastern Time) before the Honorable Martin Glenn, Room 501, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before June 12, 2008 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in Section IX.A of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES

AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN. THE PREPETITION FIRST LIEN LENDERS, THE PREPETITION SECOND LIEN LENDERS, AND THE CREDITORS' COMMITTEE ALSO STRONGLY ENCOURAGE ALL CREDITORS TO VOTE IN FAVOR OF THE PLAN. THE PREPETITION LENDERS AND THE CREDITORS' COMMITTEE WERE ACTIVELY INVOLVED IN THE FORMULATION OF THE PLAN AND BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR THE DEBTORS' CREDITORS.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR PRECONFIRMATION EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of
Administrative Expense Claims, Claims and Preconfirmation Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[1] | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full, in Cash, on the later of the Effective Date or when such Claim becomes Allowed, or as soon thereafter as is practicable; Claims incurred in the ordinary course of business will be paid in full or performed, as applicable, in the ordinary course of business. | $145,000, plus any amounts incurred and payable in the ordinary course of business | 100% |
| -- | Postpetition Financing Obligation Claims | Paid in full, in Cash, on the Effective Date. | Undetermined | 100% |

---

[1] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records. The Bar Date (as defined below) has only recently passed. Actual amounts will depend upon the amounts of Claims timely filed before the Bar Date, final reconciliation and resolution of all Administrative Expense Claims and Claims, and the negotiation of cure amounts. Accordingly, the actual amounts may vary from the amounts set forth herein.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[1] | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Professional Compensation and Reimbursement Claims | Paid in full, in Cash, in accordance with the order of the Bankruptcy Court allowing any such Claim. | $3.12 million[2] | 100% |
| -- | Priority Tax Claims | Either (i) paid in full, in Cash, on the Effective Date or as soon thereafter as is practicable, or (ii) commencing on the Effective Date or as soon thereafter as is practicable, paid in full, in Cash, over a period not exceeding five years from and after the Commencement Date, in equal semi-annual Cash payments with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law. | Undetermined[3] | 100% |
| 1 | Other Priority Claims | Unimpaired.  Paid in full, in Cash, on the later of the Effective Date and the date such Claim becomes an Allowed Other Priority Claim or as soon thereafter as is practicable. | $82,200 | 100% |

---

[2] This figure represents estimated fees and expenses outstanding on the anticipated confirmation date of June 19, 2008.  The Debtors have calculated their estimate based upon monthly invoices for services rendered to date.

[3] The Debtors have not yet made a determination as to the correct classification of outstanding tax claims, and as such, the entirety of the estimate is currently included in Class 2 (Secured Tax Claims). Classification of tax claims as secured or priority shall not be deemed to be a waiver of the Debtors' rights or defenses with respect to such Claims.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[1] | Approximate Percentage Recovery |
|-------|----------------------------------|-----------|-------------------------------|----------------------------------|
| 2 | Secured Tax Claims | Unimpaired. Either (i) paid in full, in Cash, on the Effective Date or as soon thereafter as is practicable or (ii) commencing on the Effective Date or as soon thereafter as is practicable, paid in full, in Cash, over a period not exceeding five years from and after the Commencement Date, in equal semi-annual Cash payments with interest at the rate determined under applicable non-bankruptcy law. | $2.123 million[4] | 100% |

---

[4] The Debtors have not yet made a determination as to the correct classification of outstanding tax claims, and as such, the entirety of the estimate is currently included in Class 2 (Secured Tax Claims). Classification of tax claims as secured or priority shall not be deemed to be a waiver of the Debtors' rights or defenses with respect to such Claims. In addition, this amount is subject to change based on the outcome of any pending audits of the Debtors.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[1] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired. Either (i) reinstated, (ii) paid in full, including any required interest, in Cash, on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) receive the Collateral securing such Other Allowed Secured Claim and any required interest. | $0 | 100% |
| 4 | Allowed Prepetition First Lien Claims | Impaired. On the Effective Date, and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition First Lien Claim shall receive its Ratable Proportion of each of: (i) $40 million of the Postconfirmation Second Lien Facility; (ii) $40 million of the Postconfirmation Unsecured Note; and (iii) 80% of the equity interests of Postconfirmation HoldCo, which equity interests shall be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections (ii) and (iii) of Section 4.5(b) of the Plan. | $119.35 million | 67.0% to 73.7%[5] |

---

[5] Based on the stated face amount of the Postconfirmation Second Lien Facility and the Postconfirmation Unsecured Note, as well as the estimated Common Equity Value range set forth in Section VII.B of this Disclosure Statement.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[i] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 5 | Allowed Prepetition Second Lien Claims | Impaired. On the Effective Date, and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition Second Lien Claim shall receive its Ratable Proportion of each of: (i) 20% of the equity interests of Postconfirmation HoldCo, which equity interests shall be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections (ii) and (iii) of Section 4.5(b) of the Plan; (ii) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to 4% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based upon an enterprise value of $170 million; and (iii) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to an additional 2% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based on an enterprise value of $200 million. | $67 million | 0.0% to 3.0%[6] |

---

[6] Based on the estimated Common Equity Value range set forth in Section VII.B of this Disclosure Statement.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[1] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 6 | General Unsecured Claims | Impaired.  Paid Distribution Pro Rata Share of $1,350,000 in Cash on each Distribution Date or as soon thereafter as practicable. | $17 to 32 million[7] | 4%-8% |
| 7 | Preconfirmation Equity Interests | Impaired.  No distribution. | $0 | 0% |

   For detailed historical and projected financial information and valuation estimates, see Section VII below, entitled "PROJECTIONS AND VALUATION ANALYSIS," as well as Exhibit C to this Disclosure Statement.

<div align="center">

**III.**

**GENERAL INFORMATION**

</div>

**A.   OVERVIEW OF CHAPTER 11**

   Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

   The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt

---

[7] The estimated amount set forth above excludes (a) any claims arising under executory contracts and unexpired leases of the Debtors unless a proof of claim has been filed with respect to such contract or lease, and (b) future claims that may arise or be filed as the Debtors continue with their reorganization.  The magnitude of claims arising under executory contracts or unexpired leases for rejection damages may be substantial and may have a significant dilutive effect on the estimated recovery to holders of General Unsecured Claims. The numbers listed here are estimates.  The Bar Date for filing proofs of claim has only recently passed, and the Debtors have not completed their analysis of all claims.

that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Preconfirmation Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.    CORPORATE STRUCTURE**

The chart below provides a general overview of the prepetition corporate structure for PRC and its affiliates, including all of the Debtors and three non-debtor entities, Panther/DCP Holdings, LLC ("HoldCo"), Avaltus, Inc., and Precision Response of Louisiana, Inc.



Diamond Castle Holdings LLC ("DCH"), a private equity firm, owns a majority of the equity interests in HoldCo. HoldCo, a holding company headquartered in New York, New York, owns all of the Preconfirmation Equity Interests in, and is the sole member of, Intermediate HoldCo. PRC and PRC B2B, LLC are headquartered in Plantation, Florida. Access Direct Telemarketing, Inc. is headquartered in Cedar Rapids, Iowa, and Precision Response of Pennsylvania, LLC is headquartered in West Mifflin, Pennsylvania. PRC's two non-debtor subsidiaries, Avaltus, Inc. and Precision Response of Louisiana, Inc., both have no assets or operations and are currently subject to dissolution proceedings in New Jersey and Louisiana, respectively.

## C.    BUSINESS BACKGROUND

1.    Formation and Acquisition by IAC/InterActive Corp

The Debtors' primary operating companies consist of PRC, LLC ("PRC"), PRC B2B, LLC ("PRC B2B"), and Access Direct Telemarketing, Inc. ("ADT", and together with PRC and PRC B2B, the "Company").

PRC began operations on May 19, 1982, as Florida Fulfillment, Inc., a service business that fulfilled purchase orders for other businesses using toll-free telephone lines. Within a few years, Florida Fulfillment, Inc. expanded into database marketing and telecommunications marketing. In 1991, Florida Fulfillment, Inc. changed its name to Precision Response Corporation. On July 22, 1996, Precision Response Corporation completed an initial public offering of its common stock and operated as a publicly-held corporation until April 5, 2000, when it was acquired by USA Networks, Inc. (later renamed IAC/InterActive Corp. ("IAC")). IAC acquired Precision Response Corporation as part of a merger transaction. As a consequence of this merger, Precision Response Corporation (now, PRC, LLC) became privately held and a wholly-owned subsidiary of IAC. PRC is based in Plantation, Florida.

PRC B2B began as Hancock Information Group, Inc. ("Hancock"), which was founded in December 1984. In 2001, IAC acquired Hancock for $17 million and Hancock became a wholly-owned subsidiary of PRC. In 2005, Hancock became PRC B2B, LLC. PRC B2B is based in Orlando, Florida.

ADT was founded in 1995 and is based in Cedar Rapids, Iowa. In 2000, IAC acquired ADT and ADT became a wholly-owned subsidiary of PRC.

2.    Sale of PRC by IAC

In early 2006, IAC initiated steps to sell PRC by means of a two-stage auction. During the first stage, in June 2006, Lehman Brothers, as financial advisors to IAC, sent a Confidential Information Memorandum (the "CIM") and a letter outlining initial bidding procedures to a number of parties, including DCH, who expressed interest in purchasing PRC. The initial bidding procedures provided that interested parties should make an indicative offer to purchase PRC based on the information contained within the CIM. In addition to an estimated bid price, the indicative offer was to include a proposed transaction structure and any due diligence requirements. If IAC accepted the indicative offer, the interested parties would enter into the second phase of bidding.

By letter dated August 9, 2006, IAC accepted DCH's indicative offer and provided DCH with the second phase bidding procedures by which DCH could submit a final offer to purchase PRC. During the second phase of bidding, DCH undertook full scale due diligence to conduct a more detailed review of PRC. Ultimately, IAC accepted DCH's final offer as the winning bid.

To effectuate the sale of PRC, Panther/DCP Acquisition, LLC ("AcquisitionCo"),[8] a DCH affiliate, entered into a certain Membership Interests Purchase Agreement, dated November 2, 2006 (the "Purchase Agreement"), with IAC, as seller, PRC, as the company, and AcquistionCo, as the buyer. In accordance with the Purchase Agreement, AcquisitionCo purchased all of IAC's outstanding membership interests in PRC in exchange for a payment of $267,637,102 at closing plus escrowed funds of $10 million for additional purchase price adjustments. AcquisitionCo also paid approximately $34 million for certain fees and expenses relating to the sale, PRC payroll expenses, and cash for working capital and future obligations. To fund these payments, AcquisitionCo incurred approximately $182 million in debt obligations, including senior secured debt. The financing associated with the acquisition of PRC is described in more detail in Section III.D below. Equity investors invested approximately $129 million in connection with the acquisition of PRC from IAC.

When the parties executed the Purchase Agreement, Intermediate HoldCo was the sole member and owner of AcquisitionCo. Immediately following AcquisitionCo's acquisition of PRC, on November 29, 2006, AcquisitionCo merged with and into PRC, with PRC being the surviving entity. As a consequence of this merger, AcquistionCo ceased to exist and Intermediate Holdco became the sole member and owner of PRC.

To facilitate the sale of the Company, IAC, PRC and AcquisitionCo also entered into a certain Transition Services Agreement, dated November 29, 2006. The Transition Services Agreement obligated IAC, among other things, to fund and maintain health insurance benefits for Company employees. The Company agreed to reimburse IAC through fixed monthly payments, subject to a true-up of actual costs after the end of the term of the Transition Services Agreement. The Transition Services Agreement expired by its terms as of December 31, 2007.

3.    Business Operations

Since its inception, the Company has provided complex, consultative, outsourced services in the Customer Care and Sales & Marketing segments of the business process outsourcing industry. The Company has acquired and grown customer relationships for its clients, some of which are the world's largest and most brand-focused corporations in the financial services, media, telecommunications, transportation, and retail industries.

As of March 25, 2008, PRC had approximately 7,216 employees in Florida, Texas, Colorado, Oklahoma, North Carolina, and West Virginia. As of the same date, PRC B2B had approximately 473 employees in Florida, and ADT had approximately 911 employees in Iowa.

The Company's service offerings address many critical aspects of a client's business such as (i) targeting and segmentation of sales prospects; (ii) acquiring new customers; (iii) gaining incremental business with existing customers; (iv) cross-selling and up-selling; and (v) customer retention, billing inquiries, and technical support. Through a network of domestic contact centers, as well as significant offshore relationships with vendors located in the

---

[8] Prior to the acquisition of PRC, Intermediate HoldCo owned all of the equity interests in AcquisitionCo. As discussed above, HoldCo owns all of the Preconfirmation Equity Interests in Intermediate HoldCo, and DCH owns a majority of the equity interests in HoldCo.

Philippines, the Dominican Republic and India, the Company operates a large, scalable infrastructure that offers its clients a "best-shore" approach to outsourcing.

The Company's clients choose to outsource their business process functions in order to reduce the cost of customer interactions, to minimize capital expenditures, to maximize efficiency, to enhance the quality of service with access to the latest technology, and in many instances, to generate incremental revenue. The Company typically operates under multi-year agreements, which provide a base of recurring revenues and a foundation for organic growth as clients grow their own businesses and as the Company sells these clients additional services. A number of these contracts, however, contain provisions that allow the Company's clients to cancel such contracts for convenience upon 30 to 60-day's notice. Until recently, the Company had an excellent history of renewing contracts, with a historical renewal rate of over 90%.

The Company provides inbound and outbound services and back-office processing services through two divisions: Business-to-Consumer ("B2C") and Business-to-Business ("B2B"). The B2C division manages customer interactions on behalf of clients via a global network of integrated contact centers using telephone, e-mail, interactive voice response, and web-based applications. The B2B division helps clients design, implement, and manage sales strategies targeted at business customers. The B2B division also provides critical information to client sales teams, such as identifying new sales leads.

(a)    B2C Division

The B2C division operates contact centers that manage customer interactions on behalf of Company clients. The Company provides its B2C clients with essential functions, such as customer service, which makes up the vast majority of the Company's B2C operations, inbound and outbound sales, and technical support. The Company also provides email-based customer service, automated business process outsourcing and interactive voice response services, as well as custom software applications, monitoring calls for compliance with client standards, and dynamic call queuing.

The Company frequently serves as the first point of contact and a critical link between clients and their customers. The B2C services provided by the Debtors replace a client's higher paid in-house workforce with the Debtors' trained customer care and sales and marketing specialists. Typically, the Debtors' solutions add value by providing significant operational cost savings of approximately 20% to 40% compared to a client's internal cost structure, and by allowing clients to focus on core competencies and key business objectives.

The Debtors estimate that the B2C division accounted for approximately 93% of revenues in 2007, and approximately 64% of EBITDA.

(b)    B2B Division

The B2B division helps business clients design, implement, and manage sales strategies. The B2B consultative services improve the performance and effectiveness of their clients' internal sales forces – sometimes by as much as 30% to 50% – by generating highly probable and valuable sales leads. Sales leads are generated in three main ways:

- Appointment Setting & Prospecting. B2B sales consultants deliver a well-articulated sales and marketing message to the client's potential customers.

Once a sales consultant identifies a need for the client's services, the sales consultant will schedule the customer for an appointment with a client representative.

- Full Customer Acquisition. A sales consultant will complete the entire sale transaction on behalf of the client, without the need for a separate appointment, or will transfer the opportunity over the client's sales team.

- Account Development. For clients focused on maximizing long-term customer profitability, the B2B division provides an outreach program that systematically develops and nurtures existing customers while delivering the client's message at a predetermined frequency. This practice not only supports up-selling and cross-selling initiatives, it also serves as a communication strategy for providing customer education, changing customer behaviors, refining brand perception and increasing brand awareness, and improving and maintaining business intelligence.

By using proprietary analytic tools and processes, the B2B division helps clients reach key decision-makers, increase closing rates, shorten sales cycles, and enhance market penetration. The B2B division currently obtains higher margins and is less capital-intensive than the B2C division. Accordingly, the B2B division accounted for approximately 7% of the Company's revenues and 36% of EBITDA in 2007.

    4.    Employees and Labor Matters

As of March 12, 2008, the Debtors had approximately 9,000 employees, consisting of 7,882 hourly-wage employees and 1,142 salaried employees. Historically, the Debtors have enjoyed favorable relationships with their highly qualified personnel. None of the Debtors' employees is represented by a labor union.

    5.    Properties and Assets

The Debtors' primary asset is their highly trained and skilled workforce of client-service representatives. The Debtors' income principally is derived from the time these representatives spend servicing client accounts. The Debtors' other assets include their accounts receivable for services performed, their contract rights, and their intellectual property rights. Aside from one parcel of vacant land in Miami, Florida that the Debtors own, the Debtors lease office and contact center space in Florida, Iowa, Pennsylvania, Texas, Colorado, Oklahoma, West Virginia and North Carolina. The Debtors' headquarters are located in Plantation, Florida. In addition, although the Debtors have no foreign subsidiaries, they have significant contact center operations through contractual relationships with vendors located in the Philippines, India and the Dominican Republic.

    6.    Legal Proceedings and Claims

    (a)    Pending Matters

Hall Arbitration. On September 13, 2007, John G. Hall, former CEO of PRC, commenced an arbitration proceeding, styled as John G. Hall v. PRC, LLC, AAA Case No. 32 166 00734 07, with the American Arbitration Association (the "AAA"), against PRC, in which

Hall alleged that PRC breached the terms of its employment agreement with Hall by refusing to provide him with termination compensation following his alleged resignation from PRC for "good reason." PRC has denied that Hall resigned for good reason and asserted a counterclaim against Hall, alleging that Hall continues to be in possession of PRC's business records and other confidential information, in breach of the Confidentiality, Non-Competition and Intellectual Property Agreement between PRC and Hall. The Debtors believe that they have additional counterclaims against Hall to recover certain prepetition overpayments. On February 20, 2008, the AAA notified the parties that the arbitration was stayed by operation of section 362 of the Bankruptcy Code due to the commencement of the Reorganization Cases.

O'Brien Litigation. In 2003, Wesley O'Brien, a former CEO of PRC, commenced a lawsuit, styled as Wesley T. O'Brien v. Precision Response Corporation, Case No. 03-5643-21, in the Circuit Court of the Seventeenth Judicial District, Broward County, Florida, against PRC, in which O'Brien alleged claims for (i) indemnification with respect to $1.2 million in fees and expenses he incurred in connection with a 2002 arbitration related to PRC's acquisition of Avaltus, Inc. and (ii) wrongful termination. On October 20, 2005, the trial court dismissed O'Brien's claims for indemnification, leaving his claims for wrongful termination pending. On December 6, 2006, the appellate court reversed as to the claim for indemnification with respect to costs related to O'Brien's defense of the arbitration. In June 2007, the trial court entered an order on remand and referred the matter to the magistrate for further proceedings. In connection with the Purchase Agreement, IAC agreed to indemnify the Debtors against any losses incurred in the O'Brien litigation. The matter remains pending but was stayed by operation of section 362 of the Bankruptcy Code upon the commencement of the Reorganization Cases.

Employment Litigation. The Debtors are party to several employment-related disputes that, in most instances, are pending before the Equal Employment Opportunity Commission. No such proceeding is material to the Debtors' financial performance. These proceedings have been stayed by operation of section 362 of the Bankruptcy Code.

Other than litigation in connection with the chapter 11 proceedings, the Debtors are not aware of any pending disputes, including those disputes described above, that would be likely to have a material adverse effect on current financial conditions, results of operations, or liquidity. The Debtors may also have claims in connection with other business or employment-related disputes, including in connection with those disputes described above. However, litigation is subject to inherent uncertainties, and unfavorable outcomes could occur. An unfavorable outcome could include the payment of monetary damages, Cash or other settlement, or an injunction prohibiting the sale of some of the Debtors' services. If an unfavorable resolution were to occur, there exists the possibility of a material adverse impact on the Debtors' financial condition, results of operations, or cash flows for the period in which the resolution occurs or for future periods.

(b)     Potential Claims Relating to Purchase Agreement

Certain parties, including the Creditors Committee, have inquired about the potential avoidability of transactions effectuated in connection with the Purchase Agreement with IAC. The Debtors, together with their advisors, have undertaken a preliminary analysis of these issues. Generally, a transfer (including the incurrence of an obligation) may be avoided as a "fraudulent transfer" where a debtor did not receive "reasonably equivalent value" in exchange for such transfer and the debtor was insolvent at the time the transfer was made. See 11 U.S.C. § 548. In evaluating solvency and reasonably equivalent value, courts may rely on a number of

valuation methodologies.  Recently, a number of courts have adopted a market value test.  For example, in VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit used the price set by the stock market to evaluate solvency and reasonably equivalent value of a company sold in a reverse spin-off.  In Statutory Committee of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283 (Bankr. S.D.N.Y. 2007), the United States Bankruptcy Court for the Southern District of New York cited the VFB decision with approval and applied a similar market-price-solvency analysis in evaluating various debt offerings.  In each case, however, solvency and reasonably equivalent value are fact-specific inquiries.

Here, the acquisition of PRC from IAC was consummated in connection with an auction following competitive bidding.  That process resulted in a purchase price of approximately $270 million.  Under applicable law, (a) the value of PRC is likely to be fixed conclusively at the purchase price and (b) market value is determinative of solvency.  As such, PRC was likely solvent at the time of the IAC transaction and, accordingly, the Debtors do not believe a fraudulent transfer action could be successfully pursued.  The Debtors and Reorganized Debtors reserve all rights to pursue such an action, however, in the event they, in their sole discretion, determine to do so.

Moreover, the Debtors and Reorganized Debtors intend to continue their investigation into the facts and circumstances surrounding the purchase and financing of PRC from IAC in order to ascertain whether other causes of action against IAC may exist, including claims for misrepresentation, fraud, breach of contract, and/or breach of the representations and warranties that were made in connection with the Purchase Agreement.  The Plan contemplates that, to the extent such claims and causes of action against IAC exist, they may be pursued by the Debtors, the Reorganized Debtors, or an estate representative, as the case may be.  Any estate representative would be appointed under section 1123(b)(3) of the Bankruptcy Code, following notice and a hearing.  A party who serves as the estate representative and who provides consideration acceptable to the Debtors and the Prepetition Lenders, will receive a release under Section 11.9 of the Plan.  Section VI.I.9 of this Disclosure Statement sets forth the terms of such releases in greater detail.

The Debtors may also have claims relating to an escrow account held by the Bank of New York, as escrow agent, that was established in connection with the Purchase Agreement.  As noted above, AcquisitionCo initially placed $10 million into escrow.  Of that amount, $5 million plus any accrued interest remains.  These funds are available to satisfy any rights the Debtors may have to indemnification under various provisions of the Purchase Agreement, including provisions relating to tax liabilities and IAC's representations and warranties.  On or before April 30, 2008, the Debtors notified the escrow agent of certain claims relating to the indemnification provisions of the Purchase Agreement.

**D.    SIGNIFICANT PREPETITION INDEBTEDNESS**

The following chart illustrates the Debtors' significant prepetition indebtedness:



The instruments evidencing these obligations are described below.  In addition to the foregoing, the Debtors estimate that they will have General Unsecured Claims of between $17 million and $32 million after completion of the reconciliation of General Unsecured Claims.

1.    Prepetition First Lien Credit Agreement

As of the Commencement Date, the Debtors were parties to that certain $160,000,000 Amended and Restated First Lien Credit and Guaranty Agreement, dated as of November 29, 2006, as amended and restated on December 20, 2006 (as further amended, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), with RBS Securities Corporation ("RBSSC") as sole lead arranger and sole book running manager, the Royal Bank of Scotland plc ("RBS") as administrative agent and collateral agent, and certain lenders party thereto (collectively, the "Prepetition First Lien Lenders").

The Prepetition First Lien Credit Agreement provides for (i) a revolving credit facility in the maximum aggregate amount of $20 million, including letters of credit, and (ii) a term loan facility in the amount of $140 million.  Obligations arising under the Prepetition First Lien Credit Agreement are direct obligations of PRC that are guaranteed by, and thus obligations of, the other Debtors.  On November 30, 2006, financing statements were filed on behalf of the Prepetition First Lien Lenders regarding security interests created under the Prepetition First Lien Credit Agreement.

In connection with the Prepetition First Lien Credit Agreement, the Debtors granted liens and executed security agreements in favor of RBS, as agent for the Prepetition First Lien Lenders, in substantially all of the Debtors' assets, including the following: (i) accounts, (ii) equipment, goods, inventory and fixtures, (iii) documents, instruments, and chattel paper, (iv) letters of credit and letter-of-credit rights, (v) securities collateral, (vi) investment property, (vii) intellectual property collateral, (viii) commercial tort claims, (ix) general intangibles, (x) money and deposit accounts, (xi) supporting obligations, (xii) books and records relating to all of the above, and (xiii) all other personal property, tangible and intangible, including proceeds and products of any of the foregoing.

2.    Prepetition Second Lien Credit Agreement

The Debtors are parties to that certain $67,000,000 Amended and Restated Second Lien Credit and Guaranty Agreement, dated as of November 29, 2006, as amended and restated on December 20, 2006 (as further amended, supplemented or otherwise modified from time to time, the "Prepetition Second Lien Credit Agreement", and, together with the Prepetition First Lien Credit Agreement, the "Prepetition Credit Agreements"), with RBSSC as sole lead arranger and sole book running manager, and RBS as administrative agent and collateral agent, and certain lenders party thereto (collectively, the "Prepetition Second Lien Lenders").

The Prepetition Second Lien Credit Agreement provides for two term loan facilities in the maximum aggregate amounts of $55 million and $12 million, respectively. Obligations arising under the Prepetition Second Lien Credit Agreement are direct obligations of PRC that are guaranteed by, and thus obligations of, the other Debtors. On December 1, 2006, financing statements were filed on behalf of the Prepetition Second Lien Lenders regarding security interests created under the Prepetition Second Lien Credit Agreement.

In connection with the Prepetition Second Lien Credit Agreement, the Debtors granted second liens and executed security agreements in favor of RBS, as agent for the Prepetition Second Lien Lenders, in substantially all of the Debtors' assets, including the following: (i) accounts, (ii) equipment, goods, inventory and fixtures, (iii) documents, instruments, and chattel paper, (iv) letters of credit and letter-of-credit rights, (v) securities collateral, (vi) investment property, (vii) intellectual property collateral, (viii) commercial tort claims, (ix) general intangibles, (x) money and deposit accounts, (xi) supporting obligations, (xii) books and records relating to all of the above, and (xiii) all other personal property, tangible and intangible, including proceeds and products of any of the foregoing.

By letter, dated November 2, 2007, RBS provided written notice of its resignation as agent under the Prepetition Second Lien Credit Agreement, with such resignation becoming effective on or about December 3, 2007. Subsequently, Law Debenture Trust Company of New York was appointed as the successor agent for the Prepetition Second Lien Lenders.

3.    Intercreditor Agreement

The relative priorities of liens held by the Prepetition First Lien Lenders and Prepetition Second Lien Lenders are subject to that certain Intercreditor Agreement, dated as of November 29, 2006 (as it may have been modified, supplemented or amended), between the Debtors, RBS in its capacity as agent for the Prepetition First Lien Lenders, and RBS in its capacity as agent for the Prepetition Second Lien Lenders. In accordance with the Intercreditor

Agreement, the Prepetition Second Lien Lenders agreed that liens on any collateral securing obligations under the Prepetition First Lien Credit Agreement are senior in all respects and prior to any lien on the collateral securing obligations under the Prepetition Second Lien Credit Agreement.

4.     Recent Financial Information

As of December 31, 2007, the Debtors' unaudited consolidated financial statements reflected assets totaling approximately $350 million and liabilities totaling approximately $260 million. As of December 31, 2007, the Debtors' assets included Cash or Cash equivalents of approximately $18.8 million, and accounts receivable of approximately $74.3 million.

The Debtors' total revenues for the twelve-month period ending December 31, 2007 amounted to approximately $472.9 million, a 12% increase over total revenues for the twelve-month period ending December 31, 2006. The Debtors' EBITDA for the twelve-month period ending December 31, 2007 was approximately $10.14 million, a 72% decrease from reported EBITDA during the twelve-month period ending December 31, 2006.

## IV.

## KEY EVENTS LEADING TO THE
## COMMENCEMENT OF THE REORGANIZATION CASES

**A.     DECLINE IN FINANCIAL PERFORMANCE**

Over the course of 2007, the Debtors have faced a number of challenges, which, taken together, had a negative impact on their overall financial performance, impaired their ability to service debt, obtain financing, and add new clients. Ultimately, these challenges necessitated the commencement of the Reorganization Cases.

1.     Competition and Market Conditions

The Debtors' business is extremely competitive. The Debtors have numerous domestic and foreign competitors for market share. In many cases, the Debtors are not the sole provider to a client and their revenues from a client vary from month to month, or decline, if a client allocates call volumes to a competitor. Client contracts in the Debtors' industry also may contain various termination and ramp-down privileges. As a result of these factors, service providers such as the Debtors have been, and continue to be, subject to competitive pressures on their revenues and margins, and experience operational pressures to manage their costs.

Prior to the Commencement Date, the Debtors serviced a lower percentage of business at offshore sites than their competitors did, a factor which allowed competitors to offer favorable pricing alternatives to potential clients.

2.     Operational Issues

One of the major challenges facing the Debtors at the outset of their Reorganization Cases was their substantially unprofitable relationship with a key client (the "Key Client"). On or about October 2, 2006, the Debtors entered into a new client services contract

that provided competitive pricing terms to the Key Client. In order to implement this contract, the Debtors incurred substantial capital expenditures for personnel and facilities, as well as associated equipment such as telephones and computers. The Debtors' prepetition revenue levels turned out to be inadequate to support the expenses required to service the Key Client and the Debtors' other clients. In particular, following implementation of the Key Client contract, revenues under that contract failed to meet the original representations and the Debtors' expectations. The Debtors then reviewed their financial projections and determined that performing under the Key Client contract would result in significant losses. The situation was compounded by the fact that the Debtors anticipated that they would incur millions of dollars in costs and penalties – a large portion of which relates to liquidated damages owed to landlords – if they were to end their relationship with the Key Client. Because the Debtors could not reduce their operating costs to a rate commensurate with their revenues, they projected that they would suffer an EBITDA loss of approximately $15 million during 2008 by providing services under their contract with the Key Client.

Furthermore, the Debtors' highly leveraged capital structure inhibited their flexibility in addressing operational problems. Beginning in August 2007, and continuing through November, 2007, the combination of these factors caused certain major financial ratings agencies to downgrade the Debtors' credit rating, causing concerns among some of the Debtors' clients and impeding the Debtors' ability to market their services to prospective clients.

3.     Turnaround Efforts

In response to the Debtors' deteriorating financial performance, the Debtors' management took decisive action in an effort to restructure their operations to reduce their overall cost structure and improve performance.

Beginning in August 2007, the Debtors' Board of Managers changed the Debtors' leadership, appointing Regis G. McElhatton as Chief Executive Officer. In Mr. McElhatton's first ninety days with the Debtors, he developed short- and long-term plans for operational improvements that included initiatives to reduce overhead, review client contracts, improve contact center occupancy and utilization rates, optimize contact center performance, restructure management, and improve the Company's balance between domestic and offshore operations. As of December 2007, the Debtors expected these efforts to yield significant annualized savings and margin improvement. Mr. McElhatton also engaged in extensive discussions with key clients in an effort to align those relationships so that they become profitable for both parties. Further, on December 4, 2007, the Debtors announced and began implementation of cost reductions and organizational re-alignment, which included a compression of organizational hierarchies with a significant reduction in managerial employees, a reduction of approximately 4% of their workforce, consolidation and closure of some contact centers, changes in employee deployment, and changes in service strategy.

On November 7, 2007, the Debtors began working with Evercore Group LLC to assist them in considering strategic alternatives. The Debtors and their advisors explored various transactions, including possible M&A transactions, refinancing options, recapitalizations, and a potential chapter 11 filing, in an effort to maximize value for their stakeholders. The Debtors also explored various refinancing alternatives in an effort to increase liquidity.

By mid-November 2007, the Debtors and DCH had engaged in extensive negotiations with the Prepetition Lenders regarding the Debtors' further need for additional

liquidity and a recapitalization of the existing secured debt. In conjunction with these negotiations, RBS advised the Debtors that certain Prepetition First Lien Lenders (the "DIP Lenders") were willing to extend postpetition financing on terms and conditions that would prime their own prepetition security interests. The proposed financing from the DIP Lenders permitted the Debtors to secure the postpetition financing required for their reorganization, without having to prime the Prepetition First Lien Lenders in the absence of their consent, an effort which would likely have required an extended, time-consuming, and expensive contested hearing.

In addition, the Debtors also obtained the Prepetition Lenders' agreement to the Plan Term Sheet, which was ultimately incorporated into the Plan. The Plan Term Sheet generally provided that:

- The DIP Lenders' claims under the Postpetition Financing Agreement will be paid in full on the Effective Date of the Plan by an exit facility (the "Exit Facility"). The Exit Facility will consist of revolving loans, or term loans, or both, in a committed amount up to $40-45 million. Available amounts after repayment of the Postpetition Financing Agreement will be used for the Reorganized Debtors' business needs. The DIP Lenders will be granted first priority liens on all existing and after-acquired assets that are collateral under the Postpetition Financing Agreement.

- The Prepetition First Lien Lenders' claims under the Prepetition First Lien Credit Agreement will be exchanged for new second priority lien notes in the aggregate principal amount of $40 million, new unsecured notes in the aggregate principal amount of $40 million, all of which is payable in kind no less than quarterly, plus 80% of the new equity in the Reorganized Debtors, subject to dilution.

- The Prepetition Second Lien Lenders' claims under the Prepetition Second Lien Credit Agreement will be exchanged for 20% of the new equity in the Reorganized Debtors, warrants to purchase up to 4% of the fully diluted new equity of the Reorganized Debtors based upon an enterprise value of $170 million, plus warrants to purchase up to 2% of the fully diluted new equity of the Reorganized Debtors based upon an enterprise value of $200 million.

- The holders of General Unsecured Claims will receive their ratable share of Cash in an amount to be determined and upon terms and conditions mutually satisfactory to the Prepetition Lenders.

In furtherance of their efforts to improve the financial performance of their business, the Debtors hired CXO, L.L.C. ("CXO") as their restructuring advisors on January 15, 2008. In addition, the Debtors' Board of Managers appointed members of the CXO team as Chief Financial Officer and Chief Restructuring Officer. Since being hired, the CXO team has assisted the Debtors in assessing and identifying non-profitable and inefficient contracts, agreements and leases, as well as developing and implementing strategies for enhancing cost and margin improvement.

**B.      THE RESTRUCTURING NEGOTIATIONS**

1.      Lock-up Agreement

Prior to the Commencement Date, numerous Prepetition Lenders and the DIP Lenders (together, the "Consenting Lenders") and the Debtors entered into that certain Lock-up Agreement, dated as of January 23, 2008 (the "Commitment"). Pursuant to the Commitment, the parties agreed that, among other things, (i) the Debtors' financial restructuring (the "Restructuring") would be effectuated through a pre-negotiated chapter 11 case, (ii) the Debtors would use their reasonable best efforts to adhere to the negotiated timeline for the Restructuring, and (iii) subject to certain conditions, the Debtors and the Consenting Lenders would not object to and would support the Postpetition Financing Agreement and consummation of the Restructuring.

2.      Postpetition Financing Agreement

In connection with the Commitment and the negotiations leading up to the commencement of the Restructuring, the Debtors, together with their attorneys and financial advisors, negotiated the terms and conditions of the Postpetition Financing Agreement with the DIP Agent and the Prepetition First Lien Agent. Thereafter, the Debtors and the DIP Lenders entered into the Postpetition Financing Agreement, providing up to $30 million in debtor in possession financing to enable the continued operation of the Debtors' businesses, avoid short-term liquidity concerns, and preserve the going-concern value of the Debtors' estates. The terms of the Postpetition Financing Agreement are summarized in Section V.B. below.

**V.**

**THE REORGANIZATION CASES**

**A.      FIRST DAY ORDERS**

On the Commencement Date, the Debtors filed a series of motions seeking various relief from the Bankruptcy Court designed to minimize any disruption of business operations and to facilitate their reorganization.

1.      Case Administration Orders

The Bankruptcy Court issued orders: (i) authorizing the joint administration of the chapter 11 cases, (ii) establishing certain notice and case management procedures, (iii) granting an extension of time to file the Debtors' schedules and statements, and (iv) authorizing the waiver of the requirement to file a list of creditors.

2.      Critical Obligations

The Bankruptcy Court authorized the Debtors to satisfy certain critical business obligations such as those relating to wages, compensation, and employee benefits.

3.      Business Operations

Among other things, the Bankruptcy Court (i) authorized the Debtors to continue certain workers' compensation and other insurance policies, and (ii) on an interim basis,

prohibited the Debtors' utilities service providers from altering, refusing or discontinuing service and established certain procedures for determining adequate assurance of payment.

4.     Financial Operations

The Bankruptcy Court authorized the Debtors to (i) maintain their existing bank accounts and forms, (ii) continue to use existing investment guidelines and (iii) continue their centralized cash management system.

## B.     CHAPTER 11 FINANCING

On January 24, 2008, the Bankruptcy Court entered an order approving the Postpetition Financing Agreement on an interim basis.  On February 11, 2008, the Creditors' Committee filed an objection to entry of a final order approving the postpetition financing and a memorandum of law in further support of its objection.  After an evidentiary hearing held on February 27, 2008, the Bankruptcy Court entered the Postpetition Financing Order and approved the Postpetition Financing Agreement.

The material provisions of the Postpetition Financing Agreement are described below:

- Borrowing Limits.  The DIP Lenders agree to make revolving loans and letters of credit available to the Debtors during the term of the Postpetition Financing Agreement in an aggregate amount not to exceed $30,000,000, of which $10,000,000 would be made available upon entry of the Interim Order.  Outstanding letters of credit may not exceed $4,000,000 in the aggregate.

- Borrowing Limitations.  The amount available for revolving loans and letters of credit is limited to an amount equal to (x) the lesser of (i) $30,000,000 and (ii) seventy-five percent (75%) of the net amount of the Debtors' eligible accounts less (y) the sum of (i) the amount of issued and outstanding letters of credit under the Postpetition Financing Agreement, (ii) the then-outstanding revolving credit loans under the Postpetition Financing Agreement, and (iii) reserves instituted by the DIP Agent and certain DIP Lenders, in their reasonable discretion.

- Interest Rate.  Revolving loans under the Postpetition Financing Agreement will bear interest at a per annum rate equal to either the Base Rate plus the Applicable Margin, or the Eurodollar Rate plus the Applicable Margin.[9]  In any event, the Base Rate plus the Applicable Margin will be at least 7.25%, and the Eurodollar Rate plus the Applicable Margin will be at least 8.25%.

---

[9] For purposes of the Postpetition Financing Agreement, the term "Applicable Margin" means 2.50% per annum with respect to Base Rate loans, and 4.50% per annum with respect to Eurodollar Rate loans.  The term "Base Rate" generally means a rate per annum equal to the greater of the prime rate, or the federal funds effective rate in effect plus 0.5%.  The term "Eurodollar Rate" means the rate per annum equal to the rate calculated by the British Banks' Association and obtained through a nationally recognized service such as Dow Jones Market Service (Telerate) or Reuters.

- <u>Maturity</u>. The Postpetition Financing Agreement will expire and become immediately due and payable upon the earlier of (i) July 23, 2008, (ii) the closing date of any sale of the Debtors or all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, (iii) the effective date of a chapter 11 plan of reorganization, or (iv) the date of the occurrence of an Event of Default (as defined below).

- <u>Events of Default</u>. Events of Default include provisions relating to, among other things, (i) the appointment of a trustee, responsible officer, or examiner with expanded powers, or conversion or dismissal of any Debtor's Reorganization Case, (ii) granting relief from the automatic stay as to any material asset, (iii) granting superpriority claims to any party other than the DIP Lenders, (iv) granting adequate protection, (v) impairment of liens or superpriority claims granted to the Prepetition First Lien Lenders and DIP Lenders, (vi) the Debtors' postpetition governance, (vii) use of Postpetition Financing Agreement proceeds under the Budget, (viii) covenant violations, (ix) termination or rejection of material contracts, (x) venue of the Reorganization Cases, (xi) the schedule for execution or filing of the Postpetition Financing Agreement, the Final Order, a disclosure statement, and an order confirming the Plan, (xii) insolvency proceedings other than the Reorganization Cases, (xiii) failure to pay any interest or fees and expenses when due, (xiv) failure to comply with financial covenants, and (xv) termination of the Debtors' statutory exclusive period in which to file a plan of reorganization.

- <u>Liens</u>. The DIP Lenders are granted priming liens on all property of the Debtors that constitutes collateral under the Prepetition First Lien Credit Agreement, and first priority liens on all property of the Debtors that is not collateral under the Prepetition First Lien Credit Agreement (excluding any trust fund tax and/or other fiduciary funds), including, but not limited to, all causes of action arising under chapter 5 of the Bankruptcy Code.

- <u>Fees</u>. The Debtors are obligated to pay a $300,000 underwriting fee to the DIP Lenders upon interim approval, and a $600,000 underwriting fee upon final approval. In addition, the Debtors are obligated to pay a $10,000 collateral management fee and an unused line fee to the DIP Agent.

## C.    CREDITORS' COMMITTEE AND PLAN SUPPORT AGREEMENT

On February 4, 2008, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.

The current members of the Creditors' Committee are:

| | |
|---|---|
| Verizon Communications Inc.<br>1133 19th Street, N.W.<br>Washington, DC 20026 | IAC/InterActiveCorp.<br>555 West 18th Street<br>New York, NY 10011 |
| NICE Systems Inc.<br>301 Route 17 North<br>10th Floor<br>Rutherford, NJ 07070 | SER Solutions, Inc.<br>45925 Horseshoe Drive, # 150<br>Dulles, VA 20147 |

TMP Worldwide Avertising &
Communications, LLC
205 Hudson Street, 5th Floor
New York, NY 10013

The Creditors' Committee has the following advisors:

<u>Attorneys</u>                                         <u>Financial Advisors</u>

Blank Rome LLP                            J.H. Cohn LLP
The Chrysler Building                     333 Thornall Street, 6th Floor
405 Lexington Avenue                     Edison, NJ 08837
New York, NY 10174-0208

Since the appointment of the Creditors' Committee, the Debtors have consulted with the
Creditors' Committee concerning the administration of the chapter 11 cases. The Debtors have
informed the Creditors' Committee with respect to their operations and have sought concurrence
of the Creditors' Committee for actions and transactions outside of the ordinary course of
business.

On April 10, 2008, the Debtors filed an initial form of proposed disclosure
statement and chapter 11 plan with the Bankruptcy Court. Thereafter, the Creditors' Committee
raised certain concerns regarding the Debtors' proposed treatment of General Unsecured Claims.
In an effort to resolve these concerns, the Debtors, the Creditors' Committee, the DIP Lenders,
and the Prepetition Lenders entered into extensive, arms' length negotiations. These negotiations
ultimately resulted in the formulation of the Plan, annexed hereto as Exhibit A, which has the full
support of the Creditors' Committee. The Plan, therefore, resolves any and all disputes or
controversies between the Debtors, the DIP Lenders, the Prepetition Lenders, and the Creditors'
Committee regarding the treatment of General Unsecured Claims under the Plan.

In pertinent part, the Debtors, the DIP Lenders, the Prepetition Lenders, and the
Creditors' Committee agreed to the following Plan provisions in order to facilitate the Debtors'
restructuring and other efforts to emerge from chapter 11:

- <u>Classification</u>. All General Unsecured Claims will receive the same treatment under
  Class 6 of the Plan.

- <u>Distributions</u>. The parties agreed that each holder of an Allowed General Unsecured
  Claim shall receive its Distribution Pro Rata Share of $1,350,000, as provided in the Plan.

- <u>Avoidance Actions</u>. The parties agreed that, in accordance with Section 11.10 of the
  Plan, the Debtors will waive all causes of action under section 547 of the Bankruptcy
  Code against the holders of General Unsecured Claims that are Trade Creditors of the
  Debtors.

- <u>Objections to Claims</u>. In accordance with Section 7.1 of the Plan, the Debtors and the
  Creditors' Committee will cooperate in the prosecution of objections to Material General
  Unsecured Claims. Moreover, in order to facilitate this cooperation, Section 13.8 of the
  Plan provides that the Creditors' Committee and their professionals shall continue to

perform their duties with respect to such objections for a period after the Effective Date of the Plan until any objections to Material General Unsecured Claims are resolved. The Creditors' Committee will have standing (i) to appear and be heard in connection with the administration of General Unsecured Claims and any pending objections to such Claims, (ii) to file objections to any Material General Unsecured Claim as to which, despite the Committee's urging, the Reorganized Debtors elect not to object, and (iii) to oppose any proposed settlement or compromise of a Material General Unsecured Claim that is advocated by the Reorganized Debtors.

- <u>Fees</u>. In consideration of concessions made with respect to the Plan, the Creditors' Committee has agreed that from and after May 1, 2008, all fees and expenses incurred by the Creditors' Committee and their professionals that are chargeable to the Debtors' estates shall be capped (barring an increase granted by the Bankruptcy Court in the event of any unforeseen circumstances) at $75,000 per month for a period of two months, and shall be capped at $50,000 for all time thereafter. The sum of these amounts shall be a cumulative amount which, if exceeded during one period, shall go against the total cap and, similarly, any amount which is not used during a given period shall be carried forward, subject to a total cap of $200,000.

## D.    ASSUMPTION OF ACS CONTRACT

Prior to the Commencement Date, the Debtors and Advanced Contact Solutions, Inc. ("<u>ACS</u>") entered into a service contract (the "<u>ACS Contract</u>"), pursuant to which the Debtors subcontract to ACS a significant volume of customer care, sales, and marketing services provided to several of Debtors' clients. ACS provides a cost structure that is more economical for some services than the Debtors achieve in U.S. centers. The contract with ACS has, therefore, enabled the Debtors to obtain business which they otherwise would not have been able to price competitively.

Accordingly, on the Commencement Date, the Debtors filed a Motion for Authority to (I) Assume an Agreement with ACS, and (II) Pay Cure on a Mutually Agreeable Schedule (the "<u>ACS Motion</u>"). Pursuant to the ACS Motion, the Debtors requested authority to cure any and all defaults under the ACS Contract by paying to ACS: (i) $2,766,962.90 on March 7, 2008, (ii) $4,310,306.41 on April 4, 2008, and (iii) beginning in May 2008, the balance of any cure amount in three monthly installments, contingent upon the Bankruptcy Court's entry of the Postpetition Financing Order. In exchange, ACS would continue to provide services to the Debtors under the ACS Contract.

On February 13, 2008, the Bankruptcy Court entered an initial order granting the ACS Motion and authorizing the Debtors to assume the ACS Contract and pay the proposed cure amount, unless the Creditors' Committee, the DIP Lenders, or the DIP Agent filed an objection thereto, in which case (i) the order would not take effect and (ii) a final hearing on the ACS Motion would be held on February 27, 2008. The Creditors' Committee filed a Conditional Objection and Reservation of Rights to the ACS Motion on February 20, 2008, which subsequently was resolved. Accordingly, on February 26, 2008, the Bankruptcy Court entered an order granting the ACS Motion and authorizing the Debtors to assume the ACS Contract and pay the following cure amounts to ACS: (i) $2,986,008 on March 7, 2008, (ii) $4,310,306 on April 4, 2008, (iii) $3,000,000 on May 2, 2008, and (iv) $3,000,000 on November 30, 2008, in exchange for which ACS will continue to provide services to the Debtors under the ACS Contract.

E.    **SALE OF CERTAIN NON-MATERIAL ASSETS**

In December 2000, the Debtors paid $675,000 for approximately three acres of undeveloped real property in Miami-Dade County, Florida (the "Kendall Property"). The Debtors purchased the Kendall Property to use as a parking lot because one of their call centers adjacent to the Kendall Property did not have parking for employees. By April 2007, the Debtors had ceased operations at that call center and the premises were vacated in December 2007. Because the Kendall Property was no longer needed for the Debtors' business operations, the Debtors determined to sell this asset.

Realizing early in 2007 that the Kendall Property should be sold, the Debtors interviewed real estate brokers. On January 15, 2007, the Debtors entered into an Exclusive Sales Agreement with ComReal Miami, Inc., who extensively marketed the property. After active negotiations between the Debtors and various bidders, the Debtors entered into that certain Purchase and Sale Agreement between PRC, LLC and J. Brett Houston, dated October 16, 2007 (the "Sale Agreement"). The Sale Agreement subsequently was amended to (i) provide for a final purchase price of $2,275,000 and (ii) extend the closing date to March 4, 2008 so that the Bankruptcy Court could approve the sale of the Kendall Property.

On February 4, 2008, the Debtors filed a Motion for Approval of (I) the Assumption of the Sale Agreement, (II) Private Sale of the Kendall Property, and (III) Payment of Related Sales Commissions (the "Sale Motion"). By the Sale Motion, the Debtors sought entry of an order, pursuant to (i) section 365(a) of the Bankruptcy Code and Bankruptcy Rule 6006 authorizing them to assume the Sale Agreement and (ii) sections 363(b), (f) and (m) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004 approving the sale of the Property pursuant to the Sale Agreement and authorizing the transactions contemplated thereby, including the payment of related sales commissions.

The Creditors' Committee filed a limited objection and reservation of rights with respect to the Sale Motion, arguing that the proceeds of the sale should be escrowed for the benefit of the general unsecured creditors, as the Debtors should not be permitted to grant liens to the DIP Lenders and/or for the benefit of the Prepetition Lenders on previously unencumbered assets. After a hearing held on February 27, 2008, the Bankruptcy Court granted the Sale Motion over the Creditors' Committee's limited objection and authorized the Debtors to assume the Sale Agreement, sell the Kendall Property and pay the related sales commissions. Closing for the Kendall Property was held in accordance with the Sale Agreement on March 4, 2008.

F.    **REJECTION OF CERTAIN AGREEMENTS**

As part of their efforts to reduce their operating expenses, the Debtors engaged in an analysis of their various contracts and agreements, including unexpired leases (collectively, the "Executory Contracts"). On and after the Commencement Date, the Debtors determined to reject various Executory Contracts pursuant to orders of the Bankruptcy Court. In accordance with the Plan, all Executory Contracts that exist between the Debtors and any person or entity will be deemed rejected by the Debtors as of the Effective Date, except as provided in the Plan. See Section VI.F. of this Disclosure Statement for more information about the Debtors' assumption and rejection of Executory Contracts.

G.    **SCHEDULES AND BAR DATE**

On or about March 7, 2008, the Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs.  On March 13, 2008, the Bankruptcy Court entered an order establishing May 1, 2008 at 5:00 p.m. (Eastern Time) as the last date and time (the "Bar Date") for each person or entity to file proofs of Claim based on prepetition Claims against any of the Debtors, and July 21, 2008 at 5:00 p.m. (Eastern Time) as the last date and time for governmental units to file proofs of Claim based upon prepetition Claims against any of the Debtors.  In accordance with this order, the Debtors mailed a notice of the Bar Date and a proof of Claim form to all known holders of Claims.

<div align="center">VI.</div>

<div align="center">**THE PLAN OF REORGANIZATION**</div>

A.    **INTRODUCTION**

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Preconfirmation Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

B.    **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is

not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the Claims in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims), are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, the holders of Preconfirmation Equity Interests in Class 7 (Preconfirmation Equity Interests) are deemed to reject the Plan because they receive no distribution and retain no property interest under the Plan. Because Class 7 (Preconfirmation Equity Interests) is deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Class. Among these are the requirements that the plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, the equity interests in such Class. For a more detailed description of the requirements for confirmation, see Section IX.B

below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Preconfirmation Equity Interests in, the Debtors into the following Classes:

| Class | Claims |
|-------|--------|
| 1 | Other Priority Claims |
| 2 | Secured Tax Claims |
| 3 | Other Secured Claims |
| 4 | Allowed Prepetition First Lien Claims |
| 5 | Allowed Prepetition Second Lien Claims |
| 6 | General Unsecured Claims |
| 7 | Preconfirmation Equity Interests |

1. **Unclassified**

**Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors during the Reorganization Cases and compensation for professional services rendered and reimbursement of expenses incurred. Specifically excluded from Administrative Expense Claims are any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code, which fees or charges, if any, will be paid in accordance with Section 13.7 of the Plan.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors will be paid in full and performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions; provided, further, that if any such ordinary course expense is not billed or a request for payment is not made within ninety (90) days after the Effective Date, claims for payment of such an ordinary course expense will be barred.

**Postpetition Financing Obligation Claims**

Postpetition Financing Obligation Claims are all obligations of the Debtors arising under the Postpetition Financing Agreement and the Postpetition Financing Order.

On the Effective Date, all Allowed Postpetition Financing Obligation Claims will be paid in full in Cash.  Upon payment and satisfaction in full of all Postpetition Financing Obligation Claims, all liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, will be terminated and of no further force or effect.

### Professional Compensation and Reimbursement Claims

Professional Compensation and Reimbursement Claims are all Claims of entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.  All such entities must file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.

Pursuant to the Plan, holders of Allowed Professional Compensation and Reimbursement Claims will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim.  The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.  From and after May 1, 2008, all fees and expenses incurred by the Creditors' Committee and their professionals that are chargeable to the Debtors' estates shall be capped (barring an increase granted by the Bankruptcy Court in the event of any unforeseen circumstances) at $75,000 per month for a period of two months, and shall be capped at $50,000 for all time thereafter.  The sum of the amounts payable to the Creditors' Committee and their professionals section 2.3 of the Plan shall be a cumulative amount which, if exceeded during one period, shall go against the total cap and, similarly, any amount which is not used during a given period shall be carried forward, subject to a total cap of $200,000.

### Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim or, (b) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law; provided that the first payment shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims, and subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

2.    **Classified**

**Class 1 – Other Priority Claims**

Other Priority Claims include Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of the Debtors up to a statutory cap of $10,950 per employee. The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $82,200.

Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim will receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

**Class 2 – Secured Tax Claims**

Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties). The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $2,123,000.

Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim will receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as practicable, Cash in an amount equal to such Allowed Secured Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law; provided that the first payment shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims, and subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

**Class 3 – Other Secured Claims**

Other Secured Claims include any Secured Claim other than a Secured Tax Claim, Prepetition First Lien Claim or Prepetition Second Lien Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### Class 4 – Allowed Prepetition First Lien Claims

Prepetition First Lien Claims include Claims held by Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $119.35 million.

Class 4 is impaired by the Plan. Each holder of a Prepetition First Lien Claim is entitled to vote to accept or reject the Plan.

Under the Plan, the Allowed Prepetition First Lien Claims will be Allowed in the aggregate amount of $119,350,000. On the Effective Date, in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition First Lien Claim will receive its Ratable Proportion of each of: (i) $40 million of the Postconfirmation Second Lien Facility; (ii) $40 million of the Postconfirmation Unsecured Note, all of which is payable in kind no less than quarterly; and (iii) 80% of the equity interests of Postconfirmation HoldCo, which equity interests will be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections (ii) and (iii) of Section 4.5(b) of the Plan. The Postconfirmation Second Lien Facility will include a feature allowing the Reorganized Debtors to pay interest in kind with a toggle feature based on the Reorganized Debtors' free cash flow or a similar metric to be determined. The material terms of the Postconfirmation Second Lien Facility and the Postconfirmation Unsecured Note will be included with the Plan Supplement.

**Class 5 – Allowed Prepetition Second Lien Claims**

Prepetition Second Lien Claims include Claims held by Prepetition Second Lien Lenders under the Prepetition Second Lien Credit Agreement. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $67 million.

Class 5 is impaired by the Plan. Each holder of a Prepetition Second Lien Claim is entitled to vote to accept or reject the Plan.

Under the Plan, the Allowed Prepetition Second Lien Claims will be Allowed in the aggregate amount of $67,000,000. On the Effective Date and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition Second Lien Claim will receive its Ratable Proportion of each of: (x) 20% of the equity interests of Postconfirmation HoldCo, which equity interests will be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections (ii) and (iii) of Section 4.5(b) of the Plan; (y) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to 4% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based upon an enterprise value of $170 million; and (z) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to an additional 2% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based on an enterprise value of $200 million. The material terms of the warrants will be included with the Plan Supplement.

**Class 6 – General Unsecured Claims**

General Unsecured Claims include any Claim against the Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Secured Tax Claim, Other Secured Claim, Prepetition First Lien Claim, Prepetition Second Lien Claim, or Preconfirmation Equity Interest Claim.

Class 6 is impaired by the Plan. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Each holder of an Allowed General Unsecured Claim shall receive its Distribution Pro Rata Share of $1,350,000 in Cash (which shall be calculated as if no prior distributions had been made) on each Distribution Date or as soon thereafter as is practicable, *provided, however,* in any distribution made to the holder of an Allowed General Unsecured Claim, there shall be deducted from such distribution the amount of any distribution previously distributed to such holder on account of such Allowed General Unsecured Claim in any distribution made prior thereto.

**Class 7 – Preconfirmation Equity Interests**

Preconfirmation Equity Interests include all instruments evidencing an ownership interest in Intermediate HoldCo, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

Class 7 is impaired by the Plan. Each holder of a Preconfirmation Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

On the Effective Date, the Preconfirmation Equity Interests will be cancelled and the holders of Preconfirmation Equity Interests will not be entitled to, and will not receive or retain any property or interest in property on account of such Preconfirmation Equity Interests under the Plan.

## C.    MEANS OF IMPLEMENTING THE PLAN

1.    Intercompany Claims

Notwithstanding anything to the contrary in the Plan, Intercompany Claims will be adjusted, continued or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, in their sole discretion.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Debtors or the Reorganized Debtors.

2.    Restructuring and Other Transactions

(a)    Restructuring Transactions

On the Effective Date, the following transactions ("Restructuring Transactions") will be effectuated in the order set forth below:

(i)    Simultaneously, (A) in accordance with Section 4.7 of the Plan, all of the Preconfirmation Equity Interests will be cancelled, and (B) all of the new membership interests in Postconfirmation Intermediate HoldCo will be issued to the Prepetition First Lien Agent and the Prepetition Second Lien Agent on behalf of the holders of Allowed Prepetition First Lien Claims and the Allowed Prepetition Second Lien Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative values of their Claims); and

(ii)    Immediately thereafter, the Prepetition First Lien Agent and the Prepetition Second Lien Agent will, on behalf of the holders of Allowed Prepetition First Lien Claims and the Allowed Prepetition Second Lien Claims, respectively, contribute all of the membership interests in Postconfirmation Intermediate HoldCo to Postconfirmation HoldCo in exchange for the consideration described in Sections 4.4 and 4.5 of the Plan.

(b)    Consistent Tax Reporting

(i)    All parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of Postconfirmation HoldCo membership interests and warrants) will report for all federal income tax purposes consistent with the form of the Restructuring Transactions.

(ii)    As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Postconfirmation Board will determine the value of the membership interests of Postconfirmation Intermediate HoldCo as of the Effective Date (as appropriate for federal income tax purposes) and the portions of such value which are allocable, respectively, to the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants to purchase fully diluted interests of Postconfirmation HoldCo.  Such allocation will take into account the relative fair market values of the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured

Note, the membership interests in Postconfirmation HoldCo, and the warrants. The Postconfirmation Board will apprise, in writing, all parties of such valuation and allocation. The valuation and allocation will be used consistently by all parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of membership interests and warrants) for all federal income tax purposes.

        (iii)      Consistent with the intent that Postconfirmation HoldCo will initially be treated as a partnership for federal income tax purposes, no election will be made by Postconfirmation HoldCo or by Intermediate HoldCo (or any of their direct or indirect subsidiaries) to be taxed as a corporation for federal income tax purposes that is effective on or prior to the Effective Date. All parties (including the Reorganized Debtors and the holders of Postconfirmation HoldCo membership interests and warrants) will not treat the holders of warrants as owning partnership interests in Postconfirmation HoldCo for federal income tax purposes by reason of their ownership of warrants, unless the Postconfirmation Board determines otherwise.

        (c)      <u>Other Transactions</u>

        On or as of the Effective Date or as soon as practicable thereafter, and without the need for any further action, the Reorganized Debtors may (i) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors or (iii) engage in any other transaction in furtherance of the Plan.

        3.      <u>Cancellation of Existing Agreements and Preconfirmation Equity Interests</u>

        Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Postpetition Financing Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement and any notes issued thereunder, all Preconfirmation Equity Interests and other instruments evidencing any Claims against the Debtors or Preconfirmation Equity Interests in the Debtors will be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors thereunder will be discharged.

        4.      <u>Incurrence of New Indebtedness</u>

        Postconfirmation PRC expects to enter into an Exit Facility likely consisting of a facility commitment of up to $30 to $40 million or such other amount as the Debtors deem appropriate and necessary. The proceeds of the Exit Facility will be used to repay the claims in connection with the Postpetition Financing Agreement, and to meet working capital and other corporate needs of Postconfirmation PRC, thereby facilitating its emergence from bankruptcy.

        The Exit Facility will likely consist of a combination of a revolving facility and a term loan, which will be secured by first priority liens upon all existing and after-acquired assets of the Debtors that constitute collateral under the Postpetition Financing Agreement. The Debtors expect to receive proposals for exit financing that meet the Debtors' requirements and will continue to negotiate with such parties regarding the Exit Facility. As of the date hereof, no

formal commitment to provide the Exit Facility has been obtained. The Debtors are confident that they will obtain one or more formal commitments to provide the Exit Facility prior to confirmation. Entry into the Exit Facility is a condition to the effectiveness of the Plan.

Documents evidencing the Exit Facility, or commitment letters with respect thereto, will be filed by the Debtors with the Plan Supplement. In the Confirmation Order, the Debtors will request the Bankruptcy Court to authorize the Reorganized Debtors to execute the same together with other documents as the Exit Facility lenders may reasonably require to effectuate the treatment afforded to the parties under the Exit Facility. In accordance with Section 5.4 of the Plan, the Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date will be authorized without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests.

### D.    PLAN PROVISIONS GOVERNING DISTRIBUTION

1.    <u>Distributions on Account of Allowed General Unsecured Claims</u>

Distributions with respect to holders of Allowed General Unsecured Claims shall only be made on each Distribution Date; <u>provided</u>, <u>however</u>, that, if any Disputed General Unsecured Claim becomes Allowed subsequent to the Initial Distribution Date, the Reorganized Debtors may, in their sole discretion, make a distribution with respect to such Claim prior to a Distribution Date. All Allowed General Unsecured Claims held by a creditor shall be aggregated and treated as a single Claim. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed General Unsecured Claims shall provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions shall be sent.

2.    <u>Date of Distributions</u>

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.

3.    <u>Disbursing Agent</u>

All distributions under the Plan will be made by Postconfirmation PRC as Disbursing Agent or such other entity designated by Postconfirmation PRC as a Disbursing Agent.

4.    <u>Rights and Powers of Disbursing Agent</u>

The Disbursing Agent will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated by the Plan, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions thereof.

5.      Expenses of the Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date will be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.      Delivery of Distributions

(a)      Last Known Address

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in the Plan will require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

(b)      Unclaimed Distributions

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and reinvested in the Reorganized Debtors and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.

(c)      Distribution Record Date

With respect to holders of all General Unsecured Claims against the Debtors, on the Distribution Record Date, the claims register will be closed and any transfer of any Claim therein will be prohibited. The Debtors and the Reorganized Debtors will have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

7.      Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements. All distributions of Cash to the creditors of each of the Debtors under the Plan will be made by, or on behalf of, the applicable Debtor.

8.      Cash Distributions

No payment of Cash less than fifty dollars ($50) will be made to any holder of an Allowed Claim unless a request for such payment is made in writing to the Reorganized Debtors.

9.      Setoffs and Recoupment

The Debtors may, but will not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of

any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

      10.     <u>Allocation of Plan Distributions Between Principal and Interest</u>

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## E.      PROCEDURES FOR TREATING DISPUTED CLAIMS

      1.     <u>Objections</u>

Except as otherwise provided in Section 7.1(B) of the Plan, as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors. Such objections and requests for estimation will be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (i) sixty (60) days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court (the "<u>Objection Deadline</u>"); provided, however, that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter, or adversary proceeding (an "<u>Initial Objection</u>") wherein the Debtors' objection to such claim is ultimately denied, the objection deadline will be extended to the latter of: (a) sixty (60) days from the date on which the Bankruptcy Court enters an order denying such Initial Objection or (b) sixty (60) days from the date on which any appellate court enters a final order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; provided, further, that with respect to Claims that are filed (whether as an amended Claim, new Claim, or otherwise) after the Effective Date, the objection deadline shall be sixty (60) days after the date on which such Claim was filed. Nothing in the Plan will affect the Debtors' and Reorganized Debtors' ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

Section 7.1(B) of the Plan provides that the Debtors will make good faith efforts to file objections to Material General Unsecured Claims as the Debtors deem appropriate in consultation with the Creditors' Committee. The Plan defines Material General Unsecured Claims as those General Unsecured Claims which, if reduced or disallowed pursuant to Bankruptcy Rule 3007, would reduce the aggregate amount of Allowed General Unsecured Claims by at least $200,000. The Debtors will use their best efforts to file and serve such objections to Material General Unsecured Claims on or before the later of thirty (30) days after the Effective Date of the Plan or thirty (30) days a proof of claim for rejection damages is filed. Section 7.1(B) of the Plan further provides that the Creditors' Committee will have standing (x) to appear and be heard in connection with the administration of General Unsecured Claims and any pending objections to such Claims, (y) to file objections to any Material General Unsecured Claim as to which, despite the Committee's urging, the Reorganized Debtors elect not to object, and (z) to oppose any proposed settlement or compromise of a Material General Unsecured Claim that is advocated by the Reorganized Debtors

2.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided in the Plan will be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Administrative Expense Claim or Disputed Claim becomes Allowed.

3.      Distributions After Allowance

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) will be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

4.      Resolution of Administrative Expense Claims and Claims

On and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

5.      Estimation of Claims

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

6.      Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim will not be entitled to any interest thereon.

F.    **PROVISIONS GOVERNING EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

    1.    <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>

        The Bankruptcy Code empowers the Debtors to assume or reject their executory contracts and unexpired leases.  All executory contracts and unexpired leases that exist between the Debtors and any person or entity will be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date, or (c) that is specifically designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedule will be contained in the Plan Supplement; <u>provided, however</u>, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either rejected or assumed as of the Effective Date; <u>provided further, however</u>, that agreements to refrain from offering employment to persons employed by the Debtors, refrain from competition with the Debtors' business, refrain from soliciting business from the Debtors' customers, protect the Debtors' confidential information from disclosure, or recognize the Debtors' ownership of intellectual property or inventions, shall remain in full force and effect and shall be enforceable by the Debtors or the Reorganized Debtors, as the case may be.  The Debtors will provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedule 8.01(A) or 8.01(B) will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

        Notwithstanding the preceding paragraph, to the extent (1) the Debtors are party to any contract, service agreement, statement of work, letter of authorization or similar agreement providing for the sale of the Debtors' services to third parties, (2) any such agreement constitutes an executory contract and (3) such agreement (a) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (b) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such executory contract, or (c) is not subject to a motion to reject such executory contract filed on or prior to the Effective Date, such agreement will be assumed as of the Effective Date by the Debtor that performs the obligations to the client under such agreement, in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code.  The cure required to be paid in connection with the assumption of such a client-related agreement shall be $0.00.

    2.    Approval of Assumption or Rejection of
        <u>Executory Contracts and Unexpired Leases</u>

        Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the executory contracts and unexpired leases specified in Section 8.1 of the Plan through the date of

entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases, and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

    3.    <u>Inclusiveness</u>

        Unless otherwise specified on Schedule 8.01(A) or 8.01(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein will be inclusive of any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on such Schedule 8.01(A) or 8.01(B).

    4.    <u>Cure of Defaults</u>

        Except to the extent that different treatment has been agreed to by the parties, within thirty (30) days after the Effective Date, the Reorganized Debtors will cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured will be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. Notwithstanding Section 8.1 of the Plan, the Debtors will retain their rights to reject any of their executory contracts or unexpired leases that are the subject of a dispute concerning amounts necessary to cure any defaults, in which event the Reorganized Debtors will make their election to reject such executory contracts and unexpired leases within thirty (30) days of the entry of a Final Order determining the amount required to be cured.

    5.    <u>Bar Date for Filing Proofs of Claim Relating to<br>Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>

        Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease pursuant to Section 8.1 of the Plan must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of amendment to Schedules 8.01(A) or 8.01(B) of the Plan Supplement (solely with respect to the party directly affected by such amendment), or (d) notice of the Debtors' election to reject under Section 8.4 of the Plan. All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

    6.    <u>Indemnification Obligations</u>

        Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational

documents or applicable law, will survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

7.     Insurance Policies

Unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies which are executory, if any, and any agreements, documents or instruments relating thereto, will be assumed under the Plan. Nothing contained in Section 8.7 of the Plan will constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

8.     Benefit Plans

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors will continue to honor, in the ordinary course of business, all employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated; provided, however, that, to the extent the Transition Services Agreement is determined to be an executory contract by the Bankruptcy Court, Section 8.8 of the Plan shall not apply to the Transition Services Agreement.

9.     Retiree Benefits

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

G.     **CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS**

1.     General

On the Effective Date, the management, control and operation of Postconfirmation PRC and the other Reorganized Debtors will become the general responsibility of the Postconfirmation Board of Postconfirmation HoldCo.

2.     Postconfirmation Board of Postconfirmation HoldCo

The initial Postconfirmation Board of Postconfirmation HoldCo will consist of five members, who will be selected as follows:  three members by the class of equity interests issued to the holders of Allowed Prepetition First Lien Claims, one member by the class of equity interests issued to the holders of Allowed Prepetition Second Lien Claims, and one member from the management of Postconfirmation PRC.  The initial members of the Postconfirmation Board of

Postconfirmation HoldCo, together with biographical information, will be set forth in the Plan Supplement.

        3.        <u>Postconfirmation Organizational Documents</u>

      On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors will file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment to reflect that: (a) Postconfirmation Intermediate HoldCo is the sole owner of the equity interests of Postconfirmation PRC and (b) Postconfirmation HoldCo is the sole owner of the equity interests of Postconfirmation Intermediate HoldCo.

        4.        <u>Officers of the Reorganized Debtors</u>

      The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors, and the Postconfirmation Organizational Documents.

        5.        <u>Postconfirmation Management Incentive Plan</u>

      On the Effective Date, Postconfirmation HoldCo will be deemed to have adopted the Postconfirmation Management Incentive Plan. The Debtors will seek approval of the Postconfirmation Management Incentive Plan at the Confirmation Hearing. Entry of the Confirmation Order will constitute such approval.

**H.     CONDITIONS PRECEDENT TO EFFECTIVE DATE**

        1.        <u>Conditions Precedent to Effectiveness</u>

      The Effective Date will not occur and the Plan will not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 10.2 of the Plan:

      (a)     The Confirmation Order, in form and substance acceptable to the Debtors, the Prepetition Lenders, and the DIP Lenders, will have been entered and is a Final Order;

      (b)     The conditions precedent to the effectiveness of the Exit Facility are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility;

      (c)     All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

      (d)     All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

2.    Waiver of Conditions

Each of the conditions precedent in Section 10.1 of the Plan may be waived, in whole or in part, upon written notice, signed by both the Debtors and the DIP Lenders (and, in the case of Section 10.1(a), the Prepetition Lenders). Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

3.    Satisfaction of Conditions

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action. In the event that one or more of the conditions specified in Section 10.1 of the Plan have not occurred or otherwise been waived pursuant to Section 10.2 of the Plan, (a) the Confirmation Order will be vacated, (b) the Debtors and all holders of Claims and interests, including any Preconfirmation Equity Interests, will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Preconfirmation Equity Interests will remain unchanged and nothing contained herein will constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

I.    **EFFECT OF CONFIRMATION**

1.    Continued Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations will be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors will continue to vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

2.    Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Preconfirmation Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Preconfirmation Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

3.    Discharge of Claims and Termination of Preconfirmation Equity Interests

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will terminate all Preconfirmation Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in

the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Preconfirmation Equity Interests will be, and will be deemed to be, discharged and terminated, and all holders of such Claims and Preconfirmation Equity Interests will be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Preconfirmation Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Preconfirmation Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

    4.    <u>Discharge of Debtors</u>

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Preconfirmation Equity Interest and any Affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Preconfirmation Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Preconfirmation Equity Interest in the Debtors.

    5.    **<u>Injunction or Stay</u>**

**Except as otherwise expressly provided under the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Preconfirmation Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Preconfirmation Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest and (e) pursuing any claim released pursuant to Article XI of the Plan.**

    6.    **<u>Terms of Injunction or Stay</u>**

**Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date will remain in full force and effect until the Effective Date; provided, however, that no such injunction or stay will preclude enforcement of parties' rights under the Plan and the related documents.**

7.    Reservation of Causes of Action/Reservation of Rights

Nothing contained in the Plan, except as set forth in section 11.9(b) of the Plan, a Final Order approving the appointment of an Estate Representative, or the Confirmation Order will be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors, or the Prepetition Lenders may have or may choose to assert against any parties relating to the purchase and financing of PRC from IAC/Interactive Corp.  As used in the Plan, the term "Estate Representative" means a Person appointed as a representative of the estates of the Debtors under section 1123(b) of the Bankruptcy Code for the purpose of enforcing claims or causes of action relating to the purchase and financing of PRC from IAC/Interactive Corp.  The terms of such an appointment shall be subject to approval by (a) the Prepetition Lenders, and (b) the Bankruptcy Court, after notice of a motion and a hearing.

8.    Exculpation

None of the Debtors, the Prepetition First Lien Agent, the Prepetition Second Lien Agent, the Prepetition Lenders, the DIP Agent, the DIP Lenders, the Creditors' Committee and its members solely in their capacity as such, and members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors (collectively, the "Exculpated Parties"), and the Exculpated Parties' respective officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but, in each case, solely in connection with their official capacities in the Reorganization Cases), will have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however*, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

9.    Limited Releases

(a)    Except as expressly provided in the Plan, including but not limited to Section 11.7 of the Plan, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of the present and former members of the board of managers of Panther/DCP Holdings, LLC solely in their capacity as managers of the Debtors, directors, officers, employees, agents, financial advisors, restructuring advisors, attorneys and representatives of the Debtors who acted in such capacities after the Commencement Date; (x) the Debtors, (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan), and (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim that does not vote to accept the Plan (the parties set forth in subsections (x), (y), and (z) being the "Releasors"), will release, waive and discharge, unconditionally and forever each present or former members of the board of managers of Panther/DCP Holdings, LLC solely in their capacity as managers of the Debtors, director, officer, employee, agent, financial advisor, restructuring advisor, attorney and representative of the Debtors who acted in such capacity after the Commencement Date, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and

representatives from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the performance of their duties on behalf of the Debtors in the Prepetition Period, these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; provided that the foregoing will not operate as a waiver of or release from any causes of action arising out of the willful misconduct or gross negligence of any such person or entity; provided further, that the equity interests of HoldCo in the Debtors will be extinguished without releases from the Debtors and the Prepetition Lenders unless pursuant to separate consideration paid and satisfactory to the individual Prepetition Lenders.

(b)    Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and without regard to Section 11.7 of the Plan, in consideration of the services, agreements and accommodations of the Lender Released Parties; the Releasors and any Estate Representative, will release, waive and discharge unconditionally and forever each of the Lender Released Parties and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Commencement Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder.

(c)    Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and the provisions of a Final Order approving the appointment of an Estate Representative, and without regard to Section 11.7 of the Plan, in consideration of the services and other benefits provided by an Estate Representative; the Releasors, will release, waive and discharge unconditionally and forever any Estate Representative and each of its respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Commencement Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder.

10.    Avoidance Actions/Objections

Other than any releases granted under the Plan, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors will have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession; provided, however, that the Reorganized Debtors shall be deemed to have waived all causes of action under section 547 of the Bankruptcy Code against Trade Creditors of the

Debtors. The Plan defines a Trade Creditor as a holder of a General Unsecured Claim against a Debtor if the holder of such General Unsecured Claim provided goods or services to the Debtors in the ordinary course of the Debtors' business. For the avoidance of doubt, IAC/Interactive Corp., former employees of the Debtors, and former officers of the Debtors will not be considered Trade Creditors for purposes of the Plan. An employee or officer of the Debtors will be considered a former employee or former officer if that person is not an employee or officer on the date of the Confirmation Hearing.

## J.    RETENTION OF JURISDICTION

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)    To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters;

(c)    To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)    To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f)    To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g)    To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)    To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated thereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i)    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

     (j)     To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

     (k)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

     (l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

     (m)     To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

     (n)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

     (o)     To enter a final decree closing the Reorganization Cases; and

     (p)     To hear any other matter not inconsistent with the Bankruptcy Code.

**K.     MISCELLANEOUS PROVISIONS**

     1.     <u>Effectuating Documents and Further Transactions</u>

     On or before the Effective Date, and without the need for any further order or authority, the Debtors will file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Reorganized Debtors are authorized under the Plan to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

     2.     <u>Withholding and Reporting Requirements</u>

     In connection with the Plan and all instruments issued and distributed pursuant to the Plan, any party issuing any instrument or making any distribution under the Plan must comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

3.    Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, will be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors or the Reorganized Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors will, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

4.    Modification of Plan

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors will have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Preconfirmation Equity Interests.

5.    Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan will be deemed null and void.  In such event, nothing contained under the Plan will constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

6.    Plan Supplement

The Plan Supplement and the documents contained therein will be in form, scope and substance satisfactory to the Debtors, the DIP Lenders, and the Prepetition Lenders, except that the Exit Facility will only be required to be in form, scope and substance satisfactory to the Debtors and the DIP Lenders, and will be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan; provided that the documents included therein may thereafter be amended and supplemented prior to execution, so

long as no such amendment or supplement materially affects the rights of holders of Claims. The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full therein. Any party in interest wishing to obtain copies of documents included within the Plan Supplement should telephone the Debtors' voting agent, Epiq Bankruptcy Solutions, LLC at (866) 897-6433, or may examine such documents free of charge at http://chapter11.epiqsystems.com/prcllc.

7.    Payment of Statutory Fees

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on the Effective Date.

8.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, will terminate except as follows: (a) the Creditors' Committee and its professionals may continue to perform duties solely with respect to the evaluation and prosecution of objections to Material General Unsecured Claims as provided in Section 7.1 of the Plan for a period after the Effective Date of the Plan until those objections are resolved; and (b) for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith. Fees and expenses incurred by the Creditors' Committee and their professionals after the Effective Date for the services described in the preceding sentence are subject to the limitations set forth in Section 2.3 of the Plan. For a more detailed description of these limitations, see Section VI.B.1 of this Disclosure Statement regarding "Professional Compensation and Reimbursement Claims."

9.    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Exit Facility and the Postconfirmation Unsecured Note, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

10.    Expedited Tax Determination

The Debtors and the Reorganized Debtors are authorized under the Plan to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

11.    Exhibits/Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full in the Plan.

12.    Substantial Consummation

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.    Severability of Plan Provisions

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

14.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein will be applicable to such exhibit), the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

15.    Notices

All notices, requests and demands to or upon the Debtors must be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided under the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

PRC, LLC
8151 Peters Road, Suite 4000
Plantation, Florida 33324
Attn: Stephen R. Dubé
Title: Chief Restructuring Officer
Telephone: (214) 577-3619
Telecopier: (253) 498-4915

- and -

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77021
Attn:    Alfredo R. Pérez
         James T. Grogan III
Telephone: (713) 546-5000
Telecopier: (713) 224-9511

16.    Exemption from Securities Laws

       The Plan contemplates the issuance of Postconfirmation HoldCo membership interests and warrants to holders of Allowed Prepetition First Lien Claims and Allowed Prepetition Second Lien Claims, as the case may be, as well as the possible issuance of Postconfirmation HoldCo membership interests to participants in the Postconfirmation Management Incentive Plan. In reliance upon section 1145 of the Bankruptcy Code, the offer and issuance of Postconfirmation HoldCo membership interests and warrants (to the extent they constitute "securities" and, collectively with the Postconfirmation HoldCo membership interests, the "1145 Securities"), will be exempt from the registration requirements of the Securities Act of 1933 (the "Securities Act") and equivalent provisions in state securities laws. Section 1145(a) of the Bankruptcy Code generally exempts from such registration requirements the issuance of securities if the following conditions are satisfied: (i) the securities are issued or sold under a chapter 11 plan by (a) a debtor, (b) one of its affiliates participating in a joint plan with the debtor, or (c) a successor to a debtor under the plan and (ii) the securities are issued entirely in exchange for a claim against or interest in the debtor or such affiliate, or are issued principally in such exchange and partly for cash or property. The Debtors believe that the exchange of 1145 Securities for Claims against the Debtors under the circumstances provided in the Plan will satisfy the requirements of section 1145(a) of the Bankruptcy Code.

       The 1145 Securities to be issued pursuant to the Plan will be deemed to have been issued in a public offering under the Securities Act and, therefore, may be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b)(1) of the Bankruptcy Code (a "statutory underwriter"). In addition, such securities generally may be resold by the holders thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, holders of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(i) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (i) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, or (ii) offers to sell securities issued under a plan for the holders of such securities, or (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (iv) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.

An entity is not deemed to be an "underwriter" under section 2(a)(11) of the Securities Act with respect to securities received under section 1145(a)(1) which are transferred in "ordinary trading transactions" made on a national securities exchange or a NASDAQ market. However, there can be no assurances, and it is not currently anticipated, that such securities will be listed on an exchange or NASDAQ market. What constitutes "ordinary trading transactions" within the meaning of section 1145 of the Bankruptcy Code is the subject of interpretive letters by the staff of the Securities and Exchange Commission (the "SEC"). Generally, ordinary trading transactions are those that do not involve (i) concerted activity by recipients of securities under a plan of reorganization, or by distributors acting on their behalf, in connection with the sale of such securities, (ii) use of informational documents in connection with the sale other than the disclosure statement relating to the plan, any amendments thereto, and reports filed by the issuer with the SEC under the Securities Exchange Act of 1934 or (iii) payment of special compensation to brokers or dealers in connection with the sale.

The term "issuer" is defined in section 2(4) of the Securities Act; however, the reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the voting securities of such issuer. Additionally, the legislative history of section 1145 of the Bankruptcy Code provides that a creditor who receives at least 10% of the voting securities of an issuer under a plan of reorganization will be presumed to be a statutory underwriter within the meaning of section 1145(b)(i) of the Bankruptcy Code.

The Debtors believe that any securities (the "Management Securities") to be issued under the Postconfirmation Management Incentive Plan as provided under the Plan will be exempt from the registration requirements of the Securities Act, pursuant to section 4(2) of the Securities Act, as transactions by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

To the extent that persons receive Management Securities or persons deemed to be "underwriters" receive 1145 Securities pursuant to the Plan (collectively, the "Restricted Holders"), resales by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders may, however, be able, at a future time and under certain conditions described below, to

sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act.

Under certain circumstances, holders of 1145 Securities deemed to be "underwriters" or holders of Management Securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state and foreign securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the Securities and Exchange Commission. The Debtors cannot assure, however, that adequate current public information will exist with respect to any issuer of 1145 Securities or Management Securities and therefore, that the safe harbor provisions of Rule 144 of the Securities Act will be available.

Pursuant to the Plan, certificates evidencing 1145 Securities or Management Securities received by Restricted Holders or by a holder that the Debtors determine is an underwriter within the meaning of section 1145 of the Bankruptcy Code will bear a legend substantially in the form below:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE COMPANY RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

Any person or entity entitled to receive 1145 Securities who the issuer of such securities determines to be a statutory underwriter that would otherwise receive legended securities as provided above, may instead receive certificates evidencing 1145 Securities without such legend if, prior to the distribution of such securities, such person or entity delivers to such issuer, (i) an opinion of counsel reasonably satisfactory to such issuer to the effect that the 1145 Securities to be received by such person or entity are not subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that such person or entity is not an "underwriter" within the meaning of section 1145 of the Bankruptcy Code.

Any holder of a certificate evidencing 1145 Securities bearing such legend may present such certificate to the transfer agent for 1145 Securities for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such time as (i) such securities are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder delivers to the issuer of such securities an opinion of counsel reasonably satisfactory to such issuer to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to such issuer an opinion of counsel reasonably satisfactory to such issuer to the effect that (x) such securities are no longer subject to the restrictions pursuant to an exemption

under the Securities Act and such securities may be sold without registration under the Securities Act or (y) such transfer is exempt from registration under the Securities Act, in which event the certificate issued to the transferee shall not bear such legend.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.  ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## VII.

## PROJECTIONS AND VALUATION ANALYSIS

### A.    CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS

1.    <u>Responsibility for and Purpose of the Projections</u>

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

2.    <u>Pro Forma Financial Projections</u>

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtors or any successor under the Plan.

In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy financial obligations while maintaining sufficient liquidity and capital resources.  In this regard the Debtors, in consultation with their professionals, have prepared projected consolidated income statements and projected consolidated statements of cash flows of the operating Debtors (PRC; PRC B2B, LLC; Access Direct Telemarketing, Inc.; and PRC of Pennsylvania, LLC) for the six months ending December 31, 2008 ("<u>Stub Period</u>") and for the years ending December 31, 2009 and 2010 (collectively, the "<u>Projection Period</u>"), and the projected consolidated balance sheets of PRC as at December 31, 2008, 2009 and 2010 (collectively, the "<u>Projections</u>").

The Projections are based on a number of assumptions as set forth in Exhibit C, and while the Debtors have prepared the Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will ultimately be realized.  The Projections should be read in conjunction with the qualifications contained herein, the risk factors described in the Disclosure Statement, and the

historical unaudited financial statements for the fiscal year ended December 31, 2007 which are also included in Exhibit C to this Disclosure Statement.

The Debtors do not, as a matter of course, publish their business plans and strategies or projections or anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. Since the Projections are based on forecasts of key economic variables such as the demand for the Debtors' services, favorable capital market conditions for refinancing maturing term debt, the Debtors' ability to restructure operations and achieve certain cost reductions in an efficient manner, and the Debtors' ability to maintain their client relationships, business volumes and pricing, the ability add clients profitably, and the ability to manage their costs and manage the growth of the operations, the estimates and assumptions underlying the Projections are inherently uncertain. Though considered reasonable by the Debtors as of the date hereof, the Projections are subject to significant business, economic and competitive uncertainties. Accordingly, such projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less favorable or more favorable than as set forth. The Projections were substantially completed in April of 2008.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD PUBLIC DISCLOSURE OR COMPLIANCE WITH PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH THE GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION, THE RULES AND REGULATIONS PROMULGATED BY THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS, OR THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT CERTIFIED ACCOUNTANTS.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTIONS. IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC ACTIVITY AND PRC PERFORMANCE AT MORE DISTANT POINTS IN THE FUTURE. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THE DEBTORS' ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED. IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET**

**FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Reorganized Debtors, (iv) the application of Fresh Start Reporting will not materially change the Debtors' revenue accounting procedures, and (v) there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only an estimate and, therefore, necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other person that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections should be read together with the information, the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows) set forth herein, and the historical consolidated financial information (including the notes and schedules thereto) all as set forth in Exhibit C to this Disclosure Statement.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.** The Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Projections include the intent, belief or current expectations of the Debtors and members of their management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based. While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to the Debtors' management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Projections include, but are not limited to, further adverse developments with respect to the Debtors' liquidity position or operations of the Debtors' business, adverse developments in the Debtors' efforts to renegotiate their funding and adverse developments in the bank financing or public or private markets for debt or equity securities, or adverse developments in the timing or results of the Debtors' strategic business plan (including the timeline to emerge from chapter 11), the ability of the Debtors to retain and attract new clients and maintain

favorable vendor relationships, the difficulty in controlling industry costs and the ability of the Debtors to realize the anticipated general and administrative expense savings and overhead reductions presently contemplated, the ability of the Debtors to return their operations to profitability, the level and nature of any restructuring and other one-time charges, the difficulty in estimating costs relating to exiting certain markets and consolidating and closing certain operations, and the possible negative effects of a change in applicable legislation.

## B.    VALUATION

In connection with certain matters relating to the Plan, the Debtors directed Evercore to prepare a valuation analysis of the Debtors' businesses.

### 1.    Overview

The Debtors have been advised by Evercore, their investment banker, with respect to the consolidated Enterprise Value (as hereinafter defined) of the Reorganized Debtors on a going-concern basis.  Evercore undertook this valuation analysis for the purpose of determining value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder.  The estimated total value available for distribution to holders of Allowed Claims is comprised of an estimated value of the Reorganized Debtors' operations on a going concern basis (the "Enterprise Value").

Based in part on information provided by the Debtors, Evercore has concluded solely for purposes of the Plan that the Enterprise Value of the Reorganized Debtors ranges from approximately $74 to $109 million.  Evercore's estimated Enterprise Value implies a value for the equity interests in the Reorganized Debtors (the "Common Equity Value") of approximately $0 to $10 million.  These values do not assume any value for potential net operating losses ("NOLs") that may be available upon the Effective Date.  Evercore's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE REFLECTS WORK PERFORMED BY EVERCORE ON THE BASIS OF INFORMATION AVAILABLE TO EVERCORE AS OF APRIL 7, 2008.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT EVERCORE'S CONCLUSIONS, NEITHER EVERCORE NOR THE COMPANY HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM EVERCORE'S ESTIMATE.

The estimate of the Enterprise Value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, the continued implementation of the Company's business plan, the achievement of the forecasts reflected in the Projections, access to adequate exit financing, no material changes to the existing management team, market conditions and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Projections prepared by the management of the Company and included as Exhibit C to this Disclosure Statement, Evercore assumed that such Projections have been reasonably prepared in good faith and on a basis reflecting the best currently available estimates and judgments of the Company as to the future operating and financial performance of the Reorganized Debtors.  Evercore's estimate of a range of Enterprise Values assumes that

operating results projected by the Company will be achieved by the Reorganized Debtors in all material respects. If the business performs at levels below or above those set forth in the projections, such performance may have a material impact on the estimated range of values derived therefrom.

In estimating the Enterprise Value and Common Equity Value of the Reorganized Debtors, Evercore: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, including the Projections as described in this Disclosure Statement, which data was prepared and provided to Evercore by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects; (c) met with members of senior management to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data for, and considered the market value of, public companies that Evercore deemed generally comparable to the operating business of the Debtors; (e) reviewed publicly available financial data for, and considered the value of, merger and acquisition transactions involving companies Evercore deemed generally comparable to the operating business of the Debtors; (f) considered certain economic and industry information relevant to the operating business; and (g) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Evercore conducted a review and analysis of the Debtors' business, operating assets and liabilities, and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors, as well as publicly available information.

In addition, Evercore did not independently verify management's Projections in connection with preparing estimates of Enterprise Value and Common Equity Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Estimates of Enterprise Value and Common Equity Value were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder. Such estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.

The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Evercore, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of any securities received by holders of Allowed Claims (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), and other factors which generally influence the prices of such securities.

2.    Valuation Methodology

The following is a brief summary of certain financial analyses performed by Evercore to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. Evercore primarily relied on three methodologies: comparable public company analysis, discounted cash flow analysis and precedent transactions analysis. Evercore placed different weights on each of these analyses and made judgments as to the relative significance of each analysis in determining the Reorganized Debtors' value. Evercore's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value.

In preparing its valuation estimate, Evercore performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Evercore's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

The three methodologies considered by Evercore in preparing a valuation of the Reorganized Debtors are as follows:

(a)    Comparable Company Analysis

Comparable company analysis estimates the value of a company based on relative comparison with publicly traded companies with similar operating and financial characteristics. Under this methodology, observed enterprise values for selected public companies are commonly expressed as multiples of various measures of earnings, most commonly earnings before interest, taxes, depreciation and amortization ("EBITDA"), earnings before interest and taxes ("EBIT") and net income. In addition, each company's operational performance, operating margins, profitability, leverage and business trends are examined. Based on these analyses, financial multiples and ratios are calculated to measure each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. Common criteria for selecting comparable companies in the Business Process Outsourcing ("BPO") industry for the analysis include, among other relevant characteristics, similar lines of businesses, site location/geography, customers, business risks, growth prospects, maturity of businesses, market presence and size and scale of operations. In selecting the comparables, Evercore specifically excluded BPO companies whose service offerings focused on higher value services including, but not limited to, consulting services, human resource management, debt collection, and benefits processing.

The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining enterprise value.

Evercore selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Debtors in one or more of the factors described above:

Convergys Corp., Etelecare Global Solution, ICT Group Inc., Paxys Inc., Peoplesupport Inc., Startek Inc., Sykes Enterprises Inc., Teleperformance, Teletech Holdings, Inc., and WNS Holdings.

In developing multiples of earnings for the Peer Group, Evercore relied primarily on multiples of EBITDA. Evercore calculated EBITDA multiples for the Peer Group by dividing the enterprise values of each comparable company by the projected 2008 and 2009 EBITDA. The estimated 2008 and 2009 EBITDA for the Peer Group was sourced from I/B/E/S, which aggregates estimates from equity and fixed income research reports.

Evercore developed a range of enterprise values for the Reorganized Debtors by applying representative EBITDA multiples for the Peer Group to the Debtors' FY 2008 and FY 2009 Adjusted EBITDA. In applying these ranges, Evercore considered a variety of factors, including both quantitative attributes and qualitative measures such as historical and projected revenue and EBITDA results, historical enterprise value/EBITDA trading multiples, EBITDA margins, similar lines of businesses, site location/geography, customers, business risks, growth prospects, maturity of businesses, market presence and size and scale of operations

Having calculated these statistics, Evercore then applied the ranges of multiples to the Debtors' 2008 Adjusted EBITDA of $15.9 million and 2009 Adjusted EBITDA of $18.1 million to determine a range of Enterprise Values.

(b)    Precedent Transactions Analysis

The precedent transactions analysis estimates value by examining public merger and acquisition transactions. An analysis of a company's transaction value as a multiple of various operating statistics provides industry-wide valuation multiples for companies in similar lines of business to the Debtors. Transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtors. Evercore specifically focused on prices paid as a multiple of EBITDA in determining a range of values for the Debtors. The derived multiples are then applied to the Debtors' key operating statistics to determine the Enterprise Value or value to a potential strategic buyer.

Unlike the comparable public company analysis, the valuation in this methodology reflects a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. Other aspects of value that are manifest in a precedent transaction analysis include the following: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (*e.g.*, an additional premium may be extracted from a buyer in a case of a competitive bidding contest); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (*e.g.*, a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable public company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each. Therefore, qualitative judgments must be made concerning the

differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Because the precedent transaction analysis explains other aspects of value besides the inherent value of a company, there are limitations as to its use in the valuation of the Debtors.

In deriving a range of Enterprise Values for the Debtors under this methodology, Evercore evaluated various North American merger and acquisition transactions that have occurred in the BPO industry since 2005 at values greater than $50.0 million. Evercore calculated multiples of Transaction Value to LTM EBITDA of the target companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction, by disclosed LTM EBITDA. Evercore then applied these multiples to the Debtors' LTM June 2008 Adjusted EBITDA of $14.6 million.

     (c)    <u>Discounted Cash Flow Analysis</u>

The Discounted Cash Flow ("<u>DCF</u>") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "<u>Discount Rate</u>"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based on its capital structure. The value of the firm (or Enterprise Value) is determined by calculating the present value of the Reorganized Debtors' unlevered, after-tax, free cash flows based on its business plan, plus an estimate for the value of the firm beyond the period of July 2008 to 2010 ("<u>DCF Projection Period</u>") known as the terminal value. The terminal value range was derived by applying a range of multiples to the Reorganized Debtors' projected EBITDA in the final year of the DCF Projection Period, discounted back to the assumed date of emergence by the Discount Rate.

To estimate the Discount Rate, Evercore used the cost of equity and the after-tax cost of debt for the Reorganized Debtors. Evercore calculated the cost of equity based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Evercore considered the debt financing costs for comparable companies with leverage similar to the Reorganized Debtors' target capital structure.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples.

In applying the above methodology, Evercore utilized management's detailed Projections to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of this analysis, the Reorganized Debtors are assumed to have no cash-tax expense in the DCF Projection Period. These cash flows, along with the terminal value, are discounted back to the assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

THE ESTIMATED COMMON EQUITY VALUE ASCRIBED IN THE FOREGOING ANALYSIS DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, NOR IS IT INTENDED TO BE AN ESTIMATE OF THE MARKET TRADING VALUE OF THE NEW COMMON STOCK OR ANY OTHER SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. ACTUAL MARKET VALUES THAT MAY BE REALIZED THROUGH THE SALE OF SUCH SECURITIES MAY BE SIGNIFICANTLY DIFFERENT THAN THE ESTIMATED VALUES DISCUSSED HEREIN.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY EVERCORE. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. FURTHERMORE, VALUATION OF AN OPERATING BUSINESS IS A COMPLEX ANALYTICAL PROCESS, SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND BEYOND THE CONTROL OF THE DEBTORS AND EVERCORE. CONSEQUENTLY, SUCH VALUATION WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF A BUSINESS. AS A RESULT, THE ESTIMATED RANGE OF VALUES SET FORTH IN THIS DISCLOSURE STATEMENT IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, EVERCORE, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.

<div align="center">VIII.</div>

<div align="center">**CERTAIN FACTORS AFFECTING THE DEBTORS**</div>

A.      **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

    1.      <u>Risk of Non-Confirmation of the Plan of Reorganization</u>

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes. Moreover, the failure of the Debtors to obtain entry of the Confirmation Order on or before June 21, 2008, constitutes an event of default under the Postpetition Financing Agreement that could give rise to termination of such facility and the exercise of remedies by the DIP Agent thereunder with respect to some or all of the Debtors' assets. Such default would also result in the Debtors' inability to use cash collateral absent further order of the Bankruptcy Court. Furthermore, the failure of the Debtors to obtain entry of the Confirmation Order on or before July 15, 2008, would (unless duly waived) constitute a termination event under the Restructuring Agreement that could allow parties to terminate their obligations to support the Plan.

2.    Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. See Section IX.B.2 below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization; Requirements of Section 1129(b) of the Bankruptcy Code." Because Class 7 (Preconfirmation Equity Interests) is deemed to reject the Plan, these requirements must be satisfied with respect to such Class. The Debtors believe that the Plan satisfies these requirements.

3.    Risk of Delay in Confirmation of the Plan

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. Moreover, in connection with the Postpetition Financing Agreement, the Debtors have committed to the achievement of certain milestones, including the following: (i) entry of an order reasonably acceptable to certain DIP Lenders shall have been entered by the Bankruptcy Court approving the Disclosure Statement under Section 8.01(t) of the Postpetition Financing Agreement no later than May 12, 2008; and (ii) an order reasonably acceptable to such DIP Lenders shall have been entered by the Bankruptcy Court confirming the Plan under Section 8.01(u) of the Postpetition Financing Agreement no later than June 21, 2008. The failure of the Debtors to achieve these milestones by the dates required under the Postpetition Financing Agreement would (unless duly waived) constitute an event of default under the Postpetition Financing Agreement and the Postpetition Financing Order that could give rise to termination of the postpetition credit facility and the Debtors' ability to use cash collateral as well as the exercise of remedies by the DIP Agent with respect to some or all of the Debtors' assets.

**B.    ADDITIONAL FACTORS TO BE CONSIDERED**

1.    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.    No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Reorganization Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.    Projections and Other Forward-Looking Statements
     <u>Are Not Assured, and Actual Results May Vary</u>

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

4.    <u>General Unsecured Claims Could Be More Than Projected</u>

The general Bar Date for filing proofs of Claim has only recently passed. The Allowed amount of Claims in each class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. If the Claims asserted against the Debtors exceed projections, it may reduce the amount of the Distribution Pro Rata Share distributed to each holder of an Allowed General Unsecured Claim.

5.    <u>Debtors Could Withdraw the Plan</u>

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtors and proceed with confirmation of the Plan with respect to any other Debtors.

6.    <u>No Legal or Tax Advice Is Provided to You by This Disclosure Statement</u>

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice. Each creditor or Preconfirmation Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Preconfirmation Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you. This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

7.    <u>No Admission Made</u>

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Preconfirmation Equity Interests.

8.    <u>Business Factors and Competitive Conditions</u>

(a)    <u>General Economic Conditions</u>

In their financial projections, the Debtors have assumed that the general economic conditions of the United States economy will be stable over the next several years. The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the

operating performance of the Reorganized Debtors.  There is no guarantee that economic conditions will improve in the near term.

(b)    Business Factors

The Debtors believe that they will succeed in implementing and executing their business plan and operational restructuring for benefits of all constituencies.  However, there are risks that the goals of the Debtors' going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Debtors may be unable to refinance maturing term debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.  Holders of Claims in Class 4 (Allowed Prepetition First Lien Claims) and Class 5 (Allowed Prepetition Second Lien Claims) will receive equity in Postconfirmation HoldCo under the Plan; in the event of further restructurings or insolvency proceedings, the equity interests of such persons could be substantially diluted or even cancelled.

(c)    Competitive Conditions

The  outsourced B2B and B2C marketing and sales and business process outsourcing industry is highly competitive.  There can be no assurance that existing clients of the Debtors will not exercise contractual termination rights, allow contracts to expire without renewal, or otherwise reduce the level of business they transact with the Debtors in favor of alternative services.  Moreover, there can be no assurance that the Debtors will be able to add clients or grow their business profitably.

(d)    Reliance on Key Clients

The Debtors' B2B business has one key client that generates the majority of that division's revenue, and that is also a significant client of the Debtors' B2C business.  Although the Debtors' relationship with this client has remained strong, a reduction in business transactions and revenues from this client could have a deleterious effect on the Debtors' business.

(e)    Reliance on Employees

A critical asset of the Debtors is their personnel, who have the ability to leave the Debtors and deprive the Debtors of the manpower and expertise essential for performance of the Debtors' businesses.  The nature of the Debtors' business requires the Debtors to be able to recruit, train, and continuously improve the performance of their employee base to meet clients' needs.  Moreover, the Debtors encourage their clients to rely on the Debtors' superior performance over an extended period of time.  Deterioration of the Debtors' business, loss of a significant number of employees, or the inability to hire sufficient numbers of qualified employees at wage rates that allow the Debtors to earn margins consistent with their business plan could have a material adverse effect on the Reorganized Debtors and may threaten their ability to survive as a going concern.

The Debtors' successful transition through the restructuring process is dependent in part on the ability to retain and motivate their management and employees.  There can be no assurance that the Reorganized Debtors will be able to retain or employ qualified management and personnel.  Should the Reorganized Debtors be unable to retain the services of a large part of

their management team, the business prospects of the Reorganized Debtors could be materially and adversely affected.

(f)    Clients

The Debtors believe that the majority of their client relationships are strong. However, if the Debtors' clients delay or stop paying the Debtors for services performed, assert unauthorized or inappropriate deductions against payments due to the Debtors, or refuse to continue to do business with the Debtors on customary, ordinary course, or continuing terms, the Debtors may be harmed. Additionally, the loss of a key client or a significant reduction in business volumes with continuing clients could have a material adverse impact on operating performance.

(g)    Risks of International Operations

The Debtors generate a portion of their revenue from transactions with subcontractors and vendors located outside the United States, and as a result, are subject to the risks associated with doing business internationally. ACS provides services that support a significant percentage of the Debtors' revenues and margins. International transactions, particularly those with foreign subcontractors, frequently involve increased financial and legal risks arising from stringent contractual terms and conditions and the widely differing legal systems and customs in foreign countries. War, terrorism or public health issues in the regions of the world in which the Debtors do business have caused and may continue to cause damage or disruption to commerce by creating economic and political uncertainties. Such events could adversely affect the Debtors' business in any number of ways, such as decreasing demand for services, increasing costs of operations, making it difficult to perform services for clients, and causing delays and other problems in the course of operations. Future revenue, gross margin, expenses and financial condition could also suffer due to other international factors, including but not limited to: changes in a country's economic and labor conditions; currency fluctuations; compliance with a variety of foreign laws, as well as U.S. laws affecting the activities of U.S. companies abroad; changes in tax laws; changes in the regulatory or legal environment; difficulties associated with repatriating cash generated abroad; fluctuations in transportation costs; natural and medical disasters; and trade protection measures. Certain foreign vendors are paid by the Debtors in U.S. dollars. The recent depreciation in the foreign-exchange value of the U.S. dollar has, and may continue to have, adverse effects on the profitability of foreign vendors and this may occasion renegotiation of prices for services provided by such foreign vendors.

(h)    Other Factors

Other factors that holders of Claims should consider are potential regulatory and legal developments that may impact the Reorganized Debtors. Although these and other such factors are beyond the Debtors' control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtors' operating performance.

9.    Access to Financing and Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support. The Debtors' postpetition operations have been financed from operating cash flow and borrowings pursuant to the

Postpetition Financing Agreement. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by projected operating cash flow, the Exit Facility, and trade terms supplied by vendors. However, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to (i) obtain other sources of financing or (ii) curtail their operations. The Reorganized Debtors may not be able to retire the term debt issued under the Plan from operating cash flows and may, therefore, have to refinance such debt when it matures.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors. The Debtors believe that it is important to their going-forward business plan that their performance meet projected results in order to ensure continued support from vendors. There are risks to the Reorganized Debtors in the event that such support erodes after emergence from chapter 11 that could be alleviated by remaining in chapter 11. Chapter 11 affords to debtors, such as these Debtors, the opportunity to close facilities and liquidate assets relatively expeditiously, tools that will not be available to the Reorganized Debtors upon emergence. However, the Debtors believe that the benefits of emergence from chapter 11 at this time outweigh the potential costs of remaining in chapter 11, and that emergence at this time is in the long-term operational best interests of the Debtors, their creditors, clients, and employees.

      10.     Impact of Interest Rates and Foreign Exchange Valuations

The Debtors' assets and liabilities are subject to market risk associated with interest rate movements and currency rate movements on non-U.S. dollar denominated assets and liabilities, as well as collection of accounts receivable. Specifically, decreases in interest rates will positively impact the value of the Debtors' assets and the weakening of the U.S. dollar will negatively impact the value of their assets by increasing the cost of foreign transactions.

      11.     Variances from Projections

The fundamental premise of the Plan is the reduction of the Debtors' debt levels and the implementation and realization of the Debtors' business plan, as reflected in the Projections contained in this Disclosure Statement. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize. Such assumptions include, among other items, assumptions concerning the general economy, the ability to make necessary capital expenditures, the ability to establish market strength, and the ability to stabilize and grow the company's client base and control future operating expenses. The Debtors believe that the assumptions underlying the projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of the Reorganized Debtors. Therefore, the actual results achieved throughout the periods covered by the Projections necessarily will vary from the projected results, and such variations may be material and adverse.

## C.     CERTAIN TAX MATTERS

For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtors, see Section XI below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

## IX.

### CONFIRMATION OF THE PLAN OF REORGANIZATION

**A.    CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for June 19, 2008. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) counsel for the Debtors, Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 1600, Houston, Texas 77002-2784 (Attn: Alfredo R. Pérez and James T. Grogan), (ii) the U.S. Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Greg M. Zipes), (iii) Chadbourne & Park LLP, 30 Rockefeller Plaza, New York, New York 10112 (Attn: Howard Seife and Andrew Rosenblatt), (iv) Bingham McCutchen LLP, 355 South Grand Avenue, Suite 4400, Los Angeles, California 90071-3106 (Attn: William Govier), (v) Bingham McCutchen LLP, 399 Park Avenue New York, NY 10022 (Attn: Timothy B. DeSieno), (vi) Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174-0208 (Attn: Andrew B. Eckstein and Rocco Cavaliere), (vii) Blank Rome LLP, One Logan Square, Philadelphia, PA 19103 (Attn: Regina Stango Kelbon), and (viii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019-6064 (Attn: Douglas A. Cifu and Jeffrey D. Saferstein), so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on June 12, 2008.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION**

    1.    <u>Requirements of Section 1129(a) of the Bankruptcy Code</u>

        (a)    <u>General Requirements</u>

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

        (1)    The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)     The Plan has been proposed in good faith and not by any means proscribed by law.

(4)     Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(6)     With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test" below.

(7)     Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(8)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(9)     At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(10)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any

successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

(11)    The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

(b)    Best Interests Test

As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. The Debtors believe that in a chapter 7 case, holders of General Unsecured Claims would receive no distributions of property. Accordingly, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

**The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the assets of the Debtors. The analysis is based upon a number of significant assumptions which are described. The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual liquidation.**

(c)     <u>Liquidation Analysis</u>

The Debtors' chapter 7 liquidation analysis and assumptions are set forth in Exhibit D to this Disclosure Statement.

(d)     <u>Feasibility</u>

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As part of this analysis, the Debtors have prepared the projections contained in section VII above, entitled "PROJECTIONS AND VALUATION ANALYSIS," and in Exhibit C to this Disclosure Statement. These Projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place in June, 2008. The Projections include balance sheets, statements of operations and statements of cash flows. Based upon the Projections, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

2.     <u>Requirements of Section 1129(b) of the Bankruptcy Code</u>

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination.*  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

*Fair and Equitable Test.*  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Secured Claims.*  Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Claims.*  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- *Equity Interests.*  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement notwithstanding that Class 7 (Preconfirmation Equity Interests) is deemed to reject the Plan, because as to Class 7 (Preconfirmation Equity Interests), there is no class of equal priority receiving more favorable treatment and no class that is junior to such dissenting class will receive or retain any property on account of the claims or equity interests in such class.

## X.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

## A.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to

liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis are set forth in Section IX above, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION; Requirements for Confirmation of the Plan of Reorganization; Consensual Confirmation; Best Interests Test." The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. In a chapter 7 liquidation, the Debtors believe that there would be no distribution to the holders of General Unsecured Claims or the holders of Preconfirmation Equity Interests.

**B.      ALTERNATIVE PLAN OF REORGANIZATION**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

<div align="center">

**XI.**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

</div>

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired (e.g., Other Priority Claims, Secured Tax Claims and Other Secured Claims). In addition, the following summary does not address the federal income tax consequences to holders of Preconfirmation Equity Interests as they are deemed to reject the Plan and the Debtors have been advised that such holders have engaged independent counsel.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have

retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations (including, without limitation, certain pension funds), persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in pass-through entities).

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Preconfirmation Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Preconfirmation Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Preconfirmation Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.    CONSEQUENCES TO THE DEBTORS

With the exception of ADT, prior to the Effective Date each of the Debtors is treated as a "disregarded entity" for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of the Plan will generally not be borne by the Debtors and instead will be borne by Holdco and its owners.

In connection with the implementation of the Plan, ADT (a separate corporate taxpayer) will incur cancellation of debt ("COD") for federal income tax purposes. COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor. Certain statutory or judicial exceptions can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). It is not expected that such COD will be material in amount. Although any COD incurred will be excluded from taxable income under a bankruptcy exception contained in the Tax Code, it would result in a reduction of certain tax attributes of ADT. Although the use of any net operating losses and certain other tax attributes of ADT as of the Effective Date would be subject to limitations under Section 382 of the Tax Code following the Effective Date as a result of the change in ownership of ADT, it is not expected that ADT will have any material net operating losses or other tax attributes at the Effective Date that would be subject to Section 382 of the Tax Code.

## B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

1.    Consequences to Holders of Prepetition First Lien Claims and Prepetition Second Lien Claims

Pursuant to the Plan, on the Effective Date the following Restructuring Transactions will occur in the following order:

(i)    First, all of the new membership interests in Postconfirmation Intermediate HoldCo will be issued to the Prepetition First Lien Agent and the Prepetition Second Lien Agent on behalf of the holders of Allowed Prepetition First Lien Claims and Allowed Prepetition Second Lien Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative values of their Claims). Because Postconfirmation Intermediate HoldCo and its subsidiaries (other than ADT) are treated as disregarded entities for federal income tax purposes, this transaction should be treated for federal income tax purposes as a transfer of undivided interests in all of the underlying assets of PRC and its subsidiaries (other than ADT); and

(ii)    Second, immediately after the transfer to the Prepetition First Lien Agent and the Prepetition Second Lien Agent, the agents will, on behalf of the holders of Allowed Prepetition First Lien Claims and Allowed Prepetition Second Lien Claims, respectively, contribute all of the membership interests in Postconfirmation Intermediate HoldCo (which, for federal income tax purposes, should be treated as a contribution of undivided interests in the underlying assets of PRC and its subsidiaries (other than ADT)) to Postconfirmation HoldCo in exchange for Postconfirmation HoldCo membership interests and either debt or warrants. Holders of Allowed Prepetition First Lien Claims (Class 4) will receive their Ratable Proportion of (i) $40 million of the Postconfirmation Second Lien Facility, (ii) $40 million of the Postconfirmation Unsecured Note, all of which is payable in kind no less frequently than quarterly, and (iii) 80% of the equity interests of Postconfirmation HoldCo. Holders of Allowed Prepetition Second Lien Claims (Class 5) will receive their Ratable Proportion of (i) 20% of the equity interests of Postconfirmation HoldCo, (ii) warrants to purchase up to 4% of the fully diluted equity interests of Postconfirmation HoldCo, and (iii) warrants to purchase up to an additional 2% of the fully diluted equity interests of Postconfirmation HoldCo.

Pursuant to the Plan, all parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of Postconfirmation HoldCo membership interests and warrants) will be required to report for all federal income tax purposes consistent with the characterization of the Restructuring Transactions described above.

Accordingly, each holder of an Allowed Prepetition First Lien Claim or Allowed Prepetition Second Lien Claim generally should recognize gain or loss in connection with its receipt for federal income tax purposes of an undivided interest in the underlying assets of PRC in an amount equal to the difference between (x) the fair market value of the interest received in

satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). For a discussion of the tax consequences of any Claim for accrued but unpaid interest, see Section XI.B.3 below ("Distributions in Discharge of Accrued but Unpaid Interest").

The deemed contribution for federal income tax purposes of the undivided interest in the assets of PRC to Postconfirmation HoldCo will be treated in part as a tax-free contribution under Section 721 of the Tax Code to the extent Postconfirmation HoldCo membership interests are received, and will be treated in part as a taxable exchange in which gain or loss will be recognized to the extent debt or warrants are received. A holder of a Preconfirmation First Lien Claim should recognize short-term gain in the taxable exchange in an amount equal to the excess, if any, of (i) the issue price (as determined for federal income tax purposes, as discussed below) of the portion of the Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note received by the holder, which, as discussed in Section XI.B.4(a), below, would be equal to either the fair market value or the stated principal amount (which may exceed fair market value) of such portion of the facility or note, over (ii) the fair market value of such holder's undivided interest in the assets of PRC. If the issue price of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note is equal to its fair market value, a holder of a Preconfirmation First Lien Claim generally should have little, if any, gain in respect of the receipt of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note, as applicable, as the holder should have received a fair market value tax basis in the interest deemed exchanged therefor.

As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Postconfirmation Board will determine the value of the underlying assets of PRC and its subsidiaries as of the Effective Date and the portions of such value which are allocable, respectively, to the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants. Such allocation will take into account the relative fair market values of the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants. The Postconfirmation Board will apprise, in writing, all parties of such valuation and allocation. Pursuant to the Plan, all parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of Postconfirmation HoldCo membership interests and warrants) will be required to report consistent with the valuation and allocation for all federal income tax purposes.

Where gain or loss is recognized by a holder of an Allowed Prepetition First Lien Claim or Allowed Prepetition Second Lien Claim in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Where gain is recognized by a holder of a Preconfirmation First Lien Claim in respect of the contribution of assets to Postconfirmation HoldCo, the character of such gain may be treated as short-term capital gain depending in part on the holder's personal circumstances. Holders of Preconfirmation First Lien Claims are urged to consult their tax advisors regarding the character of any gain recognized on the contribution to Postconfirmation HoldCo.

A holder's initial tax basis in the Postconfirmation HoldCo membership interest received should equal the fair market value of the membership interest (as such value should be equal to the fair market value tax basis of the holder's undivided interest in the underlying assets of PRC treated as contributed therefor), increased for the portion of Postconfirmation HoldCo's liabilities that is allocated to the holder. A holder's initial tax basis in the warrants received should equal their fair market value. A holder's tax basis in its portion of the Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note received should equal the issue price of such facility or note. A holder's holding period for any Postconfirmation HoldCo membership interests, warrants and portion of the Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note generally should begin the day following the Effective Date.

2.     Consequences to Holders of General Unsecured Claims

Pursuant to the Plan, holders of Allowed General Unsecured Claims (Class 6) will receive, in one or more distributions, their Distribution Pro Rata Share of $1,350,000 in Cash on each Distribution Date in satisfaction and discharge of their Claims.

In general, each holder of such a Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest and other than any amount treated as imputed interest as further discussed below) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). For a discussion of the tax consequences of any Claim for accrued but unpaid interest, see Section XI.B.3 below ("Distributions in Discharge of Accrued but Unpaid Interest").

Distributions to such a holder will be made subsequent to the Effective Date on the Initial Distribution Date and may be made on any subsequent Distribution Date. Under the Tax Code, a portion of each distribution to such a holder may be treated as imputed interest. In addition, it is possible that any loss and a portion of any gain realized by such holder may be deferred until such time as such holder has received its final distribution. All holders of such Claims should consult their tax advisors as to tax consequences of distributions subsequent to the Effective Date.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

3.     Distributions in Discharge of Accrued but Unpaid Interest

Pursuant to the Plan, distributions to any holder of Allowed Claims will be allocated first to the principal amount of such Claims, as determined for federal income tax purposes, and thereafter, to the portion of such Claim, if any, representing accrued but unpaid interest or original issue discount ("OID"). However, there is no assurance that the IRS would respect such allocation for federal income tax purposes.

In general, to the extent that any consideration received pursuant to the Plan by a holder of an Allowed Claim is received in satisfaction of accrued interest or OID during its

holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a security of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly it is also unclear whether, by analogy, a holder of a Claim of a non-corporate issuer would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for federal income tax purposes.

4.    Ownership and Disposition of Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note

The application of the OID provisions of the Tax Code, and the federal income tax treatment of stated interest, with respect to the Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note depends, in part, upon whether the respective "issue prices" of the Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note are equal to their stated principal amount. Pursuant to applicable Treasury Regulations, the respective "issue prices" of the Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note depend, in part, upon whether they are traded on an "established market" during the sixty-day period ending thirty days after the Effective Date (the "Testing Period"). If either the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note is not traded on an "established market" during the Testing Period, the "issue price" of such non-traded instrument will depend on whether Section 1274(b)(3) of the Tax Code, as discussed below, applies to its issuance.

For this purpose, an "established market" includes, among other things, (i) a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers, or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, and (ii) the ready availability of price quotations from dealers, brokers or traders. If either the Postconfirmation Second Lien Facility or the Postconfirmation Unsecured Note, as applicable, are traded on an established market during the Testing Period, the "issue price" will be equal to the fair market value of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note.

Pursuant to Section 1274(b)(3) and applicable Treasury Regulations, if either the Postconfirmation Second Lien Facility or the Postconfirmation Unsecured Note is not traded on an established market during the Testing Period, the "issue price" of such non-traded instrument will still be equal to its fair market value if the fair market value of such instrument has been established in a "recent sales transaction" within the meaning of such provisions. Neither the Tax Code nor the Treasury Regulations expound on the meaning of a recent sales transaction. Because, as stated above, (i) the holders of Allowed Prepetition First Lien Claims and Allowed Prepetition Second Lien Claims should be treated as having first received undivided interests in the underlying assets of PRC and its subsidiaries in a taxable transaction in which the determination of gain or loss will be based on the fair market value of such interests, and (ii) the fair market value of such interests will be required to be allocated among the Postconfirmation

Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants for purposes of determining gain or loss and tax basis upon the transfer of such interests to Postconfirmation HoldCo, the Debtors anticipate that they would take the position that the Postconfirmation Second Lien Facility and the Postconfirmation Unsecured Note have an established fair market value by reason of recent sales transactions involving the undivided interests exchanged therefor.  The determination whether to take such position on Postconfirmation HoldCo's tax return would be made by the management of Postconfirmation HoldCo and the Postconfirmation Board.  There is no assurance that the IRS would not take a contrary position.  Pursuant to the applicable Treasury Regulations, a holder of the Postconfirmation Second Lien Facility or the Postconfirmation Unsecured Note will be required to report consistent with the issuer's determination unless the holder explicitly discloses such inconsistent position on the holder's federal income tax return for the taxable year that includes the Effective Date.

If the Postconfirmation Second Lien Facility or the Postconfirmation Unsecured Note, as applicable, are not traded on an established market during the Testing Period and Section 1274(b)(3) of the Tax Code does not apply, the "issue price" of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note will be its stated principal amount.

Each holder of an Allowed Prepetition First Lien Claim or an Allowed Prepetition Second Lien Claim is urged to consult its tax advisor regarding the determination of the respective "issue prices" of the Postconfirmation Second Lien Facility and the Postconfirmation Unsecured Note.

      (a)    <u>Interest and OID on the Postconfirmation Second Lien Facility</u>

Stated interest on the Postconfirmation Second Lien Facility should generally be includable in a holder's gross income as interest in accordance with such holder's normal method of accounting.

If the issue price of the Postconfirmation Second Lien Facility is less than the stated principal amount, the excess of the facility's stated principal amount over its issue price should generally be treated as OID under the Tax Code.  Each holder will be required to include in its gross income, as interest for federal income tax purposes, the portion of the OID that accrues while the holder held the facility (including the day the facility is acquired but excluding the day it is disposed of), regardless of such holder's normal method of accounting.  Any OID will accrue over the term of the Postconfirmation Second Lien Facility based on the constant interest method (with the amount of OID attributable to each accrual period allocated ratably to each day in such period).  Accordingly, a holder may be required to recognize income prior to the receipt of cash payments attributable to such income.

      (b)    <u>Interest and OID on the Postconfirmation Unsecured Note</u>

All of the stated interest on the Postconfirmation Unsecured Note should generally be treated as OID under the Tax Code.  In addition, if the issue price of such note is less than its stated principal amount, the excess of the note's stated principal amount over its issue price should generally be treated as OID under the Tax Code.  Each holder will be required to include in its gross income, as interest for federal income tax purposes, the portion of the OID (inclusive of all stated interest) that accrues while the holder held the note (including the day the note is acquired but excluding the day it is disposed of), regardless of such holder's normal

method of accounting. Any OID will accrue over the term of the Postconfirmation Unsecured Note based on the constant interest method (with the amount of OID attributable to each accrual period allocated ratably to each day in such period). Accordingly, a holder may be required to recognize income prior to the receipt of cash payments attributable to such income.

(c)     Application of AHYDO Provisions of the Tax Code

Any OID on the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note generally would be amortizable by Postconfirmation HoldCo utilizing the constant interest method, and deductible as interest, unless the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note is treated as an applicable high yield discount obligation ("AHYDO") within the meaning of Section 163(e)(5) of the Tax Code. Although Section 163(e)(5) of the Tax Code by its terms applies only to corporate issuers, the Treasury Regulations under the partnership provisions of the Tax Code state that the AHYDO rules also apply to debt instruments issued by partnerships to the extent that the partnership has corporate partners. The determination of whether the AHYDO rules will apply is complex, and since the terms of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note have not been finalized, it is not yet possible to determine whether the AHYDO rules will apply to the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note. If the AHYDO rules were to apply to the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note, the interest deduction otherwise allowable to a direct or indirect corporate member of Postconfirmation HoldCo with respect to amortizing OID would, at a minimum, be deferred until such OID is actually paid in cash, and may be disallowed in part. The portion of any interest deduction that will be disallowed is that portion that is equal to the fraction, the numerator of which is equal to the "disqualified yield" (*i.e.*, the excess of the yield to maturity of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note over the sum of the applicable federal rate for the calendar month in which the Effective Date occurs plus six percentage points) and the denominator of which is equal to the total yield to maturity of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note. The income of a corporate holder of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note with respect to the disqualified yield, if any, should be treated as a dividend for purposes of the dividends-received-deduction to the extent the corporate member has sufficient earnings and profits such that a similar distribution in respect of stock would have been treated as a dividend for federal income tax purposes. Presumably, a corporate holder's entitlement to a dividends-received-deduction is subject to the normal holding period and taxable income requirements and other limitations applicable to dividends-received-deductions. The Reorganized Debtors will endeavor to make available to a holder of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note the necessary information regarding the portion of the OID, if any, that should be treated as a dividend.

(d)     Sale, Exchange or Redemption of Postconfirmation Second Lien Facility and Postconfirmation Unsecured Note

Unless a non-recognition provision applies, a holder generally will recognize gain or loss upon the sale, exchange or redemption of the Postconfirmation Second Lien Facility or Postconfirmation Unsecured Note equal to the difference, if any, between the holder's adjusted tax basis and the amount realized on the sale, exchange or redemption. For this purpose, a holder's adjusted tax basis generally will equal the holder's initial tax basis, increased by the amount of any OID accrued (determined without adjustments) up through the date of the sale,

exchange, or redemption, and decreased by the amount of any cash payments (other than qualified stated interest). Any gain or loss generally will be capital gain or loss.

     5.     <u>Ownership and Disposition of Postconfirmation HoldCo Membership Interests</u>

     Under current Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for federal income tax purposes, unless it elects to be treated as a corporation. Pursuant to the Plan and the Postconfirmation Organizational Documents, no election may be made for Postconfirmation HoldCo to be classified as a corporation for federal income tax purposes that is effective on or prior to the Effective Date. Thus, subject to the discussion of "publicly traded partnerships" below, and subject to the discussion regarding a possible election to be treated as a corporation after the Effective Date, Postconfirmation HoldCo will be treated as a partnership for U.S. federal income tax purposes.

     Under the "publicly traded partnership" provisions of the Tax Code, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation. The Postconfirmation Organizational Documents will prohibit the transfer of membership interests in Postconfirmation HoldCo if such transfer would jeopardize the status of Postconfirmation HoldCo as a partnership for federal income tax purposes (prior to an actual conversion for federal income tax purposes to corporate status). Any purported transfer in violation of such provisions will be null and void and would not be recognized by Postconfirmation HoldCo.

     The Postconfirmation Organizational Documents will provide that, upon the decision of the board of Postconfirmation HoldCo, Postconfirmation HoldCo will (i) make an election to be treated as a corporation for United States federal and applicable state and local income tax purposes or (ii) convert into a corporation by filing a certificate of conversion with the requisite Secretary of State, in each case to be effective after the Effective Date. After the Effective Date, each owner would be required to cooperate fully with any such election or conversion, including through the execution of any necessary or appropriate forms. Furthermore, Postconfirmation Organizational Documents will provide that at any time after any such election or conversion, each owner that holds equity interests in Postconfirmation HoldCo through a corporation will have the right to merge such corporation with and into Postconfirmation HoldCo (or its successor) , provided in each case that at the time of such merger such corporation has no material asset other than equity interests in Postconfirmation HoldCo and has no liabilities. This discussion does not address any tax consequences resulting from any such an election, conversion or merger, and each holder of a Prepetition First Lien Claim and Prepetition Second Lien Claim is urged to consult its own tax advisor regarding such tax consequences.

     This discussion of the federal income tax consequences of the Plan assumes that Postconfirmation HoldCo will be treated as a partnership for federal income tax purposes.

     As a partnership, Postconfirmation HoldCo itself will not be subject to federal income tax. Instead, Postconfirmation Holdco will file an annual partnership information return with the IRS which will report the results of Postconfirmation HoldCo's operations. Each Postconfirmation HoldCo member will be required to report on its federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Postconfirmation HoldCo's income, gain, loss, deduction and credit for each taxable year of Postconfirmation HoldCo ending with or within the member's taxable year. Each item generally will have the

same character as if the member had realized the item directly. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Postconfirmation HoldCo for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Postconfirmation HoldCo. For purposes of calculating Postconfirmation HoldCo's items of income, gain, loss and deduction, upon the implementation of the Plan, Postconfirmation HoldCo should have a new cost tax basis and holding period in the underlying assets of PRC and its subsidiaries (other than the assets of ADT).

A member is allowed to deduct its allocable share of Postconfirmation HoldCo losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit a member's ability to deduct its allocable share of deductions and losses of Postconfirmation HoldCo against other income.

Postconfirmation HoldCo will provide each member with the necessary information to report its allocable share of Postconfirmation HoldCo's tax items for federal income tax purposes. However, no assurance can be given that Postconfirmation HoldCo will be able to provide such information prior to the initial due date of the members' federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

Under the Postconfirmation Organizational Documents, the Postconfirmation Board will decide how items will be reported on Postconfirmation HoldCo's federal income tax returns, and all members will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of Postconfirmation HoldCo are audited by the IRS, the tax treatment of Postconfirmation HoldCo income and deductions generally will be determined at the Postconfirmation HoldCo level in a single proceeding, rather than in individual audits of the members. The Postconfirmation Organizational Documents will generally provide that the members will elect one member to be the "Tax Matters Partner" for Postconfirmation HoldCo, as such term is defined in Section 6231(a)(7) of the Tax Code. The Tax Matters Partner will have considerable authority under the Tax Code and the Postconfirmation Organizational Documents to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from Postconfirmation HoldCo (provided that the member is not treated as exchanging such member's share of Postconfirmation HoldCo's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from Postconfirmation HoldCo (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of Postconfirmation HoldCo) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution

from the Partnership generally will be capital gain, but may be taxable as ordinary income, either in whole or in part, under certain circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (see Section IX.B.1, above), increased by the sum of (i) any additional capital contribution such member makes to Postconfirmation HoldCo, (ii) the member's allocable share of the income of Postconfirmation HoldCo, and (iii) increases in the member's allocable share of the indebtedness of Postconfirmation HoldCo, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of Postconfirmation HoldCo, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of indebtedness of Postconfirmation HoldCo.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of Postconfirmation HoldCo and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items. A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

Each holder of a Preconfirmation First Lien Claim or Preconfirmation Second Lien Claim is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in Postconfirmation HoldCo.

6.    Ownership and Disposition of Warrants

The tax consequences relating to the ownership and disposition (including exercise) of the warrants to purchase fully diluted interests of Postconfirmation HoldCo are not clear. The Treasury has promulgated proposed regulations dealing with the receipt, ownership and exercise of noncompensatory warrants issued by an entity that is treated as a partnership for federal income tax purposes. However, such regulations have not yet been finalized and, when finalized, such regulations are to be effective on a prospective basis. The description below is based on the proposed regulations. Accordingly, no assurance can be given that the IRS would not challenge the treatment described below and holders of Preconfirmation Second Lien Claims are urged to consult their tax advisors as to tax consequences of the ownership and disposition of warrants.

The proposed regulations contain rules that would treat a holder of an option to acquire a partnership interest as being a partner in the partnership if the option provides the holder with rights that are substantially similar to the rights afforded to a partner and as of the date that the option is issued, transferred or modified, there is a strong likelihood that the failure to treat the holder as a partner would result in a substantial reduction in the present value of the partners' and the holder's aggregate tax liabilities. Postconfirmation HoldCo does not currently intend to treat holders of warrants as owning partnership interests by reason of their ownership of the warrants,

all holders of membership interests and warrants shall report consistently therewith (unless the Postconfirmation Board determines otherwise), and the remainder of this discussion assumes that the holders of warrants would not be so treated. If the IRS were to successfully challenge this position, the consequences described below would not be applicable.

A holder of a warrant should not recognize gain or loss upon the exercise of the warrant. Upon exercise, the holder should be treated as having contributed to Postconfirmation HoldCo an amount equal to (i) the tax basis of the warrant (see Section XI.B.1, above), plus (ii) the exercise price paid by the holder of the warrant. In addition, in connection with the exercise of the warrant, Postconfirmation HoldCo will revalue its property immediately following the exercise of the warrant. After Postconfirmation HoldCo revalues its property, the warrant holder's capital account should reflect the entire amount that the holder would be entitled to if Postconfirmation HoldCo were to sell all of its assets for their fair market value in a taxable transaction and then liquidate. To the extent it would be necessary to transfer capital from or to other Postconfirmation HoldCo members' capital accounts in order for the warrant holder's initial capital account to reflect the amount described in the prior sentence, Postconfirmation HoldCo would be required to make special allocations of gross income (or gross loss), solely for tax purposes, to the holder of the warrant or to the other members to whom capital was transferred (or, in the case of gross loss, from whom capital was transferred) in an aggregate amount equal to the amount of capital that was transferred.

Upon the lapse or disposition of a warrant, the holder generally would recognize gain or loss equal to the difference between the amount received (zero in the case of a lapse) and its tax basis in the warrant. In general, such gain or loss would be a capital gain or loss, long term or short term, depending whether the requisite holding period was satisfied.

## C.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

*The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.*

## XII.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Class 4, Class 5, and Class 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (prevailing Eastern Time) on June 9, 2008.

Dated: May 2, 2008

Respectfully submitted,

PRC, LLC
Panther/DCP Intermediate Holdings, LLC
PRC B2B, LLC
Access Direct Telemarketing, Inc.
Precision Response of Pennsylvania, LLC.

By:    */s/ Stephen R. Dubé*
Name: Stephen R. Dubé
Title:   Chief Restructuring Officer of PRC, LLC

By:    */s/ Alfredo R. Pérez*
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana St., Suite 1600
Houston, TX  77002-2784
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

Attorneys for Debtors and Debtors in Possession

**EXHIBIT A TO THE DISCLOSURE STATEMENT**

**The Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | |
| | : | **Chapter 11 Case No.** |
| **PRC, LLC, et al.,** | : | **Case No. 08-10239 (MG)** |
| | : | |
| | : | |
| **Debtors** | : | **(Jointly Administered)** |
| | : | |
| **8151 Peters Road** | : | |
| **Suite 4000** | : | |
| **Plantation, FL 33324** | : | |
| **EIN No. 592194806** | : | |

------------------------------------------------------------x

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**
**DATED AS OF MAY 2, 2008**

PRC, LLC, Panther/DCP Intermediate Holdings, LLC, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC propose the following chapter 11 plan pursuant to section 1121(a) of the Bankruptcy Code:

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION**

A.    **Definitions**.

The following terms used herein shall have the respective meanings set forth below:

1.1    ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of the Reorganization Cases Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' estates, (b) any actual and necessary costs and expenses of operating the Debtors' businesses, (c) any indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases and (d) any compensation for professional services rendered and reimbursement of expenses incurred.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code is excluded from the definition of Administrative Expense Claim and shall be paid in accordance with section 13.7 of the Plan.

1.2     *Affiliate* has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3     *Allowed* means, with reference to any Claim against the Debtors, (a) any Claim against any Debtor that has been listed by such Debtor in its Schedules (as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009) as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed or no timely objection to allowance or request for estimation has been interposed, (b) any timely filed proof of Claim as to which no objection has been or is interposed in accordance with section 7.1 of the Plan or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules or the Bankruptcy Court or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder of such Claim, (c) any Claim expressly allowed by a Final Order or under the Plan, (d) any Claim that is compromised, settled or otherwise resolved pursuant to the authority granted to the Reorganized Debtors pursuant to a Final Order of the Bankruptcy Court or under section 7.4 of the Plan; *provided, however,* that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims." Unless otherwise specified in the Plan or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Claim from and after the Commencement Date.

1.4     *Allowed Postpetition Financing Obligation Claim* means an Allowed Claim of the DIP Lenders under the Postpetition Financing Agreement.

1.5     *Allowed Prepetition First Lien Claim* means the Allowed Claim of the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement in the amount of $119,350,000.

1.6     *Allowed Prepetition Second Lien Claim* means the Allowed Claim of the Prepetition Second Lien Lenders under the Prepetition Second Lien Credit Agreement in the amount of $67,000,000.

1.7     *Ballot* means the form distributed to each holder of an impaired Claim or Preconfirmation Equity Interest that is entitled to vote to accept or reject the Plan on which is to be indicated an acceptance or rejection of the Plan.

1.8     *Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

1.9     *Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York or any other court of the United States having jurisdiction over the Reorganization Cases.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

1.11    ***Benefit Plans*** means all employee benefit plans, policies and programs sponsored by any of the Debtors, including, without limitation, all incentive and bonus arrangements, medical and health insurance, life insurance, dental insurance, disability benefits and coverage, leave of absence, savings plans, retirement pension plans and retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code).

1.12    ***Business Day*** means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    ***Cash*** means legal tender of the United States of America.

1.14    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.15    ***Class*** means a category of holders of Claims or Preconfirmation Equity Interests set forth in Article IV of the Plan.

1.16    ***Collateral*** means any property or interest in property of the estates of the Debtors subject to a Lien, charge or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

1.17    ***Commencement Date*** means January 23, 2008, the date on which the Debtors commenced their Reorganization Cases.

1.18    ***Creditors' Committee*** means the committee of unsecured creditors appointed in the Reorganization Cases pursuant to section 1102(a) of the Bankruptcy Code.

1.19    ***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

1.20    ***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.21    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan.

1.22    ***Contingent Claim*** means any Claim, the liability for which attaches or is dependent upon the occurrence or happening of, or is triggered by, an event, which event has not yet occurred, happened or been triggered as of the date on which such Claim is sought to be estimated or an objection to such Claim is filed, whether or not such event is within the actual or presumed contemplation of the holder of such Claim and whether or not a relationship between the holder of such Claim and the applicable Debtor now or hereafter exists or previously existed.

1.23    ***Debtors*** means each of PRC, LLC, Intermediate HoldCo, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC.

1.24    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession in the Reorganization Cases under sections 1107(a) and 1108 of the Bankruptcy Code.

1.25    ***DIP Agent*** means The Royal Bank of Scotland plc, as administrative agent and collateral agent under the Postpetition Financing Agreement.

1.26    ***DIP Lenders*** means the lenders party to the Postpetition Financing Agreement.

1.27    ***Disbursing Agent*** means Postconfirmation PRC or any entity in its capacity as a disbursing agent under sections 6.5 and 6.6 of the Plan.

1.28    ***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as the same may be amended, supplemented or otherwise modified from time to time, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.29    ***Disclosure Statement Order*** means the order of the Bankruptcy Court approving, among other things, the Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan.

1.30    ***Disputed*** means, with reference to any Administrative Expense Claim or Claim, any such Administrative Expense Claim or Claim (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, (b) which has been or hereafter is listed by a Debtor on its Schedules as unliquidated, disputed or contingent and which has not been resolved by written agreement of the parties or a Final Order or (c) as to which the Debtors or any other party in interest has interposed a timely objection and/or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.  Prior to the earlier of the time an objection has been timely filed and the expiration of the time within which to object to such Claim set forth herein or otherwise established by order of the

Bankruptcy Court, a Claim shall be considered a Disputed Claim to the extent that the amount of the Claim specified in a proof of Claim exceeds the amount of the Claim scheduled by the Debtor as not disputed, contingent or unliquidated.

1.31    ***Distribution Date*** means (a) the Initial Distribution Date, (b) the first Business Day after the end of the months of March, June, September and December, commencing with the first such date to occur more than forty-five (45) days after the Effective Date and until the second anniversary of the Effective Date, (c) after the second anniversary of the Effective Date, the first Business Day after the end of the month of December and (d) the Final Distribution Date; *provided, however,* that any General Unsecured Claim that becomes Allowed less than ten (10) Business Days prior to a Distribution Date shall be treated as a Disputed Claim for the purposes of the distribution occurring on such Distribution Date and shall not receive a distribution until the Distribution Date immediately succeeding such Distribution Date.

1.32    ***Distribution Pro Rata Share*** means, as of any Distribution Date, the ratio (expressed as a percentage) of the amount of an Allowed General Unsecured Claim to the aggregate amount of all Allowed General Unsecured Claims at such date plus the Disputed Claim amount of all remaining Disputed General Unsecured Claims.

1.33    ***Distribution Record Date*** means the date that is three (3) Business Days from and after the Confirmation Date.

1.34    ***Effective Date*** means a Business Day selected by the Debtors on or after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect and (b) the conditions precedent to the effectiveness of the Plan specified in section 10.1 of the Plan shall have been satisfied or waived as provided in section 10.2.

1.35    ***Estate Representative*** means a Person appointed as a representative of the estates of the Debtors under section 1123(b) of the Bankruptcy Code for the purpose of enforcing claims or causes of action relating to the purchase and financing of PRC from IAC/Interactive Corp.  The terms of such an appointment shall be subject to approval by (a) the Prepetition Lenders, and (b) the Bankruptcy Court, after notice of a motion and a hearing.

1.36    ***Exit Facility*** means financing obtained by the Debtors in connection with the occurrence of the Effective Date and emergence from chapter 11, (a) which shall not exceed $45 million in principal amount, shall have a maturity of no earlier than three years, shall have a market rate of interest, and the proceeds of which shall be used, in part, to repay the Postpetition Financing Obligations and (b) a form of which shall be included in the Plan Supplement.

1.37   ***Final Distribution Date*** means a date on or after the Initial
Distribution Date and after (a) the deadline for the Debtors or the Reorganized Debtors
to interpose objections to Claims has passed, (b) all such objections have been
resolved by signed agreement with the Debtors or Reorganized Debtors and/or Final
Order, as may be applicable, and (c) all Claims that are Contingent Claims or
Unliquidated Claims have been liquidated but, in any event, the Final Distribution
Date shall be no later than thirty (30) days thereafter, or such later date as the
Bankruptcy Court may establish, upon request by the Reorganized Debtors, for cause
shown.

1.38   ***Final Order*** means an order or judgment of a court of
competent jurisdiction that has been entered on the docket maintained by the clerk of
such court and has not been reversed, vacated or stayed and as to which (a) the time to
appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has
expired and as to which no appeal, petition for *certiorari* or other proceedings for a
new trial, reargument or rehearing shall then be pending or, (b) if an appeal, writ of
*certiorari*, new trial, reargument or rehearing thereof has been sought, (i) such order or
judgment shall have been affirmed by the highest court to which such order was
appealed, *certiorari* shall have been denied or a new trial, reargument or rehearing
shall have been denied or resulted in no modification of such order and (ii) the time to
take any further appeal, petition for *certiorari*, or move for a new trial, reargument or
rehearing shall have expired; *provided, however*, that the possibility that a motion
under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the
Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order
shall not prevent such order from being a Final Order.

1.39   ***General Unsecured Claim*** means any Claim against the
Debtors other than an Administrative Expense Claim, Priority Tax Claim, Other
Priority Claim, Secured Tax Claim, Other Secured Claims, Prepetition First Lien
Claim, Prepetition Second Lien Claim, or Preconfirmation Equity Interest Claim.

1.40   ***Initial Distribution Date*** means a date after the Effective Date
that is selected by the Reorganized Debtors in their sole discretion but, in any event, is
within forty-five (45) days after the date of service of notice of the Confirmation Date,
or such later date as the Bankruptcy Court may establish upon request by Reorganized
Debtors, for cause shown; *provided, however*, that in no event shall the Initial
Distribution Date be more than seventy-five (75) days after the date of service of
notice of the Confirmation Date.

1.41   ***Intercompany Claim*** means any Claim against any Debtor or
Non-Debtor Subsidiary held by another Debtor or Non-Debtor Subsidiary.

1.42   ***Intermediate HoldCo*** means Panther/DCP Intermediate
Holdings, LLC.

1.43    ***Lender Released Parties*** means, collectively, (a) the Prepetition First Lien Agent; (b) the Prepetition Second Lien Agent; (c) the Prepetition Lenders; (d) the DIP Agent; and (e) the DIP Lenders.

1.44    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.45    ***Local Bankruptcy Rules*** means the Local Bankruptcy Rules for the Southern District of New York, as amended from time to time.

1.46    ***Material General Unsecured Claim*** means any General Unsecured Claim if its reduction or disallowance following a good faith objection pursuant to Bankruptcy Rule 3007 would reduce the aggregate amount of Allowed General Unsecured Claims by at least $200,000.

1.47    ***Non-Debtor Subsidiary*** means any direct or indirect subsidiary of PRC that is not a Debtor.

1.48    ***Other Priority Claim*** means a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

1.49    ***Other Secured Claim*** means a Secured Claim other than a Secured Tax Claim, Prepetition First Lien Claim, or Prepetition Second Lien Claim.

1.50    ***Person*** means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

1.51    ***Plan*** means this Joint Plan of Reorganization, including, without limitation, the exhibits and schedules hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

1.52    ***Plan Supplement*** means the supplement or supplements to the Plan containing certain documents relevant to the implementation of the Plan specified in section 13.6 of the Plan.

1.53    ***Postconfirmation Board*** means the board of directors or managers of Postconfirmation HoldCo which will be disclosed in the Plan Supplement.

1.54    ***Postconfirmation HoldCo*** means, as of the Effective Date, as of the Effective Date, a newly formed limited liability company that will be the holder of the sole equity interests of Postconfirmation Intermediate HoldCo, as more fully described in section 5.2(a) of the Plan.

1.55  ***Postconfirmation Intermediate HoldCo*** means, as of the Effective Date, the obligor on the Postconfirmation Unsecured Note.

1.56  ***Postconfirmation Management Incentive Plan*** means the management bonus providing for, *inter alia*, possible equity incentives for management, which shall be substantially in the form set forth in the Plan Supplement and shall contain terms and conditions that shall be subsequently reviewed and approved by the Postconfirmation Board.

1.57  ***Postconfirmation Organizational Documents*** means each certificate of incorporation, certificate of formation, limited liability company agreement, bylaws, and other organizational document for each of the Reorganized Debtors and Postconfirmation HoldCo, in each case, forms of which shall be included in the Plan Supplement.

1.58  ***Postconfirmation PRC*** means PRC, on and after the Effective Date.

1.59  ***Postconfirmation Second Lien Facility*** means that certain second lien term loan facility, with Postconfirmation PRC as borrower, referenced in Article IV of the Plan, (a) which shall not exceed $40 million in principal amount, shall have a bullet maturity of no earlier than four years, shall have a market rate of interest and a pay-in-kind toggle feature, and (b) a form of which shall be included in the Plan Supplement.

1.60  ***Postconfirmation Unsecured Note*** means that certain unsecured note issued by Postconfirmation Intermediate HoldCo and referenced in Article IV of the Plan, (a) which shall not exceed $40 million in principal amount, shall have a bullet maturity of no earlier than five years, shall have a rate of interest of 12% per annum, all of which is payable in kind no less frequently than quarterly, and shall have no security or guaranty and (b) a form of which shall be included in the Plan Supplement.

1.61  ***Postpetition Financing Agreement*** means that certain senior secured superpriority debtor-in-possession credit and guaranty agreement dated as of March 4, 2008, among PRC, as borrower, Intermediate HoldCo, and certain subsidiaries of the borrower as guarantors, various lenders and The Royal Bank of Scotland plc as administrative agent and collateral agent, as entered into pursuant to the Postpetition Financing Order as modified or amended from time to time during the Reorganization Cases.

1.62  ***Postpetition Financing Obligation*** means any obligation of the Debtors arising under the Postpetition Financing Agreement and the Postpetition Financing Order.

1.63  ***Postpetition Financing Order*** means the Final Order Approving Debtors' Motion For Authorization to (i) Obtain Postpetition Financing

Pursuant to 11 U.S.C. § 364; (ii) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (iii) Grant Priming Liens and Superpriority Claims to Postpetition Lenders Pursuant to 11 U.S.C. § 364(c) and (d); (iv) Provide Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, dated February 28, 2008.

1.64    ***Preconfirmation Equity Interests*** means all instruments evidencing an ownership interest in Intermediate HoldCo, whether or not transferable, and all options, warrants or rights, contractual or otherwise, to acquire any such interests, all as of the Effective Date.

1.65    ***Preconfirmation Equity Interest Claim*** means a Claim of a holder of a Preconfirmation Equity Interest.

1.66    ***Prepetition First Lien Agent*** means the administrative agent and collateral agent under the Prepetition First Lien Credit Agreement.

1.67    ***Prepetition First Lien Claim*** means a Claim of a Prepetition First Lien Lender under the Prepetition First Lien Credit Agreement.

1.68    ***Prepetition First Lien Credit Agreement*** means that certain Amended & Restated First Lien Credit and Guaranty Agreement, dated as of November 29, 2006, as amended and restated on December 20, 2006.

1.69    ***Prepetition First Lien Lender*** means the holder of a Prepetition First Lien Claim.

1.70    ***Prepetition Lenders*** means the Prepetition First Lien Lender and the Prepetition Second Lien Lender.

1.71    ***Prepetition Period*** means the time-period prior to the Commencement Date.

1.72    ***Prepetition Second Lien Agent*** means, collectively, the administrative agent and collateral agent, and any predecessors thereto, under the Prepetition Second Lien Credit Agreement.

1.73    ***Prepetition Second Lien Claim*** means a Claim of a Prepetition Second Lien Lender under the Prepetition Second Lien Credit Agreement.

1.74    ***Prepetition Second Lien Credit Agreement*** means that certain Amended & Restated Second Lien Credit and Guaranty Agreement, dated as of November 29, 2006, as amended and restated on December 20, 2006.

1.75    ***Prepetition Second Lien Lender*** means the holder of a Claim arising under the Prepetition Second Lien Credit Agreement.

1.76    ***PRC*** means PRC, LLC.

1.77    **Priority Tax Claim** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.78    **Ratable Proportion** means, with reference to any distribution on account of any Allowed Claim in any class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of Allowed Claims in such class.

1.79    **Reorganization Cases** means the jointly administered cases commenced by the Debtors under chapter 11 of the Bankruptcy Code.

1.80    **Reorganized Debtors** means Postconfirmation PRC, Postconfirmation Intermediate HoldCo, Postconfirmation HoldCo, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC on and after the Effective Date.

1.81    **Restructuring Transactions** means the transactions described in section 5.2(a) of the Plan.

1.82    **Schedules** means, collectively, the schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007 and the Official Bankruptcy Forms in the Reorganization Cases, as may have been amended or supplemented through the Confirmation Date pursuant to Bankruptcy Rule 1007.

1.83    **Secured Claim** means any Claim that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

1.84    **Secured Tax Claim** means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).

1.85    **Tax Code** means the Internal Revenue Code of 1986, as amended.

1.86    **Trade Creditor** means a holder of a General Unsecured Claim against a Debtor if the holder of such General Unsecured Claim provided goods or services to the Debtors in the ordinary course of the Debtors' business; *provided, however*, that IAC/Interactive Corp., former employees of the Debtors, and former officers of the Debtors shall not be considered Trade Creditors for purposes of the Plan.  For purposes of this definition, an employee or officer of the Debtors shall be

considered a former employee or former officer if that person is not an employee or officer on the date of the Confirmation Hearing.

       1.87   ***Transition Services Agreement*** means that certain agreement, between Panther/DCP Acquisition, LLC, PRC, and IAC/Interactive Corp., dated as of November 29, 2006.

       1.88   ***U.S. Trustee*** means the United States Trustee appointed under section 581 of title 28 of the United States Code to serve in the Southern District of New York.

       1.89   ***Unliquidated Claim*** means any Claim, the amount of liability for which has not been fixed, whether pursuant to agreement, applicable law or otherwise, as of the date on which such Claim is asserted or sought to be estimated.

**B.**     **Interpretation; Application of Definitions and Rules of Construction**.

       Unless otherwise specified, all section, article, schedule or exhibit references in the Plan are to the respective section in, article of or schedule or exhibit, to the Plan or the Plan Supplement, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**
**PROVISIONS FOR PAYMENT OF ADMINISTRATIVE**
**EXPENSES AND PRIORITY TAX CLAIMS**

   2.1   ***Administrative Expense Claims***.

       Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be paid in full and performed by the Debtors in Possession or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such

transactions; *provided, further*, that if any such ordinary course expense is not billed or a request for payment is not made within ninety (90) days after the Effective Date, claims for payment of such an ordinary course expense shall be barred.

### 2.2    *Postpetition Financing Agreement.*

On the Effective Date, all Allowed Postpetition Financing Obligation Claims shall be paid in full in Cash. Upon payment and satisfaction in full of all Allowed Postpetition Financing Obligation Claims, all liens and security interests granted to secure such obligations, whether in the Reorganization Cases or otherwise, shall be terminated and of no further force or effect.

### 2.3    *Professional Compensation and Reimbursement Claims.*

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim; *provided, however*, that from and after May 1, 2008, all fees and expenses incurred by the Creditors' Committee and their professionals that are chargeable to the Debtors' estates shall be capped (barring an increase granted by the Bankruptcy Court in the event of any unforeseen circumstances) at $75,000 per month for a period of two months, and shall be capped at $50,000 for all time thereafter; *provided further*, that the sum of the amounts payable to the Creditors' Committee and their professionals under this section 2.3 shall be a cumulative amount which, if exceeded during one period, shall go against the total cap and, similarly, any amount which is not used during a given period shall be carried forward, subject to a total cap of $200,000. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Priority Tax Claim or, (b) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest for

the period after the Effective Date at the rate determined under applicable non-bankruptcy law, *provided* that the first payment shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims, and subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

## ARTICLE III
### CLASSIFICATION OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS, IMPAIRMENT AND VOTING

The following table designates the classes of Claims against and Preconfirmation Equity Interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Allowed Prepetition First Lien Claims | Impaired | Yes |
| Class 5 | Allowed Prepetition Second Lien Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | Preconfirmation Equity Interests | Impaired | No (deemed to reject) |

## ARTICLE IV
### PROVISIONS FOR TREATMENT OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS

4.1     *Other Priority Claims (Class 1)*.

(a)     Impairment and Voting. Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

4.2    ***Secured Tax Claims (Class 2).***

(a)    <u>Impairment and Voting.</u>  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date, or as soon thereafter as is practicable, Cash in an amount equal to such Allowed Secured Tax Claim or, (ii) commencing on the Effective Date, or as soon thereafter as is practicable, and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest for the period after the Effective Date at the rate determined under applicable non-bankruptcy law, *provided* that the first payment shall represent a percentage recovery at least equal to that expected to be received by holders of Allowed General Unsecured Claims, and subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

4.3    ***Other Secured Claims (Class 3).***

(a)    <u>Impairment and Voting.</u>  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

4.4    ***Allowed Prepetition First Lien Claims (Class 4)***.

(a)    <u>Impairment and Voting.</u>  Class 4 is impaired by the Plan. Each holder of a Prepetition First Lien Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  The Allowed Prepetition First Lien Claims shall be allowed in the aggregate amount of $119,350,000.  On the Effective Date, and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition First Lien Claim shall receive its Ratable Proportion of each of: (i) $40 million of the Postconfirmation Second Lien Facility; (ii) $40 million of the Postconfirmation Unsecured Note; and (iii) 80% of the equity interests of Postconfirmation HoldCo, which equity interests shall be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections 4.5(b)(ii) and (iii) of the Plan.

4.5    ***Allowed Prepetition Second Lien Claims (Class 5)***.

(a)    <u>Impairment and Voting.</u>  Class 5 is impaired by the Plan. Each holder of a Prepetition Second Lien Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  The Allowed Prepetition Second Lien Claims shall be allowed in the aggregate amount of $67,000,000.  On the Effective Date, and in accordance with the Restructuring Transactions, each holder of an Allowed Prepetition Second Lien Claim shall receive its Ratable Proportion of each of: (i) 20% of the equity interests of Postconfirmation HoldCo, which equity interests shall be subject to further dilution by the holders of Allowed Prepetition Second Lien Claims in the event such holders exercise their rights, as described in subsections (ii) and (iii) of this section 4.5(b) of the Plan; (ii) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to 4% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based upon an enterprise value of $170 million; and (iii) warrants, which may be exercised up to five (5) years after the Effective Date, to purchase up to an additional 2% of the fully diluted equity interests of Postconfirmation HoldCo with an exercise price based on an enterprise value of $200 million.

4.6    ***General Unsecured Claims (Class 6)***.

(a)    <u>Impairment and Voting.</u>  Class 6 is impaired by the Plan. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive its Distribution Pro Rata Share of $1,350,000 in Cash (which shall be calculated as if no prior distributions had been

made) on each Distribution Date or as soon thereafter as is practicable, *provided, however,* that in any distribution made to the holder of an Allowed General Unsecured Claim, there shall be deducted from such distribution the amount of any distribution previously distributed to such holder on account of such Allowed General Unsecured Claim in any distribution made prior thereto.

4.7    *Preconfirmation Equity Interests (Class 7)*.

(a)    <u>Impairment and Voting.</u>  Class 7 is impaired by the Plan. Each holder of a Preconfirmation Equity Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

(b)    <u>Distributions.</u>  On the Effective Date, the Preconfirmation Equity Interests shall be cancelled and the holders of Preconfirmation Equity Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Preconfirmation Equity Interests under the Plan.

**ARTICLE V**
**MEANS OF IMPLEMENTATION**

5.1    *Intercompany Claims*.

Notwithstanding anything to the contrary herein, Intercompany Claims will be adjusted, continued or discharged to the extent determined appropriate by the Debtors or the Reorganized Debtors, in their sole discretion.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Debtors, the Debtors in Possession, or the Reorganized Debtors.

5.2    *Restructuring and Other Transactions*.

(a)    **Restructuring Transactions**.

On the Effective Date, the following transactions (the "Restructuring Transactions") shall be effectuated in the order set forth:

(i)    Simultaneously, (A) in accordance with section 4.7 of the Plan, all of the Preconfirmation Equity Interests shall be cancelled, and (B) all of the new membership interests in Postconfirmation Intermediate HoldCo shall be issued to the Prepetition First Lien Agent and the Prepetition Second Lien Agent on behalf of the holders of Allowed Prepetition First Lien Claims and the Allowed Prepetition Second Lien Claims, respectively, in full satisfaction of their Claims (and in proportion to the relative values of their Claims); and

(ii)    Immediately thereafter, the Prepetition First Lien Agent and the Prepetition Second Lien Agent shall, on behalf of the holders of Allowed Prepetition First Lien Claims and the Allowed Prepetition Second Lien Claims,

respectively, contribute all of the membership interests in Postconfirmation Intermediate HoldCo to Postconfirmation HoldCo in exchange for the consideration described in sections 4.4 and 4.5 of the Plan.

(b)    **Consistent Tax Reporting.**

(i)    All parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of Postconfirmation HoldCo membership interests and warrants) shall report for all federal income tax purposes consistent with the form of the Restructuring Transactions.

(ii)    As soon as possible after the Effective Date, but in no event later than thirty (30) days thereafter, the Postconfirmation Board shall determine the value of the membership interests of Postconfirmation Intermediate HoldCo as of the Effective Date (as appropriate for federal income tax purposes) and the portions of such value which are allocable, respectively, to the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants to purchase fully diluted interests of Postconfirmation HoldCo.  Such allocation shall take into account the relative fair market values of the Postconfirmation Second Lien Facility, the Postconfirmation Unsecured Note, the membership interests in Postconfirmation HoldCo and the warrants.  The Postconfirmation Board shall apprise, in writing, all parties of such valuation and allocation.  The valuation and allocation shall be used consistently by all parties (including the Reorganized Debtors, the holders of Preconfirmation Equity Interests and the holders of membership interests and warrants) for all federal income tax purposes.

(iii)    Consistent with the intent that Postconfirmation HoldCo shall initially be treated as a partnership for federal income tax purposes, no election shall be made by Postconfirmation HoldCo or by Intermediate HoldCo (or any of their direct or indirect subsidiaries) to be taxed as a corporation for federal income tax purposes that is effective on or prior to the Effective Date.  All parties (including the Reorganized Debtors and the holders of Postconfirmation HoldCo membership interests and warrants) shall not treat the holders of warrants as owning partnership interests in Postconfirmation HoldCo for federal income tax purposes by reason of their ownership of warrants, unless the Postconfirmation Board determines otherwise.

(c)    **Other Transactions.**

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may: (i) cause any or all of the Reorganized Debtors or to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan.

5.3    *Cancellation of Existing Agreements and Preconfirmation Equity Interests.*

Except (a) as otherwise expressly provided in the Plan, (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, (c) for purposes of evidencing a right to distributions under the Plan, or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Postpetition Financing Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement and any notes issued thereunder, all Preconfirmation Equity Interests and other instruments evidencing any Claims against the Debtors or Preconfirmation Equity Interests in the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

5.4    *Incurrence of New Indebtedness.*

The Reorganized Debtors' entry into the Exit Facility and the incurrence of the indebtedness thereunder on the Effective Date is hereby authorized without the need for any further corporate action and without any further action by holders of Claims or Preconfirmation Equity Interests.

**ARTICLE VI**
**PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS**

6.1    *Voting of Claims.*

Each holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

6.2    *Nonconsensual Confirmation.*

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 13.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired classes of claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

6.3    *Distributions on Allowed General Unsecured Claims.*

Distributions with respect to holders of Allowed General Unsecured Claims shall only be made on each Distribution Date; *provided, however*, that, if any Disputed General Unsecured Claim becomes Allowed subsequent to the Initial Distribution Date, the Reorganized Debtors may, in their sole discretion, make a distribution with respect to such Claim prior to a Distribution Date. All Allowed General Unsecured Claims held by a creditor shall be aggregated and treated as a single Claim. At the written request of the Reorganized Debtors or the Disbursing Agent, any creditor holding multiple Allowed General Unsecured Claims shall provide to the Reorganized Debtors or the Disbursing Agent, as the case may be, a single address to which any distributions shall be sent.

6.4    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.5    *Disbursing Agent.*

All distributions under the Plan shall be made by Postconfirmation PRC as Disbursing Agent or such other entity designated by Postconfirmation PRC as a Disbursing Agent.

6.6    *Rights and Powers of Disbursing Agent.*

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.7    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. Nothing in this Plan shall require the Reorganized Debtors to attempt to locate any holder of an Allowed Claim.

6.8    *Unclaimed Distributions.*

All distributions under the Plan that are unclaimed for a period of one (1) year after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and reinvested in the Reorganized Debtors and any entitlement of any holder of any Claims to such distributions shall be extinguished and forever barred.

6.9    *Distribution Record Date.*

With respect to holders of all General Unsecured Claims against the Debtors, on the Distribution Record Date, the claims register shall be closed and any transfer of any Claim therein shall be prohibited.   The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any such Claims occurring after the close of business on such date.

6.10    *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements. All distributions of Cash to the creditors of each of the Debtors under the Plan shall be made by, or on behalf of, the applicable Debtor.

6.11    *Cash Distributions.*

No payment of Cash less than fifty dollars ($50) shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors.

6.12    *Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim they may have against such claimant.

6.13    *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**ARTICLE VII**
**PROCEDURES FOR TREATING DISPUTED**
**CLAIMS UNDER PLAN OF REORGANIZATION**

7.1     *Objections*.

(A)     Except as otherwise provided in section 7.1(B), as of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of: (i) sixty (60) days after the Effective Date or (ii) such later date as may be fixed by the Bankruptcy Court (the "Objection Deadline"); *provided, however,* that with respect to Claims that, as of the Objection Deadline, are subject to a pending claim objection, contested matter, or adversary proceeding (an "Initial Objection") wherein the Reorganized Debtors' objection to such claim is ultimately denied, the objection deadline shall be extended to the latter of: (a) sixty (60) days from the date on which the Bankruptcy Court enters an order denying such Initial Objection or (b) sixty (60) days from the date on which any appellate court enters a final order reversing or vacating an order of the Bankruptcy Court granting such Initial Objection; *provided, further,* that with respect to Claims that are filed (whether as an amended Claim, new Claim, or otherwise) after the Effective Date, the objection deadline shall be sixty (60) days after the date on which such Claim was filed.  Nothing herein shall affect the Debtors' or the Reorganized Debtors' ability to amend the Schedules in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(B)     The Reorganized Debtors will make a good faith effort to file objections to Material General Unsecured Claims as appropriate under the circumstances, in consultation with the Creditors' Committee, and will cooperate with the Creditors' Committee in the identification of Claims to which such objections will be filed.  The Reorganized Debtors will use their best efforts to file and serve such objections to Material General Unsecured Claims on or before the later of thirty (30) days after the Effective Date of the Plan or thirty (30) days after a proof of claim for rejection damages is filed.  Until any objections to Material General Unsecured Claims are resolved, the Creditors' Committee will have standing (i) to appear and be heard in connection with the administration of General Unsecured Claims and any pending objections to such Claims, (ii) to file objections to any Material General Unsecured Claim as to which, despite the Committee's urging, the Reorganized Debtors elect not to object, and (iii) to oppose any proposed settlement or compromise of a Material General Unsecured Claim that is advocated by the Reorganized Debtors.

7.2     *No Distributions Pending Allowance*.

Notwithstanding any other provision hereof, if any portion of a Claim or Administrative Expense Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Administrative Expense Claim

unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

7.3     *Distributions After Allowance.*

To the extent that a Disputed Claim or Disputed Administrative Expense Claim ultimately becomes an Allowed Claim or Allowed Administrative Expense Claim, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Administrative Expense Claim in accordance with the provisions of the Plan.

7.4     *Resolution of Administrative Expense Claims and Claims.*

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court.

7.5     *Estimation of Claims.*

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

7.6     *Interest.*

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

# ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

8.1    *Assumption or Rejection of Executory Contracts and Unexpired Leases.*

(A)    Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any person or entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (1) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date, (2) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date,  or (3) that is specifically designated as a contract or lease to be assumed on Schedules 8.01(A) (executory contracts) or 8.01(B) (unexpired leases), which schedule shall be contained in the Plan Supplement; *provided, however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedules 8.01(A) and 8.01(B) to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date; *provided further, however*, that any agreement by a party to (i) refrain from offering employment to persons employed by the Debtors, (ii) refrain from competition with the Debtors' business, (iii) refrain from soliciting business transactions from the Debtors' customers (iv) protect the Debtors' confidential information from disclosure, or (v) recognize the Debtors' ownership of any intellectual property or inventions, shall remain in full force and effect and shall be enforceable by the Debtors or the Reorganized Debtors, as the case may be.  The Debtors shall provide notice of any amendments to Schedules 8.01(A) and/or 8.01(B) to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.01(A) or 8.01(B) shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

(B)    Notwithstanding section 8.1(A) above, to the extent (1) the Debtors are party to any contract, service agreement, statement of work, letter of authorization or similar agreement providing for the sale of the Debtors' services to third parties, (2) any such agreement constitutes an executory contract and (3) such agreement (a) has not been rejected pursuant to a Final Order of the Bankruptcy Court, (b) is not subject to a pending motion for reconsideration or appeal of an order authorizing the rejection of such executory contract, or (c) is not subject to a motion to reject such executory contract filed on or prior to the Effective Date, such agreement will be assumed as of the Effective Date by the Debtor that performs the obligations to the client under such agreement, in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code.  The cure required to be paid in connection with the assumption of such a client-related agreement shall be $0.00.

8.2    *Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to section 8.1 of the Plan, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign or reject the executory contracts and unexpired leases specified in section 8.1 of the Plan through the date of entry of an order approving the assumption, assumption and assignment or rejection of such executory contracts and unexpired leases and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to section 8.1 of the Plan.

8.3    *Inclusiveness.*

Unless otherwise specified on Schedules 8.01(A) or 8.01(B) of the Plan Supplement, each executory contract and unexpired lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedules 8.01(A) or 8.01(B).

8.4    *Cure of Defaults.*

Except to the extent that different treatment has been agreed to by the parties, within thirty (30) days after the Effective Date, the Reorganized Debtors shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Reorganized Debtors' liability with respect thereto, or as may otherwise be agreed to by the parties. Notwithstanding section 8.1 of the Plan, the Debtors shall retain their rights to reject any of their executory contracts or unexpired leases that are the subject of a dispute concerning amounts necessary to cure any defaults, in which event the Reorganized Debtors shall make their election to reject such executory contracts and unexpired leases within thirty (30) days of the entry of a Final Order determining the amount required to be cured.

8.5    *Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.*

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and

served upon the attorneys for the Debtors or, on and after the Effective Date, the Reorganized Debtors, no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order, (c) notice of an amendment to Schedules 8.01(A) or (B) of the Plan Supplement (solely with respect to the party directly affected by such modification), or (d) notice of the Debtors' election to reject under section 8.4 of the Plan. All such proofs of Claim not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

8.6     *Indemnification Obligations*.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

8.7     *Insurance Policies*.

Unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies which are executory, if any, and any agreements, documents or instruments relating thereto, shall be assumed under the Plan. Nothing contained in this section shall constitute or be deemed a waiver of any cause of action that the Debtors or Reorganized Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

8.8     *Benefit Plans*.

Notwithstanding anything contained in the Plan to the contrary, unless rejected by order of the Bankruptcy Court, the Reorganized Debtors shall continue to honor, in the ordinary course of business, all employee compensation and Benefit Plans of the Debtors, including Benefit Plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Commencement Date and not since terminated, *provided, however*, that, to the extent the Transition Services Agreement is determined to be an executory contract by the Bankruptcy Court, this section 8.8 of the Plan shall not apply to the Transition Services Agreement.

8.9     *Retiree Benefits*.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to pay all retiree benefits of

the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code) for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

## ARTICLE IX
## CORPORATE GOVERNANCE AND MANAGEMENT
## OF THE REORGANIZED DEBTORS

9.1    *General.*

On the Effective Date, the management, control and operation of Postconfirmation PRC and the other Reorganized Debtors shall become the general responsibility of the Postconfirmation Board of Postconfirmation HoldCo.

9.2    *Postconfirmation Board of Postconfirmation HoldCo.*

The initial Postconfirmation Board of Postconfirmation HoldCo shall consist of five members, who shall be selected as follows: three members by the class of equity interests issued to the holders of Allowed Prepetition First Lien Claims, one member by the class of equity interests issued to the holders of Allowed Prepetition Second Lien Claims, and one member from the management of Postconfirmation PRC. The initial members of the Postconfirmation Board of Postconfirmation HoldCo, together with biographical information, shall be set forth in the Plan Supplement.

9.3    *Filing of Postconfirmation Organizational Documents.*

On the Effective Date, or as soon thereafter as practicable, to the extent necessary, the Reorganized Debtors shall file their Postconfirmation Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment to reflect that: (i) Postconfirmation Intermediate HoldCo is the sole owner of the equity interests of Postconfirmation PRC and (ii) Postconfirmation HoldCo is the sole owner of the equity interests of Postconfirmation Intermediate HoldCo.

9.4    *Officers of the Reorganized Debtors.*

The officers of the Debtors immediately prior to the Effective Date shall serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement with the Reorganized Debtors and the Postconfirmation Organizational Documents.

9.5    ***Adoption of Postconfirmation Management Incentive Plan.***

On the Effective Date, Postconfirmation HoldCo shall be deemed to have adopted the Postconfirmation Management Incentive Plan.  Entry of the Confirmation Order shall constitute an approval of the Postconfirmation Management Incentive Plan.

# ARTICLE X
## CONDITIONS PRECEDENT TO EFFECTIVE DATE

10.1    ***Conditions Precedent to Effectiveness.***

The Effective Date shall not occur and the Plan shall not become effective unless and until the following conditions are satisfied in full or waived in accordance with section 10.2 of the Plan:

(a)    The Confirmation Order, in form and substance acceptable to the Debtors, the Prepetition Lenders, and the DIP Lenders, shall have been entered and is a Final Order;

(b)    The conditions precedent to the effectiveness of the Exit Facility are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility;

(c)    All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors; and

(d)    All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

10.2    ***Waiver of Conditions.***

Each of the conditions precedent in section 10.1 hereof may be waived, in whole or in part, upon written notice, signed by both the Debtors and the DIP Lenders (and, in the case of section 10.1(a), the Prepetition Lenders).  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

10.3    ***Satisfaction of Conditions.***

Except as expressly provided or permitted in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have

occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in section 10.1 of the Plan have not occurred or otherwise been waived pursuant to section 10.2 of the Plan, (a) the Confirmation Order shall be vacated, (b) the Debtors and all holders of Claims and interests, including any Preconfirmation Equity Interests, shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims and Preconfirmation Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## ARTICLE XI
## EFFECT OF CONFIRMATION

### 11.1    *Continued Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Debtors, their properties and interests in property and their operations shall be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors shall continue to vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules or the Local Bankruptcy Rules, subject to the terms and conditions of the Plan.

### 11.2    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Preconfirmation Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Preconfirmation Equity Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

### 11.3    *Discharge of Claims and Termination of Preconfirmation Equity Interests.*

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Preconfirmation Equity Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the

Plan, upon the Effective Date, all existing Claims against the Debtors and Preconfirmation Equity Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Preconfirmation Equity Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Preconfirmation Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Preconfirmation Equity Interest and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

### 11.4 *Discharge of Debtors*.

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Preconfirmation Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Preconfirmation Equity Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Preconfirmation Equity Interest in the Debtors.

### 11.5 *Injunction or Stay*.

**Except as otherwise expressly provided herein or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against or Preconfirmation Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Preconfirmation Equity Interest against any of the Reorganized Debtors, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest, (c) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest, (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim or Preconfirmation Equity Interest and (e) pursuing any claim released pursuant to this Article XI of the Plan.**

11.6    *Terms of Injunction or Stay.*

**Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date shall remain in full force and effect until the Effective Date, *provided, however*, that no such injunction or stay shall preclude enforcement of parties' rights under the Plan and the related documents.**

11.7    *Reservation of Causes of Action/Reservation of Rights.*

Nothing contained in the Plan, except as set forth in section 11.9(b) of the Plan, a Final Order approving the appointment of an Estate Representative, or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtors, the Reorganized Debtors, or the Prepetition Lenders may have or may choose to assert against any parties relating to the purchase and financing of PRC from IAC/Interactive Corp.

11.8    *Exculpation.*

None of the Debtors, the Prepetition First Lien Agent, the Prepetition Second Lien Agent, the Prepetition Lenders, the DIP Agent, the DIP Lenders, the Creditors' Committee and its members solely in their capacity as such, and members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors (collectively, the "Exculpated Parties"), and the Exculpated Parties' respective officers, directors, employees, accountants, financial advisors, investment bankers, agents, restructuring advisors, and attorneys, and each of their respective agents and representatives (but, in each case, solely in connection with their official capacities in the Reorganization Cases), shall have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however*, that the foregoing shall not affect the liability of any Person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.

11.9    *Limited Releases.*

(a)    Except as expressly provided in the Plan, including but not limited to section 11.7 of the Plan, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, and in consideration of the services of the present and former members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors, directors, officers, employees, agents,

financial advisors, restructuring advisors, attorneys and representatives of the Debtors who acted in such capacities after the Commencement Date; (x) the Debtors; (y) each holder of a Claim that votes to accept the Plan (or is deemed to accept the Plan) and, (z) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each holder of a Claim that does not vote to accept the Plan (the parties set forth in subsections (x), (y), and (z) being the "Releasors"), shall release, waive and discharge, unconditionally and forever each present or former members of the board of managers of Panther/DCP Holdings LLC solely in their capacity as managers of the Debtors, director, officer, employee, agent, financial advisor, restructuring advisor, attorney and representative of the Debtors who acted in such capacity after the Commencement Date, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims or causes of action whatsoever in connection with, related to, or arising out of the performance of their duties on behalf of the Debtors in the Prepetition Period, these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder; *provided*, that the foregoing shall not operate as a waiver of or release from any causes of action arising out of the willful misconduct or gross negligence of any such person or entity, *provided further*, that the equity interests of Panther/DCP Holdings LLC in the Debtors shall be extinguished without releases from the Debtors and the Prepetition Lenders unless pursuant to separate consideration paid and satisfactory to the individual Prepetition Lenders.

       (b)     Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, and without regard to section 11.7 of the Plan, in consideration of the services, agreements and accommodations of the Lender Released Parties; the Releasors and any Estate Representative, shall release, waive and discharge unconditionally and forever each of the Lender Released Parties and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Commencement Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder.

       (c)     Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and the provisions of a Final Order approving the appointment of an Estate Representative, and without regard to section 11.7 of the Plan, in consideration of the services and other benefits provided by an Estate

Representative; the Releasors, shall release, waive and discharge unconditionally and forever any Estate Representative and each of its respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, and representatives from any and all Claims, obligations, suits, judgments, damages, rights, causes of action and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: (i) taking place before the Commencement Date in connection with or relating to any of the Debtors or any of their direct or indirect subsidiaries; and (ii) in connection with, related to, or arising out of these Reorganization Cases, the pursuit of confirmation of the Plan, the consummation thereof, the administration thereof or the property to be distributed thereunder.

11.10  *Avoidance Actions/Objections.*

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Reorganized Debtors shall have the right to prosecute any and all avoidance or equitable subordination actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession; *provided, however,* that the Reorganized Debtors shall be deemed to have waived all causes of action under section 547 of the Bankruptcy Code against Trade Creditors of the Debtors.

## ARTICLE XII
## RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation:

(a)  To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom;

(b)  To determine any and all adversary proceedings, applications and contested matters;

(c)  To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

(d)  To hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

(e) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(f) To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(g) To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h) To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(i) To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(j) To hear and determine all disputes involving the existence, scope and nature of the discharges granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(k) To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(l) To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m) To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(n) To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(o) To enter a final decree closing the Reorganization Cases; and

(p) To hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1    *Effectuating Documents and Further Transactions*.

On or before the Effective Date, and without the need for any further order or authority, the Debtors shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents that are in form and substance satisfactory to them as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Reorganized Debtors are authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.2    *Withholding and Reporting Requirements*.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

13.3    *Corporate Action*.

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the managers or directors of one or more of the Debtors or Reorganized Debtors, as the case may be, shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtors or the Reorganized Debtors are incorporated or established, without any requirement of further action by the managers or directors of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall, if required, file their amended articles of organization or certificates of incorporation, as the case may be, with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

### 13.4   *Modification of Plan.*

Alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Preconfirmation Equity Interests.

### 13.5   *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Preconfirmation Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 13.6   *Plan Supplement.*

The Plan Supplement and the documents contained therein shall be in form, scope and substance satisfactory to the Debtors, the DIP Lenders, and the Prepetition Lenders, except that the Exit Facility shall only be required to be in form, scope and substance satisfactory to the Debtors and the DIP Lenders, shall be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan, provided that the documents included therein may thereafter be amended and supplemented prior to execution, so long as no such amendment or supplement materially affects the rights of holders of Claims.  The Plan Supplement and the documents contained therein are incorporated into and made a part of the Plan as if set forth in full herein.

13.7  *Payment of Statutory Fees*.

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.

13.8  *Dissolution of the Creditors' Committee*.

On the Effective Date, the Creditors' Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants and other agents, if any, shall terminate, except as follows: (a) the Creditors' Committee and its professionals may continue to perform their duties solely with respect to the evaluation and prosecution of objections to Material General Unsecured Claims as provided in section 7.1 for a period after the Effective Date of the Plan until any objections to Material General Unsecured Claims are resolved; and (b) for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith. All fees and expenses incurred by the Creditors' Committee and their professionals after the Effective Date for the services set forth in the preceding sentence shall be subject to the limitations on such fees and expenses set forth in section 2.3.

13.9  *Exemption from Transfer Taxes*.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, the Exit Facility and the Postconfirmation Unsecured Note, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

13.10  *Expedited Tax Determination*.

The Debtors and the Reorganized Debtors are authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

13.11 *Exhibits/Schedules*.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.12 *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.13 *Severability of Plan Provisions*.

In the event that, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable in accordance with its terms.

13.14 *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

13.15 *Notices*.

All notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission) to be effective and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

PRC, LLC
8151 Peters Road, Suite 4000
Plantation, Florida 33324
Attn:  Stephen R. Dubé
Title:  Chief Restructuring Officer
Telephone:  (214) 577-3619
Telecopier:  (253) 498-4915

- and -

Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77021
Attn:   Alfredo R. Pérez
       James T. Grogan III
Telephone:  (713) 546-5000
Telecopier:  (713) 224-9511

Dated: May 2, 2008

Respectfully submitted,


PRC, LLC
PANTHER/DCP INTERMEDIATE HOLDINGS, LLC
PRC B2B, LLC
ACCESS DIRECT TELEMARKETING, INC.
PRECISION RESPONSE OF PENNSYLVANIA, LLC


By:   _/s/ Stephen R. Dubé_____ _____
      Name:  Stephen R. Dubé
      Title:   Chief Restructuring Officer

**EXHIBIT B TO THE DISCLOSURE STATEMENT**

**Order of the Bankruptcy Court, Dated May 8, 2008, Approving, Among
Other Things, the Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
```
In re                                                      :
                                                           :
PRC, LLC, et al.,                                          :
                                                           :        **Chapter 11**
                                                           :
                             **Debtors**                   :        **Case No. 08-10239 (MG)**
                                                           :
8151 Peters Road                                           :        **Jointly Administered**
Suite 4000                                                 :
Plantation, FL  33324                                      :
EIN No. 592194806                                          :
```
-----------------------------------------------------------x
```

**ORDER (i) APPROVING THE DISCLOSURE STATEMENT;**
**(ii) APPROVING THE NOTICE OF DISCLOSURE STATEMENT HEARING;**
**(iii) FIXING VOTING RECORD DATE; (iv) APPROVING THE NOTICE AND**
**OBJECTION PROCEDURES IN RESPECT OF CONFIRMATION OF THE**
**PLAN OF REORGANIZATION AND FIXING THE DATE OF THE**
**CONFIRMATION HEARING; (v) APPROVING SOLICITATION PACKAGES**
**AND PROCEDURES FOR DISTRIBUTION THEREOF; (vi) APPROVING THE**
**FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING**
**ON THE PLAN OF REORGANIZATION; AND (vii) APPROVING THE**
**FORMS OF NOTICES TO NON-VOTING CLASSES UNDER THE PLAN OF**
**REORGANIZATION; (viii) FIXING THE VOTING DEADLINE TO ACCEPT**
**OR REJECT THE PLAN; (ix) APPROVING THE PROCEDURES FOR VOTE**
**TABULATIONS; AND (x) AUTHORIZING THE RETENTION OF EPIQ**
**BANKRUPTCY SOLUTIONS, LLC AS VOTING AND TABULATION AGENT**

Upon the Motion dated April 10, 2008 (collectively with the supplement

thereto, dated May 2, 2008, the "Motion"), of PRC, LLC ("PRC") and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to

sections 105, 502, and 1128 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 3020, 9013, 9014 and 9021 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rules 2002-1, 3017-1, 3018-1, 3020-1, 9013-1 and 9021-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules"), for (i) approval of the notice of the hearing to

consider approval of the Debtors' proposed Disclosure Statement (as defined below) for

the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as

it may be further amended, the "Plan"), mailed by the Debtors on April 10, 2008; (ii)

approval of the Disclosure Statement; (iii) the fixing of record dates; (iv) approval of the

notice of the hearing and objection procedures in respect of confirmation of the Plan and

setting the date for the hearing on confirmation of the Plan; (v) approval of the

solicitation packages (the "Solicitation Packages") and procedures for distribution

thereof; (vi) approval of the forms of ballots and establishing procedures for voting on the

Plan; (vii) approval of the forms of the notices to non-voting classes under the Plan; (viii)

fixing the voting deadline to accept or reject the plan; (ix) approving the procedures for

vote tabulation; and (x) authorizing the retention of Epiq as the voting and tabulation

agent, all as more fully set forth in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157

and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the

District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting

C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been provided to: (i) the United States Trustee for the Southern District of New York (the

"U.S. Trustee"), (ii) the attorneys for the official committee of unsecured creditors

appointed in these chapter 11 cases (the "Creditors' Committee"), (iii) all parties entitled

to notice pursuant to this Court's Order, dated January 25, 2008, implementing notice and

case management procedures; (the "Notice Procedures Order"); (iv) the Securities and

Exchange Commission (the "SEC"), (v) the District Director of the Internal Revenue Service for the Southern District of New York (the "District Director"), (vi) all persons or entities listed in the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors on March 8, 2008 pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended (collectively, the "Schedules"), and (vii) any other known holders of claims against or equity interests in the Debtors (collectively, the "Noticed Parties"); and it appearing that no other or further notice need be provided; and a hearing having been held before the Court with respect to the Motion (the "Hearing"); and the Debtors having filed the Disclosure Statement for the Plan, a copy of which is annexed hereto as Exhibit 1 (the "Disclosure Statement"); and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish cause for the relief granted herein; and upon the record of the Hearing; and all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing, therefore

IT IS HEREBY FOUND THAT:

1.     The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.     Actual notice of the Hearing and the deadline for filing objections to the Disclosure Statement (the "Disclosure Statement Notice") was provided to the

Noticed Parties, and such notice constitutes good and sufficient notice to all interested parties.

3.      The form and manner of notice of the time set for filing objections to, and the time, date, and place of, the Hearing to consider the approval of the Disclosure Statement was adequate and comports with due process.

4.      The forms of the ballots (the "Ballots"), including all voting instructions provided therein, substantially in the forms annexed hereto as Exhibits 4, 5, and 6, are sufficiently consistent with Official Form No. 14 and adequately address the particular needs of these chapter 11 cases and are appropriate for each class of claims entitled to vote to accept or reject the Plan.

5.      Holders of claims and interests in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) are unimpaired (the "Unimpaired Classes"), and therefore, conclusively presumed to accept the Plan. Accordingly, holders of claims and interests in the Unimpaired Classes shall not be provided with a Ballot.

6.      Holders of interests in Class 7 (Preconfirmation Equity Interests) under the Plan (the "Non-Voting Impaired Class") will not receive or retain any property under the Plan, and therefore, are deemed to reject the Plan.  Accordingly, holders of claims and interests in the Non-Voting Impaired Class shall not be provided with a Ballot.

7.      The period, set forth below, during which the Debtors may solicit acceptances to the Plan is a reasonable period of time for entities entitled to vote on the Plan to make an informed decision whether to accept or reject the Plan.

8.      The procedures, set forth below, for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

9.      The procedures, set forth below, regarding notice to all parties in interest of the time, date, and place of the hearing to consider confirmation of the Plan (the "Confirmation Hearing") and the distribution and contents of the Solicitation Packages comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties.

NOW, THEREFORE, IT IS:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Disclosure Statement is APPROVED; and it is further

ORDERED that all objections to the Disclosure Statement that have not been withdrawn or resolved as provided for in the record of the Hearing are overruled, provided, however, that the objections raised by ACE American Insurance Company, ACE Property & Casualty Insurance Company, Illinois Union Insurance Company, and other members of the ACE group of insurance companies (collectively "ACE") shall be heard at the Confirmation Hearing and ACE's rights with respect thereto are reserved; and it is further

ORDERED that the Disclosure Statement Notice, substantially in the form annexed hereto as Exhibit 2, of the time set for filing objections to, and the hearing to consider approval of, the Disclosure Statement was proper, adequate, and sufficient notice thereof and of all proceedings in connection therewith; and it is further

ORDERED that, with respect to holders of claims of Class 4 (Allowed Prepetition First Lien Claims), Class 5 (Allowed Prepetition Second Lien Claims), and Class 6 (General Unsecured Claims) entitled to vote on the Plan, May 8, 2008 is established as the voting record date (the "Voting Record Date"); and it is further

ORDERED that the Voting Record Date is the date for purposes of determining which creditors and equity interest holders in non-voting classes are entitled to receive an appropriate Notice of Non-Voting Status (as defined below); and it is further

ORDERED that the Confirmation Hearing will be held at 10:00 a.m. (Prevailing New York City Time) on June 19, 2008; provided, however, that the Confirmation Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open Court or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court; and it is further

ORDERED that the notice (the "Confirmation Hearing Notice") of (i) the time fixed for filing objections to confirmation of the Plan and (ii) the time, date, and place of the Confirmation Hearing, substantially in the form annexed hereto as Exhibit 3, is APPROVED; and it is further

ORDERED that objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (a) be in writing; (b) be in the English language; (c) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (d) state with particularity the basis and nature of any objection or proposed modification to the Plan; and (e) be filed, together with proof of

service, with the Court and served so that they are actually received by the following

parties no later than June 12, 2008 at 4:00 p.m. (Prevailing New York City Time): (i)

counsel for the Debtors, Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite

1600, Houston, Texas 77002-2784 (Attn: Alfredo R. Pérez and James T. Grogan); (ii)

the U.S. Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, New York 10004 (Attn: Greg M. Zipes); (iii) Chadbourne & Park LLP, 30

Rockefeller Plaza, New York, New York 10112 (Attn: Howard Seife and Andrew

Rosenblatt); (iv) Bingham McCutchen LLP, 355 South Grand Avenue, Suite 4400, Los

Angeles, California 90071-3106 (Attn: William Govier); (v) Bingham McCutchen LLP,

399 Park Avenue New York, New York  10022 (Attn:  Timothy B. DeSieno); (vi)

Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, New

York  10174-0208 (Attn:  Andrew B. Eckstein and Rocco Cavaliere); (vii) Blank Rome

LLP, One Logan Square, Philadelphia, Pennsylvania  19103 (Attn:  Regina Stango

Kelbon); and (viii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the

Americas, New York, New York 10019-6064 (Attn: Douglas A. Cifu and Jeffrey D.

Saferstein); and it is further

       ORDERED that objections to confirmation of the Plan that are not timely

filed, served, and actually received in the manner set forth above shall not be considered

and shall be deemed overruled; and it is further

       ORDERED that the Debtors shall complete the mailing of the Solicitation

Packages by no later than May 15, 2008 (the "Solicitation Date"); and it is further

       ORDERED that the Solicitation Packages distributed to creditors holding

claims in Class 4 (Allowed Prepetition First Lien Claims), Class 5 (Allowed Prepetition

Second Lien Claims), and Class 6 (General Unsecured Claims) (collectively, the "Voting Classes") shall contain a copy of (i) this Order (excluding the exhibits annexed hereto); (ii) the Confirmation Hearing Notice; (iii) the appropriate Ballot (with instructions), together with a return envelope; (iv) the Disclosure Statement (together with the Plan annexed thereto as Exhibit A); and (v) such other materials as the Court may direct; and it is further

ORDERED that the Solicitation Packages distributed to holders of claims and interests in the Unimpaired Classes or Non-Voting Impaired Classes shall contain a copy of (i) the Confirmation Hearing Notice and (ii) the appropriate form of Notice of Non-Voting Status; and it is further

ORDERED that the Debtors shall distribute, or cause to be distributed by the Solicitation Date: (i) this Disclosure Statement Order (excluding the exhibits thereto), (ii) the Confirmation Hearing Notice, (iii) the Disclosure Statement (together with the Plan annexed thereto as Exhibit A), and (iv) such other materials as the Court may direct to the Noticed Parties; and it is further

ORDERED that, with respect to holders of claims against or interests in the Debtors within a class under the Plan that is deemed to accept or reject the Plan under section 1126(f) or (g) of the Bankruptcy Code, the Debtors are not required to distribute copies of the Plan or Disclosure Statement to holders of such claims and interests unless a party makes a specific request to the Debtors in writing for same; and it is further

ORDERED that the Debtors shall not be required to send Solicitation Packages to creditors that have claims that have already been paid in full; provided, however, that if, and to the extent that, any such creditor would be entitled to receive a

Solicitation Package for any reason other than by virtue of the fact that such claim had

been paid by the Debtors, then the Debtors shall send such creditor a Solicitation Package

in accordance with the procedures set forth herein; and it is further

ORDERED that, with respect to addressees from which Disclosure

Statement Notices are returned as undeliverable by the United States Postal Service, the

Debtors are excused from mailing Solicitation Packages or any other materials related to

voting or confirmation of the Plan to those entities listed at such addresses unless the

Debtors are provided with accurate addresses for such entities before the Solicitation

Date, and failure to mail Solicitation Packages or any other materials related to voting or

confirmation of the Plan to such entities will not constitute inadequate notice of the

Confirmation Hearing or the Voting Deadline (as defined below) and shall not constitute

a violation of Bankruptcy Rule 3017(d); and it is further

ORDERED that a letter of support for the Plan from the Creditors'

Committee, substantially in the form annexed hereto as Exhibit 7, which form is

APPROVED, shall be distributed to all known holders of claims in Class 6 (General

Unsecured Claims) as of the Voting Record Date; and it is further

ORDERED that a Notice of Non-Voting Status – Unimpaired Classes,

substantially in the form annexed hereto as Exhibit 8, which form is APPROVED, shall

be distributed to all known holders of claims and equity interests in the Unimpaired

Classes as of the Voting Record Date; and it is further

ORDERED that a Notice of Non-Voting Status – Impaired Class,

substantially in the form annexed hereto as Exhibit 9, which form is APPROVED, shall

be distributed to the holders of equity interests in the Non-Voting Impaired Class as of the Voting Record Date; and it is further

ORDERED that the Notice of Non-Voting Status – Unimpaired Classes and the Notice of Non-Voting Status – Impaired Class (together, the "Notices of Non-Voting Status") each satisfy the requirements of the Bankruptcy Code and the Bankruptcy Rules; and it is further

ORDERED that all Ballots must be properly executed, completed, and delivered to the Epiq by first-class mail, overnight courier, or personal delivery, so that they are actually received by Epiq no later than 4:00 p.m. (Prevailing New York City Time) on June 9, 2008 (the "Voting Deadline"); and it is further

ORDERED that, solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtors in any other context, each claim within a class of claims entitled to vote to accept or reject the Plan is temporarily allowed in an amount equal to the amount of such claim as set forth in the Schedules, provided that:

(i)     If a claim is deemed allowed under the Plan, such claim is allowed for voting purposes in the deemed allowed amount set forth in the Plan;

(ii)    If a claim for which a proof of claim has been timely filed is, by its terms, contingent, unliquidated, or disputed, such claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such claim is disputed as set forth in subparagraph (vii) below;

(iii)   If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(iv)    If a proof of claim was timely filed in an amount that is liquidated, non-contingent, and undisputed, such claim is temporarily allowed in the amount set forth on the proof of claim, unless such claim is disputed as set forth in subparagraph (vii) below;

(v)    If a claim is listed in the Schedules as contingent, unliquidated, or disputed and a proof of claim was not (a) filed by the applicable bar date for the filing of proofs of claims established by the Court or (b) deemed timely filed by an order of the Court prior to the Voting Deadline, unless the Debtors have consented in writing, such claim is disallowed for voting purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c);

(vi)    If a claim is listed in the Schedules or on a timely filed proof of claim as contingent, unliquidated, or disputed in part, such claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution; and

(vii)    If the Debtors have served an objection to or request for estimation of a claim at least ten (10) days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution;

and it is further

ORDERED that if any claimant seeks to challenge the allowance or disallowance of its claim for voting purposes in accordance with the above procedures, such claimant is required to (a) serve on the Debtors and the Creditors' Committee and file with the Court (with a copy to chambers) a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim in a different amount for purposes of voting to accept or reject the Plan on or before the tenth (10th) day after the later of (i) service of the Confirmation Hearing Notice and (ii) service of notice of an objection or request for estimation, and if any, as to such claim, and (b) obtain an order from the Court authorizing such temporary allowance at a hearing to be held on such motion on the date of the Confirmation Hearing; and it is further

ORDERED that each creditor that votes to accept or reject the Plan is deemed to have voted the full amount of its claim therefor; and it is further

ORDERED that any entity that holds a claim in more than one class that is entitled to vote must use separate Ballots for each such claim; and it is further

ORDERED that in the event a creditor casts more than one Ballot voting the same claim(s) before the Voting Deadline, the last Ballot received before the Voting Deadline is deemed to reflect the voter's intent, and thus, supersedes any prior Ballots; and it is further

ORDERED that in the event a creditor casts a Ballot that is properly completed, executed, and timely returned to Epiq, but does not indicate either an acceptance or rejection of the Plan, shall be deemed to reflect the voter's intent to accept the Plan; and it is further

ORDERED that in the event a creditor casts a Ballot that is properly completed, executed, and timely returned to Epiq, but indicates both an acceptance and a rejection of the Plan, shall be deemed to reflect the voter's intent to accept the Plan; and it is further

ORDERED that the following types of Ballots will not be counted in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot, (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant, (iii) any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept

or reject the Plan, (iv) any unsigned Ballot, or (v) any Ballot transmitted to Epiq by

facsimile or other means not specifically approved herein; and it is further

ORDERED that the amount of a claim that shall count for voting purposes

shall be governed by this Order and not by any amount that may be filled in on any

Ballot; and it is further

ORDERED that the Debtors are authorized, in their sole discretion, to take

or refrain from taking any action necessary or appropriate to implement the terms of and

the relief granted in this Order without seeking further order of the Court; and it is further

ORDERED that the Debtors are authorized to make nonsubstantive

changes, to the Disclosure Statement, the Plan, and related documents without further

order of the Court, including, without limitation, changes to correct typographical and

grammatical errors and to make conforming changes among the Disclosure Statement,

the Plan and any other materials in the Solicitation Packages prior to mailing; and it is

further

ORDERED that the Debtors are authorized to include, at their discretion,

an appropriate letter of support by the Creditors' Committee to be included in the

Solicitation Package; and it is further

ORDERED that the Debtors are authorized to employ and retain Epiq as

their voting and tabulation agent on the terms and subject to the conditions set forth in the

letter agreement by and between the Debtors and Epiq dated as of January 18, 2008,

annexed to the Motion as Exhibit 10 (the "Epiq Agreement"); and it is further

ORDERED that the Debtors are authorized to compensate Epiq in accordance with the Epiq Agreement upon receipt of a reasonably detailed invoice, without the necessity of Epiq filing a formal fee application; and it is further

ORDERED that the hourly rates payable to Epiq in connection with its retention by the Debtors will be those rates set forth in the Agreement; and it is further

ORDERED that all notices to be provided pursuant to the procedures set forth herein are good and sufficient notice to all parties in interest of all matters pertinent hereto and of all matters pertinent to the Confirmation Hearing and no other or further notice need be provided; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Debtors file a memorandum of law in support of the Motion is waived.

Dated:  May 8, 2008
         New York, New York


                         /s/ Martin Glenn
                         HONORABLE MARTIN GLENN
                         UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C TO THE DISCLOSURE STATEMENT**

**The Debtors' Financial Statements for the Year Ended
December 31, 2007, and Debtors' Projected Financial
Information**

# Exhibit "C"

### EXPLANATORY NOTES
### TO THE CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS
### AND CONSOLIDATED CONDENSED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED DECEMBER, 31, 2007

For purposes of developing the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated as of May 2, 2008 (as the same may be amended or modified, the "*Plan*"), of Panther/DCP Intermediate Holdings, LLC ("*Intermediate HoldCo*") and its operating subsidiaries PRC, LLC, PRC B2B, LLC, Access Direct Telemarketing, Inc., and Precision Response of Pennsylvania, LLC (collectively, the "*Operating Companies*" or, on and after the Effective Date, the "*Reorganized Operating Companies*"),[1] and evaluating its feasibility, the following unaudited financial statements for the year ended December 31, 2007 (the "*2007 Financials*") were considered, and the following financial projections for the six months ending December 31, 2008 and for the years ending December 31, 2009 and 2010 (collectively, the "*Projections*") were prepared.

Although the 2007 Financials are unaudited, they were prepared in a manner consistent with past practices and every effort was made to assure that the information contained therein is accurate. The Projections, in turn, reflect the Debtors' estimate of the Operating Companies' expected consolidated financial position, results of operations, and cash flows over the relevant period. Accordingly, the Projections reflect the Debtors' judgment, as of the date of this Disclosure Statement, of expected future operating and business conditions, which are subject to change.

THE PROJECTED FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTED FINANCIAL INFORMATION OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED.

The Projections were prepared by the Debtors; the information contained therein has not been audited or reviewed by independent accountants. The significant assumptions used in the preparation of the Projection are stated below. The Debtors have only prepared projected consolidated income statements, projected consolidated statements of cash flows, and projected consolidated balance sheets for the Reorganized Operating Companies. The projected consolidated financial statements of Reorganized Operating Companies set forth below have been prepared based on the assumption that the Effective Date of the Plan will be June 30, 2008. Although the Debtors believe that such an assumption is attainable, there can be no assurance as to when or if the Effective Date actually will occur.

The Reorganized Operating Companies' Projected Consolidated Balance Sheet as of June 30, 2008 (the "*Effective Date Balance Sheet*") set forth below presents the projected consolidated financial position of the Reorganized Operating Companies on or about the Effective Date (collectively, the "*Balance Sheet Adjustments*"). The Balance Sheet Adjustments include various

---

[1] Any capitalized term used but not defined in this Exhibit "C" will have the meaning ascribed to such term in the Plan or the Disclosure Statement, as applicable.

estimated bankruptcy-related exit costs, as well as financing and "fresh-start" accounting adjustments which reflect the assumed effects of confirmation and the consummation of the transactions contemplated by the Plan, including the settlement of various liabilities and related securities issuances, cash payments and borrowings. Holders of Claims entitled to vote on the Plan should note that, although the Debtors' management has used its best efforts to estimate the Balance Sheet Adjustments reflected in the Effective Date Balance Sheet, the actual adjustments will be determined at later date and may be materially different than the amounts reflected in the Effective Date Balance Sheet.

The Reorganized Operating Companies' Projected Balance Sheets as of the fiscal years ending 2008-2010 reflect the contemplated new capital structure of Reorganized Operating Companies, after giving effect to the Plan and the Restructuring Transactions described more fully in Article V of the Plan. The Reorganized Operating Companies' Projected Consolidated Statements of Operations set forth below present the projected consolidated results of operations of Reorganized Operating Companies for the post-Effective Date period of 2008 and each year from 2009 through 2010. The Reorganized Operating Companies' Projected Consolidated Statements of Cash Flows set forth below present the projected consolidated cash flows of Reorganized Operating Companies for the post-Effective Date period of 2008 and each year from 2009 through 2010.

As noted above, the Debtors have only prepared the Projections with respect to the Reorganized Operating Companies. To effectuate the discharge of their liabilities contemplated by the Plan, on the Effective Date certain Restructuring Transactions described more fully in Article V of the Plan will occur, such that holders of Allowed Prepetition First Lien Claims (Class 4) will receive their Ratable Proportion of, among other things, $40 million of the Postconfirmation Unsecured Note issued by Postconfirmation Intermediate HoldCo, all of which is payable in kind no less frequently than quarterly. The sole asset of Postconfirmation Intermediate HoldCo will be its equity interests in Postconfirmation PRC. The Debtors preliminarily estimate that, after taking account of the obligations and working capital needs of the operating Debtors on and after the Effective Date, the assets of Postconfirmation Intermediate HoldCo will have a value of approximately $29.6 million. The actual value of these assets will be determined at a later date and may be materially different from that presented herein.

## A.    SUMMARY OF SIGNIFICANT ACCOUNTING PRACTICES AND PROJECTION ASSUMPTIONS

### Accounting Practices

The consolidated financial projections for the Reorganized Operating Companies present, to the best of the Debtors' knowledge and belief, the Reorganized Operating Companies' expected financial position, results of operations and cash flows for the projection period(s). Accordingly, the Projections reflect the Debtors' judgment as of April 2008, the date of these Projections, of expected conditions and expected courses of action. The assumptions disclosed herein are those that the Debtors believe are significant to the Projections. Because events and circumstances frequently do not occur as expected, there will be differences between the projected and actual results. These differences may be material to the Projections herein.

### Basis of Presentation

The Projections are presented on an accrual basis using the principles of "fresh-start" accounting as required by the Statement of Position 90-7 ("*SOP 90-7*") issued by the American

Institute of Certified Public Accountants. For the Balance Sheets of Reorganized Operating Companies, the Debtors have attributed the range for Enterprise Value established in Section VII.B of the Disclosure Statement to the assets using their best judgment. The Debtors have not completed a valuation of individual assets for the purpose of "fresh-start" accounting and the adjustments, if any, required to apply "fresh-start" accounting could be material. Further, the Debtors have not attempted to make all of the estimates and entries required or included all the supplementary disclosure normally found in "notes to financial statements" that might be required for the Projections to fully conform to generally-accepted accounting principles ("*GAAP*").

*Accounting Policies*

The Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' 2007 Financials, which are annexed hereto. Although the Debtors have followed the "fresh-start" accounting principles SOP 90-7 in preparing these Projections, the Projections include assumptions with respect to certain financial accounts of Reorganized Operating Companies that are based upon estimates and uncertain market conditions. The more material of these accounts and the underlying assumptions are provided below, including the events that will ultimately determine the final amounts of such accounts at the Effective Date:

- Current assets and current liabilities are projected based on assumptions which are expected to approximate their net realizable values.

- Non-current assets and non-current liabilities are based on the initial estimate of their "fresh-start" balances.

- The ultimate value of such assets and liabilities will be based upon the respective fair market values as of the Effective Date as ultimately determined by the Reorganized Operating Companies and approved by their auditors and such values could be materially different than the amounts reflected herein.

**B.    PROJECTION ASSUMPTIONS**

The Projections are based on a number of assumptions, and while the Debtors have prepared the Projections in good faith and believe the assumptions are reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will ultimately be realized. The Projections should be read in conjunction with the assumptions and qualifications contained herein, the risk factors described in the Disclosure Statement, and the historical unaudited financial statements for the fiscal year ended December 31, 2007 included in this Exhibit C. The following summarizes the underlying key assumptions upon which the Projections are based.

*General*

1.   *Business* – The Debtors anticipate continuing to carry on their business in both the B2C and B2B markets and to continue to provide inbound call-taking, outsourced back-office services and outbound sales and marketing programs for their clients. The Debtors anticipate that their clients will continue to consist of well-known, major corporations, institutions and organizations.

2.   *Methodology* – The Projections were prepared using a customer by customer approach for each of their client programs in 2008 and then made aggregate "run-rate" assumptions for

all clients for 2009 and 2010. The operating projections for its programs were then consolidated. The Debtors added certain overlays to the consolidated projections to account for costs necessary to support growth, the impact of recent industry events, cost savings programs and other costs that impact the Debtors' operation in the Projection Period. However, the Debtors can provide no assurance that such assumptions will ultimately be realized and actual results may be materially different than projected.

3. *Plan Consummation and Effective Date* – The Projections assume the Plan will be consummated on June 30, 2008.

### Projected Consolidated Statements of Operations

1. *Revenues* – Revenues for 2008 are forecasted to be 31% below the prior year primarily due to the rejection or other termination of certain key contracts and adjustment of business volumes from continuing clients. The 2009 Projections assume that revenue will decline slightly as the Debtors will focus on retaining existing clients and improving cost structures on a lower revenue base. The Debtors assume new business will be added in 2010, which will help provide revenue growth of 11% for that year. Beginning in 2010, the Projections assume revenue growth from some existing clients, from existing programs, and from the addition of new clients. The Debtors expect that such growth will somewhat offset reductions in revenues from the completion or reduction of other client programs and any loss of existing clients.

2. *Client Specific Margin* – Client Specific Margin ("**CSM**") is a measure commonly referred to by industry participants, but is not one provided for under GAAP and is not necessarily measured in the same way across the Debtors' industry. As measured by the Debtors, the Projections reflect improved CSM over the Reorganized Debtors' recent historical results driven by improvements in profitability through initiatives to exit underperforming and unprofitable client contracts as described in the Disclosure Statement and to relocate certain client programs between contact centers. Additional cost savings are expected to be achieved through specific improvements in contact center occupancy and billing utilization for the Debtors' client-service representatives. In 2008, a portion of the savings achieved through these initiatives will be mitigated by costs associated with client turnover and the cost to implement cost-saving initiatives. The Debtors anticipate that certain of these costs will be incurred after the Effective Date of the Plan.

3. *Department Overhead and G&A* – The Projections for 2008 reflect improvements as the Debtors adjust their fixed cost structure to match a lower projected revenue base. This is achieved through the Debtors' closure of certain sites, consolidation of client programs at the remaining sites, and improved alignment of revenues to staffing levels at the Debtors' headquarters and regional offices.

4. *Increased Share of New Business Served Offshore* – The Projections reflect the assumption that 58% of revenues from new services sold will be performed by an offshore subcontractor. This compares to the current weighting of 82% of revenues performed onshore and 18% offshore.

5. *Interest Expense* – Interest expense is forecasted based on the estimated funding needs and the capital structure of the Reorganized Operating Companies as described in the Plan. The capital structure is described in the Debt section of the Balance Sheet assumptions.

6. *Income Tax Expense* – PRC and two of its wholly-owned subsidiaries (PRC B2B, LLC and Precision Response of Pennsylvania, LLC) are taxed as partnerships for Federal income tax purposes and therefore have no tax liability. However, some states treat these entities as taxable entities for state income tax purposes and therefore are subject to taxation on income generated in those states. Additionally, PRC's wholly-owned subsidiary Access Direct Telemarketing, Inc. is a corporation subject to federal, state and local income taxes. No tax provision has been reflected in the accompanying projections as such amounts, if any, would not be material to the overall financial statement projections taken as a whole. Further, the Reorganized Operating Companies will likely be included in a consolidated tax return with their parent company, which is currently contemplated to be treated as a partnership for federal income tax purposes. The ultimate tax sharing arrangements between Reorganized Operating Companies and parent company have not been fully determined as of the date of these Projections.

7. *Depreciation and Amortization Expense* – Depreciation and amortization are based on depreciable asset values established as described above in Accounting Practices - Basis of Presentation.

8. *Adjusted EBITDA* – This is a non-GAAP financial measure as defined in the Debtors' credit agreements with the Prepetition Lenders and the current Postpetition Financing Agreement with the DIP Lenders. It is generally defined as earnings before interest, taxes and depreciation & amortization, adjusted for certain specific cash and non-cash "add-backs" related to the Operating Companies' restructuring initiatives. These adjustments include "add-backs" for professionals' fees incurred during the Reorganization Cases, earnings from programs identified for exit, employee severance costs, any gain or loss on the sale of assets, and other specific, non-recurring restructuring costs, whether cash or non-cash.

9. *Other* – The Debtors plan to sell certain operating assets prior to December 31, 2008 for net proceeds of approximately $1.2 million.

### Projected Consolidated Balance Sheets and Statements of Cash Flow

1. *Cash and Cash Equivalents* –For purposes of the Projections, the Debtors assume that increases in cash and cash equivalents will be used to repay amounts outstanding under the Exit Facility.

2. *Working Capital* – The Projections anticipate that the timing for collection of cash receipts remains at historical levels. The Projections also assume accounts payable will be satisfied consistent with historical levels and timing by the end of 2008.

3. *Debt and Capital Structure* – The Projections assume that the Debtors' capital structure will be consistent with the capital structure set forth in the Plan and Disclosure Statement. Specifically, the Projections assume that Postconfirmation PRC will have an Exit Facility in the aggregate approximate amount of $30 to $40 million, $21.9 million of which will be drawn on at the Effective Date to repay amounts owed under the Postpetition Financing Facility and to satisfy other obligations under the Plan, as well as a Postconfirmation Second Lien Facility of $40.0 million and equity held by Postconfirmation Intermediate HoldCo.

4.  _Capital Expenditures_ – Capital expenditures are expected to remain relatively constant for 2008 and 2009, at $8.7 million and $7.7 million respectively, which relate primarily to maintenance expenditures.  In 2010, capital expenditures are expected to increase to $10.7 million, which relates to maintenance expenses and growth capital for new operations.

# Reorganized Operating Companies
## Projected Consolidated Statements of Operations

### ($ in 000s)

|  | Projected 6 Months Ended 12/31/2008 | Projected 12 Months Ended 12/31/2009 | Projected 12 Months Ended 12/31/2010 |
|---|---|---|---|
| Total Revenue | $134,851 | $285,547 | $316,152 |
| Direct Expenses | 93,411 | 192,159 | 212,711 |
| **Total CSM** | **$41,441** | **$93,388** | **$103,441** |
| *CSM Margin* | *30.7%* | *32.7%* | *32.7%* |
| Fixed Indirect | 29,140 | 54,100 | 57,890 |
| Sales & Administrative | 11,449 | 21,224 | 24,838 |
| Depreciation & Amortization | 8,233 | 18,083 | 20,387 |
| **Income (Loss) from Operations** | **($7,381)** | **($19)** | **$326** |
| Other Expense / (Income) | (26) | (53) | (53) |
| Interest Expense | 3,205 | 6,899 | 7,232 |
| Restructuring Expense | 3,596 | - | - |
| **Income (Loss) Before Tax** | **($14,156)** | **($6,865)** | **($6,854)** |
| Taxes | - | - | - |
| **Net Income (Loss)** | **($14,156)** | **($6,865)** | **($6,854)** |
| **Adjusted EBITDA** | **$6,815** | **$18,065** | **$20,713** |
| *Adjusted EBITDA Margin* | *5.1%* | *6.3%* | *6.6%* |

# Reorganized Operating Companies

### Projected Consolidated Balance Sheets

#### ($ in 000s)

|  | Projected at Emergence | Projected 12/31/2008 | Projected 12/31/2009 | Projected 12/31/2010 |
|---|---|---|---|---|
| Cash | $1,000 | $1,000 | $1,000 | $1,000 |
| Restricted Cash | 2,028 | - | - | - |
| Accounts Receivable, Net of Allowance | 51,359 | 37,392 | 43,028 | 47,639 |
| Other Current Assets | 4,185 | 3,733 | 3,969 | 4,943 |
| Property and Equipment, net | 14,500 | 17,958 | 19,606 | 21,950 |
| Goodwill, net | - | - | - | - |
| Intangibles and Other Assets | 48,066 | 42,058 | 30,041 | 18,026 |
| **Total Assets** | **$121,138** | **$102,141** | **$97,644** | **$93,558** |
| Accounts Payable | 12,910 | 15,066 | 14,118 | 15,811 |
| Accrued Compensation | 6,511 | 5,647 | 6,098 | 6,752 |
| Other Current Liabilities | 8,566 | 5,826 | 6,236 | 7,169 |
| Total Debt | 62,272 | 58,878 | 61,333 | 60,821 |
| Other Non-Current Liabilities | 1,271 | 1,271 | 1,271 | 1,271 |
| **Total Liabilities** | **$91,529** | **$86,688** | **$89,056** | **$91,823** |
| Stockholders' Equity | $29,609 | $15,453 | $8,588 | $1,735 |
| **Total Liabilities and Shareholders Equity** | **$121,138** | **$102,141** | **$97,644** | **$93,558** |

# Reorganized Operating Companies

### Projected Statements of Cash Flow

#### ($ in 000s)

| | Projected 6 Months Ended 12/31/2008 | Projected 12 Months Ended 12/31/2009 | Projected 12 Months Ended 12/31/2010 |
|---|---|---|---|
| Net Income (Loss) | ($14,156) | ($6,865) | ($6,854) |
| Depreciation and Amortization | 8,233 | 18,083 | 20,387 |
| Other Non-Cash Adjustments | 2,473 | 5,663 | 6,418 |
| **Changes in Working Capital:** | | | |
| Accounts Receivable | 13,967 | (5,636) | (4,612) |
| Accounts Payable | 2,156 | (949) | 1,693 |
| Other | (3,152) | 626 | 612 |
| **Cash Flow From Operations** | **$9,522** | **$10,922** | **$17,645** |
| Capital Expenditures | (5,683) | (7,714) | (10,714) |
| **Cash Flow From Investing** | **($5,683)** | **($7,714)** | **($10,714)** |
| Debt Borrowings / (Payments) | (5,867) | (3,208) | (6,931) |
| **Cash Flow From Financing** | **($5,867)** | **($3,208)** | **($6,931)** |
| Release of Restricted Cash | 2,028 | - | - |
| **Net Change In Cash** | - | - | - |

# Operating Companies

## Consolidated Statement of Operations

### ($ in 000s)

|  | 12 Months Ended 12/31/2007 (Unaudited) |
|---|---|
| Total Revenue | $472,905 |
| Direct Expenses | 343,020 |
| **Total CSM** | **$129,885** |
| *CSM Margin* | *27.5%* |
|  |  |
| Fixed Indirect | 87,300 |
| Sales & Administrative | 32,443 |
| Depreciation & Amortization | 35,938 |
| **Income (Loss) from Operations** | **($25,795)** |
|  |  |
| Other Expense / (Income) | 1,615 |
| Interest Expense | 20,112 |
| Restructuring Expense | - |
| **Income (Loss) Before Tax** | **($47,522)** |
|  |  |
| Taxes | 679 |
| **Net Income (Loss)** | **($48,202)** |
|  |  |
| **Adjusted EBITDA** | **$18,369** |
| *Adjusted EBITDA Margin* | *3.9%* |

# Operating Companies

### Consolidated Balance Sheet

### ($ in 000s)

|  | 12/31/2007 (Unaudited) |
|---|---|
| Cash and cash equivalents | $18,820 |
| Accounts Receivable, Net of Allowance | 74,337 |
| Other Current Assets | 8,898 |
| Property and Equipment, net | 47,643 |
| Goodwill, net | 105,113 |
| Intangibles and Other Assets | 95,140 |
| **Total Assets** | **$349,950** |
| | |
| Accounts Payable | 47,162 |
| Accrued Compensation | 14,713 |
| Other Current Liabilities | 9,905 |
| Total Debt | 186,804 |
| Other Non-Current Liabilities | 1,268 |
| **Total Liabilities** | **$259,853** |
| | |
| Stockholders' Equity | 90,098 |
| | |
| **Total Liabilities and Shareholders Equity** | **$349,950** |

# Operating Companies

## Consolidated Statement of Cash Flow

### ($ in 000s)

|  | 12 Months Ended 12/31/2007 (Unaudited) |
|---|---|
| Net Income (Loss) | ($48,202) |
| Depreciation and Amortization | 37,053 |
| Other Non-Cash Adjustments | 5,466 |
| **Changes in Working Capital:** |  |
| Accounts Receivable | (2,565) |
| Accounts Payable | 23,906 |
| Other | (1,880) |
| **Cash Flow From Operations** | **$13,779** |
| Acquisition of Business | - |
| Capital Expenditures | (25,602) |
| Other | - |
| **Cash Flow From Investing** | **($25,602)** |
| Debt Borrowings / (Payments) | 3,009 |
| Equity Borrowings / (Payments) | 9,581 |
| Other | 1,444 |
| **Cash Flow From Financing** | **$14,033** |
| **Net Change In Cash** | **$2,209** |

**EXHIBIT D TO THE DISCLOSURE STATEMENT**

**The Debtors' Liquidation Analysis**

# Exhibit "D"

**A.    LIQUIDATION ANALYSIS**

1.  Introduction

The liquidation analysis (the "Liquidation Analysis") reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if each Debtor were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is based on a number of estimates and assumptions that, although considered reasonable by management and Evercore, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtors' control, and which could be subject to material change.

ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RECOVERIES FROM THE LIQUIDATION OF ASSETS REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED IN THE LIQUIDATION ANALYSIS.

The Liquidation Analysis illustrates that in a chapter 7 liquidation, holders of Prepetition Second Lien Claims, Chapter 11 Unsecured Administrative Expense Claims, Priority Unsecured Claims and General Unsecured Claims (including Convenience Claims) would receive no recovery.  The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on June 30, 2008.

The Liquidation Analysis assumes the liquidation of PRC would commence under the direction of a Bankruptcy Court appointed trustee (the "Chapter 7 Trustee") and would continue for a period of approximately six months, during which time all of PRC's significant assets would either be sold or conveyed to the respective lien holders, and the cash proceeds, net of liquidation related costs, would then be distributed to creditors. Although some assets could be liquidated in less than six months, other assets would be more difficult to collect or sell, thus requiring a liquidation period substantially longer than six months.  During the liquidation, the Chapter 7 Trustee would generally undertake: (i) the orderly collection of existing accounts receivable and future receivables during the wind-down, (ii) the orderly sale of equipment and other fixed assets, and (iii) the orderly wind-down of daily operations.  For certain other assets, liquidation values were estimated for each asset or were assessed for assets in similar categories by estimating the percentage recoveries that a Chapter 7 Trustee might obtain for that category of asset.

With respect to PRC, the Liquidation Analysis assumes that the Chapter 7 Trustee would be able to negotiate a charging lien against the assets which are subject to the claims of secured creditors.  Under the DIP Financing Order, liens were or will be granted to the DIP Lenders against all of PRC's assets including avoidance actions.  Absent an agreement between the Chapter 7 Trustee and the DIP Lenders, funding for the Chapter 7 Trustee would be limited to the $50,000 carve-out provided for in the DIP Financing Order.  It is assumed that without an agreement as to a charging lien between the Chapter 7 Trustee and the DIP

1

Lenders that the Chapter 7 Trustee would likely abandon many of the assets in favor of the DIP Lenders.

The Liquidation Analysis also assumes that the gross amount of assets and the cash available for distribution would be the sum of the proceeds from the disposition of each Debtor's assets, recovery on preference claims and the cash held by each Debtor at the commencement of the chapter 7 case. Such amount then would be reduced by the costs and expenses of the chapter 7 liquidation to arrive at net proceeds available for distribution to creditors. The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with the priorities required by Bankruptcy Code sections 726 and 507. Specifically, net value from the liquidation of assets after the payment of fees associated with the liquidation generally would be distributed first to satisfy secured claims to the extent of the collateral value securing such claims, in order of priority. Next, value would flow to unsecured claims beginning with Administrative Expense Claims (including any incremental administrative expense claims that may result from the termination of PRC's business and the liquidation of its assets), second to Priority Unsecured Claims, third to General Unsecured Claims (including Convenience Claims) and fourth to Pre-Confirmation Equity Interests. Since PRC's business operations would cease in a chapter 7 liquidation, all of PRC's major executory contracts and leases would be rejected by the Chapter 7 Trustee. Based on exercising their right of set-off, certain vendors are assumed to offset some of their outstanding unsecured claims against amounts that are owed to PRC (in the form of prepetition receivables). The Liquidation Analysis does not include an estimate for other unsecured claims, such as claims of customers and other agreements arising from failure of PRC to perform and render services. These types of claims are difficult to estimate but are presumed to occur in a liquidation context due to the cessation of PRC's business operations and the resulting rejection of contracts and lease agreements. These claims are likely substantial and would further dilute any recovery estimated for unsecured creditors in the Liquidation Analysis.

The Liquidation Analysis includes an estimate of the amount of claims that could ultimately be allowed claims. Estimates for the various types of claims are based solely on the Debtors' estimates and do not constitute an admission of liability by the Debtors. Unless otherwise noted herein, no order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of claims at the projected levels set forth in this Liquidation Analysis.

In the event of a liquidation, it is likely that PRC would pursue potential fraudulent conveyances, preference claims and other causes of action. This Liquidation Analysis attempts to estimate the recovery of PRC from some of these potential claims. However, these estimated amounts are speculative and the actual recovery could differ substantially from the amounts estimated herein. In addition, unless otherwise noted herein, these estimates do not include the estimated costs of pursuing those actions.

Exhibit I
Liquidation Analysis

This Liquidation Analysis has been prepared in connection with the Disclosure Statement and the Plan. The Liquidation Analysis indicates the values that may be obtained by classes of claims upon disposition of assets, pursuant to a Chapter 7 liquidation, as an alternative to continued operation of the business under the Plan. Accordingly, collateral values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis uses the Debtors' projected June 30, 2008 financial statements, unless specified otherwise. Certain events such as the realization of proceeds from the sale of certain idle properties that have occurred since the filing of Chapter 11 are reflected in the projected Balance Sheet; to the extent that certain matters are not incorporated herein, they were deemed not to affect materially the results of this Liquidation Analysis.

**LIQUIDATION RECOVERY ANALYSIS**
*($ 000s)*

| | Note | Book Value | Est. Recovery % | | Est. Liquidation Value | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **Asset Liquidation:** | | | | | | |
| Cash and Cash Equivalents | 1 | 1,000 | 100.0% | 100.0% | $1,000 | $1,000 |
| Net Accounts Receivable | 2 | 51,359 | 40.3% | 62.6% | 20,706 | 32,171 |
| FF&E | 3 | 41,679 | 5.9% | 11.1% | 2,452 | 4,641 |
| Other Assets | 4 | 6,091 | 14.5% | 29.0% | 884 | 1,767 |
| Proceeds from Asset Liquidation | | $100,129 | 25.0% | 39.5% | $25,042 | $39,579 |
| Proceeds from Preference Claims | 5 | 45,964 | 5.0% | 10.0% | 2,298 | 4,596 |
| **Total Proceeds** | | | | | **$27,340** | **$44,176** |
| **Costs Associated with Liquidation:** | | | | | | |
| Payroll / Overhead Costs | 6 | | | | 1,506 | 1,255 |
| Site Clean-up and Additional Security Cost | 7 | | | | 1,694 | 1,694 |
| Professional Fees | 8 | | | | 1,750 | 1,750 |
| Chapter 7 Trustee Fees | 9 | | | | 870 | 1,375 |
| Total Wind-down Costs | | | | | $5,820 | $6,074 |
| **Cash Available for Distribution** | 10 | | | | **$21,520** | **$38,101** |

**DISTRIBUTION ANALYSIS SUMMARY**

| | Note | Est. Allowable Claims | |
|---|---|---|---|
| | | Low | High |
| Cash Available for Distribution | 10 | $21,520 | $38,101 |
| **DIP Claims** | 11 | **$10,421** | **$10,421** |
| Hypothetical Recovery to DIP Lenders | | 100.0% | 100.0% |
| **Proceeds Available after DIP Claims** | | **$11,098** | **$27,680** |
| **Prepetition First Lien Secured Claims** | 12 | **$118,200** | **$118,200** |
| Hypothetical Recovery to First Lien Secured Claims | 13 | 9.4% | 23.4% |
| **Proceeds Available after Prepetition First Lien Secured Claims** | | **$0** | **$0** |
| **Prepetition Second Lien Secured Claims** | 14 | **$67,000** | **$67,000** |
| Hypothetical Recovery to Second Lien Secured Claims | | 0.0% | 0.0% |
| **Proceeds Available after Prepetition Second Lien Secured Claims** | | **$0** | **$0** |
| Chapter 11 Unsecured Administrative Expense Claims | | | |
| Salaries, Wages & Benefits | 15 | $8,733 | $8,733 |
| Assumed Contracts | 16 | 3,150 | 3,150 |
| Professional Fees | 17 | 1,000 | 1,000 |
| Total Chapter 11 Administrative Expense Claims | | $12,883 | $12,883 |
| Hypothetical Recovery to Unsecured Administrative Expense Claims | | 0.0% | 0.0% |
| **Proceeds Available after Unsecured Administrative Claims** | | **$0** | **$0** |
| **Priority Unsecured Claims** | 18 | **$2,410** | **$2,410** |
| Hypothetical Recovery to Priority Unsecured Claims | | 0.0% | 0.0% |
| **Proceeds Available after Priority Unsecured Claims** | | **$0** | **$0** |
| **General Unsecured Claims** | 19 | **$29,844** | **$35,394** |
| Hypothetical Recovery to General Unsecured Claims | | 0.0% | 0.0% |
| **Proceeds Available after General Unsecured Claims** | | **$0** | **$0** |

The following major assumptions have been made for purposes of this Liquidation Analysis:

**Note 1** - Cash and Cash Equivalents includes cash in the Debtors' bank accounts as of June 30, 2008 and does not include any check float amount. It is assumed that during the liquidation period, operations would not generate additional cash available for distribution and the interest income that could be earned on cash proceeds pending distribution would be immaterial. It is assumed that $3.0 million of cash held in the Debtors' accounts based on the projected balance sheet is fully recoverable. The Liquidation Analysis assumes restricted cash held in escrow is utilized for the last payroll tax payment prior to conversion to a case under chapter 7 of the Bankruptcy Code.

**Note 2** - Accounts Receivable, Net amount is based on the June 30, 2008 projected balance sheet. The aging of the receivables has been estimated by assuming a proportional aging in June 30, 2008 as existing in the most recent actual aging report as of February 28, 2008. In addition, it includes an estimated $5.0 million of unbilled receivables accrued as of that date. Accounts Receivable collections include an offset amount of $10.0 million, which is attributable to exercising of the right to set-off by certain customers against payables owed to them as vendors. The Debtors anticipate that there would be significant uncertainty in connection with the collection of such Accounts Receivable in a chapter 7 case based on an assumption that the law regarding a creditor's right to offset amounts due to the debtor against rejection damages claims remains unsettled.

**Note 3** - FF&E includes computers, telephone equipment, computer software and leasehold improvements. Proceeds from these sales have been estimated based upon current general market conditions and an assessment by the procurement department of the Debtors. These results accounted for certain factors relating to the equipment, including the age of the equipment at each facility and whether the equipment is for general use or specialized for the Debtors' unique facilities.

**Note 4** – Other Assets consists of prepaid maintenance, insurance, licenses and other expenses. It excludes certain items such as IT set up costs, legal payments and deferred financing costs against which no recovery can be reasonably expected. The Debtors believe, and the Liquidation Analysis assumes, the prepaid and other assets would generate little or no recovery in a liquidation scenario.

**Note 5** – Preference Claims. The Debtors estimate they will be able to recover 5% to 10% of the estimated preference payments made to third parties in the 90 days prior to the bankruptcy for non-insiders and one year for insider payments. This amount excludes amounts paid to chapter 11 professionals, prepetition claims of preference defendants, amounts returned by insiders, amounts to vendors with assumed contracts in chapter 11 and amounts paid to landlords.

**Note 6** – Payroll / Overhead Costs. Corporate payroll and certain operating costs incurred during the liquidation assuming certain minimum staff would be required at the

physical locations to complete the closure of the facilities and to assist in collecting Accounts Receivable.

**Note 7** – Site Clean-up and Additional Security Cost estimates are based on the Debtors' prior experience in closing of sites. Clean-up estimate is based on a rate of $1.50 per square foot of the site and the additional security cost is assumed to be incurred over the last 3 months of the wind down period and is based on the center size.

**Note 8** – Professional Fees are fees owed to professionals for legal, accounting and other services to be incurred during the chapter 7 liquidation period and not already deducted from liquidation values and assumes full professional fees carveout of $1.0 million utilized to satisfy chapter 11 professional fees. The remaining chapter 11 professional expenses not paid by the carveout are classified as unsecured administrative claims.

**Note 9** – Chapter 7 Trustee Fees include those fees associated with the appointment of a Chapter 7 Trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees include the $50,000 allowed in the DIP Financing Order and an estimated fee calculated as 3% of the total asset liquidation value of the Debtors taken out of the First Lien Secured Claims Recovery as per section 506(c) of the Bankruptcy Code.

**Note 10** – Cash Available for Distribution amount is the total proceeds amount net of costs associated with the chapter 7 liquidation.

**Note 11** – DIP Claims. The Company entered into a $30.0 million DIP Revolving Facility with certain members of its Prepetition First Lien Lenders on January 23, 2008. The Liquidation Analysis results reflect the Company borrowing under this facility during the period the Debtors entered chapter 11 until the conversion into chapter 7. Claims amount include estimated unpaid accrued interest.

**Note 12** – Prepetition First Lien Secured Claims. PRC's obligations under its First Lien Credit Agreement is estimated to be $118.2 million, a combination of first lien term loan balance of $112.7 million and first lien revolver balance of $5.5 million.

**Note 13** – Hypothetical Recovery for Prepetition First Lien Claims is based on proceeds from liquidation after the paydown of the DIP facility, chapter 7 liquidation costs and trustee fees. The Prepetition Credit Agreement is secured by a first priority lien on all assets of PRC except for avoidance actions.

**Note 14** – Prepetition Second Lien Secured Claims. PRC's prepetition obligation under its Second Lien Credit Agreement is estimated to be $67.0 million

**Note 15** – Salaries, Wages & Benefits claims assumes that all employment agreements and labor agreements are rejected on the first day of chapter 7 for all non-essential employees. Estimated amount is based on the Debtors' severance policy implemented post-petition.

**Note 16** – Assumed Contracts claims includes amounts not cured at the time of the chapter 7 conversion for contracts assumed post-petition.

**Note 17 –** Professional Fees claims are an estimate of unpaid professional fees incurred during the administration of chapter 11 bankruptcy case after the professional fees carvout is utilized.

**Note 18 –** Priority Unsecured Claims consists of priority tax claims.

**Note 19 –** General Unsecured Claims (including Convenience Claims) include management's best estimate of prepetition accounts payable and accrued liabilities, after taking into account payments already made towards prepetition payables during the course of chapter 11 through June 30, 2008 and expected offsets against receivables. General Unsecured Claims also includes real property and equipment lease rejection claims and rejection damage claims for certain other executory contracts.    The Liquidation Analysis does not include an estimate for other unsecured claims, such as claims of customers and other agreements arising from failure of PRC to perform and render services.  These types of claims are difficult to estimate but are presumed to occur in a liquidation context due to the cessation of PRC's business operations and the resulting rejection of contracts and lease agreements.

# Exhibit G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re                                         :

                                             :

PRC, LLC, et al.,                        :

                                            :              Chapter 11

                                            :

                   Debtors             :              Case No. 08-10239 (MG)

                                            :

8151 Peters Road                   :              Jointly Administered

Suite 4000                              :

Plantation, FL  33324              :

EIN No. 592194806               :

-----------------------------------------------------------x

**ORDER (i) APPROVING THE DISCLOSURE STATEMENT;
(ii) APPROVING THE NOTICE OF DISCLOSURE STATEMENT HEARING;
(iii) FIXING VOTING RECORD DATE; (iv) APPROVING THE NOTICE AND
OBJECTION PROCEDURES IN RESPECT OF CONFIRMATION OF THE
PLAN OF REORGANIZATION AND FIXING THE DATE OF THE
CONFIRMATION HEARING; (v) APPROVING SOLICITATION PACKAGES
AND PROCEDURES FOR DISTRIBUTION THEREOF; (vi) APPROVING THE
FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING
ON THE PLAN OF REORGANIZATION; AND (vii) APPROVING THE
FORMS OF NOTICES TO NON-VOTING CLASSES UNDER THE PLAN OF
REORGANIZATION; (viii) FIXING THE VOTING DEADLINE TO ACCEPT
OR REJECT THE PLAN; (ix) APPROVING THE PROCEDURES FOR VOTE
TABULATIONS; AND (x) AUTHORIZING THE RETENTION OF EPIQ
BANKRUPTCY SOLUTIONS, LLC AS VOTING AND TABULATION AGENT**

Upon the Motion dated April 10, 2008 (collectively with the supplement

thereto, dated May 2, 2008, the "Motion"), of PRC, LLC ("PRC") and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to

sections 105, 502, and 1128 of title 11 of the United States Code (the "Bankruptcy

Code"), Rules 3020, 9013, 9014 and 9021 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") and Rules 2002-1, 3017-1, 3018-1, 3020-1, 9013-1 and 9021-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules"), for (i) approval of the notice of the hearing to

consider approval of the Debtors' proposed Disclosure Statement (as defined below) for

the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as

it may be further amended, the "Plan"), mailed by the Debtors on April 10, 2008; (ii)

approval of the Disclosure Statement; (iii) the fixing of record dates; (iv) approval of the

notice of the hearing and objection procedures in respect of confirmation of the Plan and

setting the date for the hearing on confirmation of the Plan; (v) approval of the

solicitation packages (the "Solicitation Packages") and procedures for distribution

thereof; (vi) approval of the forms of ballots and establishing procedures for voting on the

Plan; (vii) approval of the forms of the notices to non-voting classes under the Plan; (viii)

fixing the voting deadline to accept or reject the plan; (ix) approving the procedures for

vote tabulation; and (x) authorizing the retention of Epiq as the voting and tabulation

agent, all as more fully set forth in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157

and 1334 and the Standing Order of Referral of Cases to Bankruptcy Court Judges of the

District Court for the Southern District of New York, dated July 19, 1984 (Ward, Acting

C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been provided to: (i) the United States Trustee for the Southern District of New York (the

"U.S. Trustee"), (ii) the attorneys for the official committee of unsecured creditors

appointed in these chapter 11 cases (the "Creditors' Committee"), (iii) all parties entitled

to notice pursuant to this Court's Order, dated January 25, 2008, implementing notice and

case management procedures; (the "Notice Procedures Order"); (iv) the Securities and

A:\ORDER (I) APPROVING THE DISCLOSURE STATEMENT.DOC

Exchange Commission (the "SEC"), (v) the District Director of the Internal Revenue Service for the Southern District of New York (the "District Director"), (vi) all persons or entities listed in the schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors on March 8, 2008 pursuant to section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended (collectively, the "Schedules"), and (vii) any other known holders of claims against or equity interests in the Debtors (collectively, the "Noticed Parties"); and it appearing that no other or further notice need be provided; and a hearing having been held before the Court with respect to the Motion (the "Hearing"); and the Debtors having filed the Disclosure Statement for the Plan, a copy of which is annexed hereto as Exhibit 1 (the "Disclosure Statement"); and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish cause for the relief granted herein; and upon the record of the Hearing; and all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing, therefore

IT IS HEREBY FOUND THAT:

1.    The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.    Actual notice of the Hearing and the deadline for filing objections to the Disclosure Statement (the "Disclosure Statement Notice") was provided to the

Noticed Parties, and such notice constitutes good and sufficient notice to all interested parties.

3.    The form and manner of notice of the time set for filing objections to, and the time, date, and place of, the Hearing to consider the approval of the Disclosure Statement was adequate and comports with due process.

4.    The forms of the ballots (the "Ballots"), including all voting instructions provided therein, substantially in the forms annexed hereto as Exhibits 4, 5, and 6, are sufficiently consistent with Official Form No. 14 and adequately address the particular needs of these chapter 11 cases and are appropriate for each class of claims entitled to vote to accept or reject the Plan.

5.    Holders of claims and interests in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), and Class 3 (Other Secured Claims) are unimpaired (the "Unimpaired Classes"), and therefore, conclusively presumed to accept the Plan. Accordingly, holders of claims and interests in the Unimpaired Classes shall not be provided with a Ballot.

6.    Holders of interests in Class 7 (Preconfirmation Equity Interests) under the Plan (the "Non-Voting Impaired Class") will not receive or retain any property under the Plan, and therefore, are deemed to reject the Plan. Accordingly, holders of claims and interests in the Non-Voting Impaired Class shall not be provided with a Ballot.

7.    The period, set forth below, during which the Debtors may solicit acceptances to the Plan is a reasonable period of time for entities entitled to vote on the Plan to make an informed decision whether to accept or reject the Plan.

8.      The procedures, set forth below, for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

9.      The procedures, set forth below, regarding notice to all parties in interest of the time, date, and place of the hearing to consider confirmation of the Plan (the "Confirmation Hearing") and the distribution and contents of the Solicitation Packages comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties.

NOW, THEREFORE, IT IS:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that the Disclosure Statement is APPROVED; and it is further

ORDERED that all objections to the Disclosure Statement that have not been withdrawn or resolved as provided for in the record of the Hearing are overruled, provided, however, that the objections raised by ACE American Insurance Company, ACE Property & Casualty Insurance Company, Illinois Union Insurance Company, and other members of the ACE group of insurance companies (collectively "ACE") shall be heard at the Confirmation Hearing and ACE's rights with respect thereto are reserved; and it is further

ORDERED that the Disclosure Statement Notice, substantially in the form annexed hereto as Exhibit 2, of the time set for filing objections to, and the hearing to consider approval of, the Disclosure Statement was proper, adequate, and sufficient notice thereof and of all proceedings in connection therewith; and it is further

ORDERED that, with respect to holders of claims of Class 4 (Allowed Prepetition First Lien Claims), Class 5 (Allowed Prepetition Second Lien Claims), and Class 6 (General Unsecured Claims) entitled to vote on the Plan, May 8, 2008 is established as the voting record date (the "Voting Record Date"); and it is further

ORDERED that the Voting Record Date is the date for purposes of determining which creditors and equity interest holders in non-voting classes are entitled to receive an appropriate Notice of Non-Voting Status (as defined below); and it is further

ORDERED that the Confirmation Hearing will be held at 10:00 a.m. (Prevailing New York City Time) on June 19, 2008; provided, however, that the Confirmation Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open Court or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court; and it is further

ORDERED that the notice (the "Confirmation Hearing Notice") of (i) the time fixed for filing objections to confirmation of the Plan and (ii) the time, date, and place of the Confirmation Hearing, substantially in the form annexed hereto as Exhibit 3, is APPROVED; and it is further

ORDERED that objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (a) be in writing; (b) be in the English language; (c) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (d) state with particularity the basis and nature of any objection or proposed modification to the Plan; and (e) be filed, together with proof of

service, with the Court and served so that they are actually received by the following

parties no later than June 12, 2008 at 4:00 p.m. (Prevailing New York City Time): (i)

counsel for the Debtors, Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite

1600, Houston, Texas 77002-2784 (Attn: Alfredo R. Pérez and James T. Grogan); (ii)

the U.S. Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor,

New York, New York 10004 (Attn: Greg M. Zipes); (iii) Chadbourne & Park LLP, 30

Rockefeller Plaza, New York, New York 10112 (Attn: Howard Seife and Andrew

Rosenblatt); (iv) Bingham McCutchen LLP, 355 South Grand Avenue, Suite 4400, Los

Angeles, California 90071-3106 (Attn: William Govier); (v) Bingham McCutchen LLP,

399 Park Avenue New York, New York 10022 (Attn: Timothy B. DeSieno); (vi)

Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, New

York 10174-0208 (Attn: Andrew B. Eckstein and Rocco Cavaliere); (vii) Blank Rome

LLP, One Logan Square, Philadelphia, Pennsylvania 19103 (Attn: Regina Stango

Kelbon); and (viii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the

Americas, New York, New York 10019-6064 (Attn: Douglas A. Cifu and Jeffrey D.

Saferstein); and it is further

       ORDERED that objections to confirmation of the Plan that are not timely

filed, served, and actually received in the manner set forth above shall not be considered

and shall be deemed overruled; and it is further

       ORDERED that the Debtors shall complete the mailing of the Solicitation

Packages by no later than May 15, 2008 (the "Solicitation Date"); and it is further

       ORDERED that the Solicitation Packages distributed to creditors holding

claims in Class 4 (Allowed Prepetition First Lien Claims), Class 5 (Allowed Prepetition

Second Lien Claims), and Class 6 (General Unsecured Claims) (collectively, the "Voting Classes") shall contain a copy of (i) this Order (excluding the exhibits annexed hereto); (ii) the Confirmation Hearing Notice; (iii) the appropriate Ballot (with instructions), together with a return envelope; (iv) the Disclosure Statement (together with the Plan annexed thereto as Exhibit A); and (v) such other materials as the Court may direct; and it is further

ORDERED that the Solicitation Packages distributed to holders of claims and interests in the Unimpaired Classes or Non-Voting Impaired Classes shall contain a copy of (i) the Confirmation Hearing Notice and (ii) the appropriate form of Notice of Non-Voting Status; and it is further

ORDERED that the Debtors shall distribute, or cause to be distributed by the Solicitation Date: (i) this Disclosure Statement Order (excluding the exhibits thereto), (ii) the Confirmation Hearing Notice, (iii) the Disclosure Statement (together with the Plan annexed thereto as Exhibit A), and (iv) such other materials as the Court may direct to the Noticed Parties; and it is further

ORDERED that, with respect to holders of claims against or interests in the Debtors within a class under the Plan that is deemed to accept or reject the Plan under section 1126(f) or (g) of the Bankruptcy Code, the Debtors are not required to distribute copies of the Plan or Disclosure Statement to holders of such claims and interests unless a party makes a specific request to the Debtors in writing for same; and it is further

ORDERED that the Debtors shall not be required to send Solicitation Packages to creditors that have claims that have already been paid in full; provided, however, that if, and to the extent that, any such creditor would be entitled to receive a

Solicitation Package for any reason other than by virtue of the fact that such claim had

been paid by the Debtors, then the Debtors shall send such creditor a Solicitation Package

in accordance with the procedures set forth herein; and it is further

ORDERED that, with respect to addressees from which Disclosure

Statement Notices are returned as undeliverable by the United States Postal Service, the

Debtors are excused from mailing Solicitation Packages or any other materials related to

voting or confirmation of the Plan to those entities listed at such addresses unless the

Debtors are provided with accurate addresses for such entities before the Solicitation

Date, and failure to mail Solicitation Packages or any other materials related to voting or

confirmation of the Plan to such entities will not constitute inadequate notice of the

Confirmation Hearing or the Voting Deadline (as defined below) and shall not constitute

a violation of Bankruptcy Rule 3017(d); and it is further

ORDERED that a letter of support for the Plan from the Creditors'

Committee, substantially in the form annexed hereto as Exhibit 7, which form is

APPROVED, shall be distributed to all known holders of claims in Class 6 (General

Unsecured Claims) as of the Voting Record Date; and it is further

ORDERED that a Notice of Non-Voting Status – Unimpaired Classes,

substantially in the form annexed hereto as Exhibit 8, which form is APPROVED, shall

be distributed to all known holders of claims and equity interests in the Unimpaired

Classes as of the Voting Record Date; and it is further

ORDERED that a Notice of Non-Voting Status – Impaired Class,

substantially in the form annexed hereto as Exhibit 9, which form is APPROVED, shall

be distributed to the holders of equity interests in the Non-Voting Impaired Class as of the Voting Record Date; and it is further

ORDERED that the Notice of Non-Voting Status – Unimpaired Classes and the Notice of Non-Voting Status – Impaired Class (together, the "Notices of Non-Voting Status") each satisfy the requirements of the Bankruptcy Code and the Bankruptcy Rules; and it is further

ORDERED that all Ballots must be properly executed, completed, and delivered to the Epiq by first-class mail, overnight courier, or personal delivery, so that they are actually received by Epiq no later than 4:00 p.m. (Prevailing New York City Time) on June 9, 2008 (the "Voting Deadline"); and it is further

ORDERED that, solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim, and without prejudice to the rights of the Debtors in any other context, each claim within a class of claims entitled to vote to accept or reject the Plan is temporarily allowed in an amount equal to the amount of such claim as set forth in the Schedules, provided that:

(i)     If a claim is deemed allowed under the Plan, such claim is allowed for voting purposes in the deemed allowed amount set forth in the Plan;

(ii)    If a claim for which a proof of claim has been timely filed is, by its terms, contingent, unliquidated, or disputed, such claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such claim is disputed as set forth in subparagraph (vii) below;

(iii)   If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

(iv)    If a proof of claim was timely filed in an amount that is liquidated, non-contingent, and undisputed, such claim is temporarily allowed in the amount set forth on the proof of claim, unless such claim is disputed as set forth in subparagraph (vii) below;

(v)    If a claim is listed in the Schedules as contingent, unliquidated, or disputed and a proof of claim was not (a) filed by the applicable bar date for the filing of proofs of claims established by the Court or (b) deemed timely filed by an order of the Court prior to the Voting Deadline, unless the Debtors have consented in writing, such claim is disallowed for voting purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c);

(vi)    If a claim is listed in the Schedules or on a timely filed proof of claim as contingent, unliquidated, or disputed in part, such claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution; and

(vii)    If the Debtors have served an objection to or request for estimation of a claim at least ten (10) days before the Voting Deadline, such claim is temporarily disallowed for voting purposes only and not for purposes of allowance or distribution;

and it is further

ORDERED that if any claimant seeks to challenge the allowance or disallowance of its claim for voting purposes in accordance with the above procedures, such claimant is required to (a) serve on the Debtors and the Creditors' Committee and file with the Court (with a copy to chambers) a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim in a different amount for purposes of voting to accept or reject the Plan on or before the tenth (10th) day after the later of (i) service of the Confirmation Hearing Notice and (ii) service of notice of an objection or request for estimation, and if any, as to such claim, and (b) obtain an order from the Court authorizing such temporary allowance at a hearing to be held on such motion on the date of the Confirmation Hearing; and it is further

ORDERED that each creditor that votes to accept or reject the Plan is deemed to have voted the full amount of its claim therefor; and it is further

ORDERED that any entity that holds a claim in more than one class that is entitled to vote must use separate Ballots for each such claim; and it is further

ORDERED that in the event a creditor casts more than one Ballot voting the same claim(s) before the Voting Deadline, the last Ballot received before the Voting Deadline is deemed to reflect the voter's intent, and thus, supersedes any prior Ballots; and it is further

ORDERED that in the event a creditor casts a Ballot that is properly completed, executed, and timely returned to Epiq, but does not indicate either an acceptance or rejection of the Plan, shall be deemed to reflect the voter's intent to accept the Plan; and it is further

ORDERED that in the event a creditor casts a Ballot that is properly completed, executed, and timely returned to Epiq, but indicates both an acceptance and a rejection of the Plan, shall be deemed to reflect the voter's intent to accept the Plan; and it is further

ORDERED that the following types of Ballots will not be counted in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot, (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant, (iii) any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept

or reject the Plan, (iv) any unsigned Ballot, or (v) any Ballot transmitted to Epiq by

facsimile or other means not specifically approved herein; and it is further

ORDERED that the amount of a claim that shall count for voting purposes

shall be governed by this Order and not by any amount that may be filled in on any

Ballot; and it is further

ORDERED that the Debtors are authorized, in their sole discretion, to take

or refrain from taking any action necessary or appropriate to implement the terms of and

the relief granted in this Order without seeking further order of the Court; and it is further

ORDERED that the Debtors are authorized to make nonsubstantive

changes, to the Disclosure Statement, the Plan, and related documents without further

order of the Court, including, without limitation, changes to correct typographical and

grammatical errors and to make conforming changes among the Disclosure Statement,

the Plan and any other materials in the Solicitation Packages prior to mailing; and it is

further

ORDERED that the Debtors are authorized to include, at their discretion,

an appropriate letter of support by the Creditors' Committee to be included in the

Solicitation Package; and it is further

ORDERED that the Debtors are authorized to employ and retain Epiq as

their voting and tabulation agent on the terms and subject to the conditions set forth in the

letter agreement by and between the Debtors and Epiq dated as of January 18, 2008,

annexed to the Motion as Exhibit 10 (the "Epiq Agreement"); and it is further

ORDERED that the Debtors are authorized to compensate Epiq in accordance with the Epiq Agreement upon receipt of a reasonably detailed invoice, without the necessity of Epiq filing a formal fee application; and it is further

ORDERED that the hourly rates payable to Epiq in connection with its retention by the Debtors will be those rates set forth in the Agreement; and it is further

ORDERED that all notices to be provided pursuant to the procedures set forth herein are good and sufficient notice to all parties in interest of all matters pertinent hereto and of all matters pertinent to the Confirmation Hearing and no other or further notice need be provided; and it is further

ORDERED that the requirement pursuant to Local Rule 9013-1(b) that the Debtors file a memorandum of law in support of the Motion is waived.

Dated:   May 8, 2008
         New York, New York


/s/ Martin Glenn
HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

A:\ORDER (I) APPROVING THE DISCLOSURE STATEMENT.DOC

# Exhibit H



M 10-450

DISTRICT COURT
FILED
JUL 11 1984
S. D. OF N. Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Pursuant to Section 157(a) of the Bankruptcy

Amendments and Federal Judgeship Act of 1984, any or all

cases under title 11 and any or all proceedings arising

under title 11 or arising in or related to a case under

title 11 are referred to the bankruptcy judges for this

district.

So Ordered,

Robert J. Ward

ROBERT J. WARD
Acting Chief Judge

July 10, 1984

MICROFILM
JUL 11 1984